# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Catherine O'Meara, individually and as
Trustee for the Next of Kin of Thomas Byers
and on behalf of all others similarly situated,

                      *Plaintiff,*

                      v.

AW Distributing, Inc.,
AW Product Sales & Marketing, Inc.,
Shanghai AW Custom Manufacturing & Aerosol
Propellant Co., Ltd.,
Zhejiang Ludao Technology Co., Ltd.,
Jiangsu Sprayvan Commodity
Technology Development Co., Ltd.,
CRC Industries, Inc.,
Berwind Corporation,
The ODP Corporation,
ODP Business Solutions, LLC,
Office Depot, LLC,
OfficeMax North America, Inc.,
OfficeMax, LLC,
The Home Depot, Inc.,
Home Depot U.S.A., Inc.,
Menard, Inc., and
John Doe Company Defendants #1-10

                      *Defendants.*

---

**Case No. \_\_-cv-_____**

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

I.    INTRODUCTION ........................................................................................................ 1

II.   PARTIES ................................................................................................................... 15

III.  JURISDICTION & VENUE ..................................................................................... 24

IV.   FACTS ...................................................................................................................... 27

    A.    Tommy Byers' death......................................................................................... 27

    B.    The emergence of computer dusters as the most commonly abused inhalant—the data
reveals a public health crisis ..................................................................................... 33

        1. The National Survey on Drug Use and Health ................................................ 33

        2. The National Poison Data System .................................................................. 35

        3. The National Electronic Injury Surveillance System....................................... 39

        4. Though Curated for the Benefit of Computer Duster Manufacturers and Suppliers, Media
Reports Collected and Posted by the Alliance for Consumer Education Further Demonstrate
the Scope of the Intentional Inhalation Problem............................................... 41

        5. The Fox 9 Report .......................................................................................... 43

        6. Tommy's Law ............................................................................................... 44

        7. Joleen's Law ................................................................................................. 44

        8. Locally enacted bans on sales of computer duster........................................... 46

    C.    Intentional inhalation and the addictive nature of DFE – a deadly combination.............. 46

    D.    The numbers of deaths attributed to intentional inhalation are significant and rising...... 54

    E.    The CPSC has proposed a rule to ban DFE-based dusters ............................... 57

    F.    Content of the duster cans and subsequent addition of bitterant due to foreseeable use as
an inhalant......................................................................................................... 59

    G.    DB is ineffective at deterring intentional inhalation and may increase the risks of
intentional inhalation. ......................................................................................... 77

        1. DB—A bitter denaturant used to prevent accidental poisoning ...................... 77

        2. DB has not been added at the necessary concentration to deter abuse ............ 80

        3. Differences between accidental ingestion and intentional ingestion have been ignored.. 81

        4. Other considerations make DB an improper bitterant in this application........................ 84

    H.    Independent tests show that DB is not present in the quantity Defendants represent or at
the threshold level of detectability to most human subjects ................................... 86

V.    CLASS ACTION ALLEGATIONS ......................................................................... 89

VI.   CLAIMS FOR RELIEF ........................................................................................... 95

        COUNT I:      STRICT PRODUCTS LIABILITY – DESIGN DEFECT....................... 95

        COUNT II:     STRICT PRODUCTS LIABILITY – FAILURE TO WARN............... 101

        COUNT III:    STRICT PRODUCTS LIABILITY –MANUFACTURING DEFECT .. 105

        COUNT IV:     NEGLIGENCE ........................................................................ 108

COUNT V:    NEGLIGENCE ...................................................................... 115

COUNT VI:    BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY.... 118

COUNT VII:   BREACH OF EXPRESS WARRANTY .................................................. 121

COUNT VIII: PUBLIC NUISANCE ............................................................ 123

VII. NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES............................................. 127

VIII. PRAYER FOR RELIEF ........................................................................................... 127

Plaintiff Catherine Ann ("Katie") O'Meara, individually and as Trustee for the Next of Kin

of Thomas Alexander Ligouri ("Tommy") Byers and on behalf of all others similarly situated, for

her complaint against AW Distributing, Inc., AW Product Sales & Marketing, Inc., Shanghai AW

Custom Manufacturing & Aerosol Propellant Co., Ltd. (collectively, "AW" or "AW Defendants");

Zhejiang Ludao Technology Co., Ltd. ("Green Island"); Jiangsu Sprayvan Commodity

Technology Development Co., Ltd. ("Sprayvan"); CRC Industries, Inc. ("CRC"); Berwind

Corporation; The ODP Corporation, ODP Business Solutions, LLC, Office Depot, LLC,

OfficeMax North America, Inc., OfficeMax, LLC (collectively, "Office Depot" or "Office Depot

Defendants"); The Home Depot, Inc. and Home Depot U.S.A., Inc. (collectively, "Home Depot"

or "Home Depot Defendants"); and Menard, Inc. ("Menards"), alleges as follows:

## I.    INTRODUCTION

1.    Inhalant abuse is a rampant yet underreported public health crisis in the United

States. A recent national survey found that 2.4 million people aged 12 and over reported using

inhalants in 2020 alone. Of these individuals, 215,000 are estimated to have an inhalant abuse

disorder.[1] Yet, inhalant abuse has been termed "the forgotten epidemic."[2]

2.    Inhalants are extremely toxic to the human body and can have profound effects on

the nervous system and other organs.[3] Scientific research has shown that prolonged use can cause

---

[1] SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health, at 16, 27–29 and Table A.26B, available at www.samhsa.gov/data. *See also*, NATIONAL INSTITUTE ON DRUG ABUSE, How Are Inhalants Used?, Apr. 13, 2020, at 4.

[2] Carter Sherman, *Inhalants – The Easy to Acquire but Deadly Drug That Nobody Talks About*, HOUSTON PRESS, Sept. 6, 2016, at 3.

[3] NATIONAL INSTITUTE ON DRUG ABUSE, What are the Other Medical Consequences of Inhalant Abuse?, May 20, 2022, at 8–10, https://nida.nih.gov/publications/research-reports/inhalants/what-are-other-medical-consequences-inhalant-abuse.

neurological damage, resulting in cognitive abnormalities and permanent brain damage.[4] Exposure to these toxins can also cause damage to other organs and bodily systems, particularly to the heart, lungs, liver, and kidneys.[5]

3.      Despite carrying such extreme physiological risks, including death, the chemicals used in some categories of inhalants would seem innocuous to the average person. They may be colorless, odorless, and tasteless. Yet looks can be deceiving. These are highly addictive substances that can cause catastrophic injury, including brain damage or death, even to a first-time user.

4.      Moreover, inhalants are relatively inexpensive to manufacture and thus highly accessible as a means to get intoxicated. Gram for gram, inhalants may be the cheapest, easiest, and one of the fastest ways for a user to get "high," and these products can be purchased—in bulk—at the local hardware store, office supply store, grocery store or, in some cases, even the gas station.

5.      The most common cause of death from inhalants is cardiac arrest.

6.      Inhalants cause the heart to beat at an abnormal rate, known as cardiac arrhythmia, which also increases the heart's sensitivity to the hormone adrenaline. The body releases adrenaline as a response to stress. For a person intoxicated on inhalants, any sudden rush of fear, excitement, or surprise can result in cardiac arrest.[6]

---

[4] *Id.*

[5] *Id.*

[6] R.T. Shepherd, *Mechanism of Sudden Death Associated with Volatile Substance Abuse*, 8 HUMAN TOXICOLOGY 287, 287–91 (1989). *See also About Inhalants*, 7(2) PAEDIATRICS & CHILD HEALTH 93, 93–94 (2002), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2794702/#:~:text=Cardiac%20arrest%20%E2%80%93Chemicals,to%20inhalant%20abuse.

7.      Another common cause of death from inhaling is known as Sudden Sniffing Death Syndrome, which occurs when the gas component of aerosol blocks the body's normal flow of oxygen, also leading to cardiac arrest.[7]



8.      Intentional inhalation or "huffing" also contributes to motor vehicle accidents and drownings due to the user being intoxicated while driving or being near water while using inhalants.[8]

9.      Computer dusters are one of the most accessible and frequently used inhalants. Dusters are composed almost entirely of 1-1, Difluoroethane ("DFE"), an odorless gas listed as HFC-152a. When inhaled, DFE causes intense and immediate intoxication. The intoxication is short-lived and undetectable in workplace drug tests, which makes dusters a prime target for

---

[7] DRUGREHAB.COM, *Sudden Sniffing Death Syndrome*, www.drugrehab.com/addiction/drugs/inhalants/sudden-sniffing-death-syndrome/.

[8] Janet F. Williams, et al., *Inhalant Abuse*, 119 J. AM. ACAD. OF PEDIATRICS. 1009, 1009–17 (2007), available at www.pediatrics.org/cgi/doi/10.1542/peds.2007-0470.

intentional inhalation. Intentionally inhaling DFE also results in a loss of motor control and impaired judgment, leading to numerous accidents and deaths.

10.     Dusters are cheap and readily available at big-box retailers. Defendants are manufacturers, suppliers, and sellers who dominate the U.S. retail duster market. Upon information and belief, they are responsible for selling over ***20 million DFE dusters every year***—the bulk of which are sold to individuals seeking to get high, thus feeding a growing public health crisis. Industry sales are estimated to be over $160 million per year.

11.     During the relevant time period, Defendants' computer dusters cost as little as $5.00 per can. All are available in multipacks and do not feature warnings about inhalant addiction or guidance to prevent inhalant abuse. Defendants have worked to ensure that dusters continue to be sold without regard to a purchaser's age and without restriction on the number of cans purchased.

12.     AW designs, manufactures, tests, labels, markets, and distributes Ultra Duster. Ultra Duster is AW's trademark brand name.



13.     AW also private labels Ultra Duster on behalf of third parties. AW contracts with these third parties and, according to its website, places the third-party company's name on cans of

Ultra Duster or redesigns the Ultra Duster cans to reflect the third-party company's name or logo. Among the third-party brands that AW manufactures are Innovera and the Office Depot private-label brand duster. These dusters are identical in composition to Ultra Duster.




14.     Office Depot is actively involved in the design, manufacture, testing, labeling, marketing, and distributing of its private label duster product. The Office Depot brand duster is sold exclusively through Office Depot stores or via the Office Depot website. The Office Depot brand duster uses Office Depot Defendants' marks. On the Office Depot website, Office Depot Defendants list the manufacturer as Office Depot. OfficeMax is a subsidiary of Office Depot and sells Office Depot's private-label duster product in its stores.



15.      At all material and relevant times, AW and Sprayvan were Office Depot's vendors for its private label air duster products, and Green Island and Sprayvan, respectively, served as the factories for Office Depot's private-label air duster products, as shown in the table below:

| OD Private-Label Duster Product | Order Supplier | Factory Name |
|---|---|---|
| 10 oz, Single (SKU 911220) | Jiangsu Sprayvan Commodity Technology Co., Ltd. | Jiangsu Sprayvan Commodity Technology Co., Ltd. |
| 10 oz, Single (SKU 911220) | AW Product Sales & Marketing, Inc. | Zhejiang Ludao Technology Co., Ltd. (Green Island) |
| 10 oz, 3-Pack (SKU 911245) | Jiangsu Sprayvan Commodity Technology Co., Ltd. | Jiangsu Sprayvan Commodity Technology Co., Ltd. |
| 10 oz, 3-Pack (SKU 911245) | AW Product Sales & Marketing, Inc. | Zhejiang Ludao Technology Co., Ltd. (Green Island) |
| 3.5 oz, Single (SKU 911280) | Jiangsu Sprayvan Commodity Technology Co., Ltd. | Jiangsu Sprayvan Commodity Technology Co., Ltd. |
| 10 oz, 6-Pack (SKU 110284) | Jiangsu Sprayvan Commodity Technology Co., Ltd. | Jiangsu Sprayvan Commodity Technology Co., Ltd. |
| 10 oz, 6-Pack (SKU 110284) | AW Product Sales & Marketing, Inc. | Zhejiang Ludao Technology Co., Ltd. (Green Island) |
| 10 oz, 12-Pack (SKU 337994) | Jiangsu Sprayvan Commodity Technology Co., Ltd. | Jiangsu Sprayvan Commodity Technology Co., Ltd. |
| 10 oz, 12-Pack (SKU 337994) | AW Product Sales & Marketing, Inc. | Zhejiang Ludao Technology Co., Ltd. (Green Island) |

16.    CRC Industries designs, manufactures, tests, labels, markets, and distributes CRC Duster. CRC Duster is CRC Industries' trademark brand name.

 

17.    As of the filing of this Complaint, CRC Industries' 8oz DFE duster product has been discontinued. However, at all material and relevant times, CRC sold their DFE duster products. Upon information and belief, CRC Industries discontinued its DFE duster products after Tommy Byer's death. These products are included in one of CRC's products catalogs for 2023.[9] Additionally, remaining stock continues to be sold in stores and online by multiple retailers. CRC Industries' website lists stores where CRC Duster is still sold.

---

[9] 2023 CRC MRO Catalog at 5-6, https://www.crcindustries.com/media/catalogsandlabels/2023-CRC-MRO-Catalog.pdf (last accessed Sep. 26, 2025)



18.     Home Depot markets, distributes, and offers for sale CRC Duster brand computer duster products in its stores and via its website.





19.     Home Depot's website describes CRC Duster as a way to "safely" remove dust, dirt, and lint from electronic equipment "with a dry blast of air."



20.     At all material and relevant times, Menards marketed, distributed, and offered for sale Ultra Duster brand computer duster in its stores and via its website.



21.     Ultra Duster and the Office Depot private label duster are identical in composition—both are composed almost entirely of DFE and contain a trace amount of a bitterant known as denatonium benzoate ("DB").

22.     CRC Duster is composed entirely of DFE.

23.     Defendants have known for decades of the foreseeable danger of their DFE duster products. Rather than fix the defective design and adequately warn of foreseeable dangers, Defendants instead exploited a vulnerable population for their own gain. They are complicit in

creating the public health crisis of inhalant abuse. Defendants are aware of the extremely addictive nature of DFE yet continue to promote these cheap computer dusters for easy consumption by individuals addicted to DFE who frequent stores, again and again, often purchasing multiple cans on each visit.

24.     Defendants fail to provide a warning that intentionally inhaling DFE is extremely addictive, which increases the risk of injury and death to inhalant users. Defendants also do not provide any resources on their warning label on how to deal with inhalant addiction. And they falsely warrant that a bitterant is added which will help deter inhalant abuse.

25.     When Defendants started to receive pushback in the early 2000s related to the injuries and deaths from their products, they began to include the bitterant denatonium benzoate ("DB") in their cans of computer duster to forestall inquiry. For example, Walmart, another retailer for whom the AW Defendants manufactured a private-label computer duster product, specifically began requiring the addition of bitterant to the product in 2008 due to the increased intentional inhalation of duster products. However, the inclusion of DB—and Defendants' representations that the bitterant deters abuse—is misleading, deceptive, fraudulent, and unreasonably dangerous for multiple reasons.

26.     First, by design, in the manner and quantity in which it is added to computer dusters, DB has no meaningful impact because it is undetectable in the gas vapor phase. And, even if added in the quantity stated in patents, it would never trigger an actual deterrent effect upon intentional inhalation. To date, no scientific report provides evidence that DB deters inhalant abuse.

27.    As evidence of the failure of DB as a deterrent, injuries and deaths related to intentional inhalation have actually *increased exponentially* since the addition of the bitterant to these cans.[10]

28.    Second, all Defendants are aware that DB is among a class of bitter substances that a significant portion of the population cannot detect. Namely 15–30% of the adult population has a genetic trait which renders them incapable of detecting the bitter taste of certain molecules.[11] The AW, Green Island, Sprayvan, Menards, and Office Depot Defendants (collectively, the "Bitterant Defendants") whose products include DB fail to provide a warning that its bitterant could be undetectable in intentional inhalation scenarios.

29.    Finally, and perhaps most damning to the Bitterant Defendants' promises regarding the deterrent effect of the bitterant, DB is a bronchodilator which relaxes muscles in the lungs and widens the inhalant abuser's airways. As a result, DB *increases* the amount of DFE which the inhalant abuser might otherwise absorb into their lungs while intentionally inhaling. This operates to make intentionally inhaling the duster even riskier and more dangerous than it otherwise would be absent the bitterant.[12]

30.    All Defendants knew that: (1) DFE is extremely addictive and required a warning of its addictive nature due to the foreseeable use of the product for intentional inhalation, (2) the addition of DB did not deter the foreseeable intentional inhalation, (3) a significant portion of the

---

[10] Mathias B. Forrester, *Computer and Electronic Duster Spray Inhalation (Huffing) Injuries Managed at Emergency Departments*, 46 AM. J. DRUG ALCOHOL ABUSE 180, 180–83 (2020).

[11] U.S. CONSUMER PROD. SAFETY COMM'N, FINAL REPORT: STUDY OF AVERSIVE AGENTS 18 (1992).

[12] Brian E. Perron, et al., *Potentially Serious Consequences for the Use of Bitrex as a Deterrent for the Intentional Inhalation of Computer Duster Sprays*, 39 FORENSIC TOXICOLOGY 286 (2021), available at http://link.springer.com/10.1007/s11419-020-00559-2.

population cannot taste DB in any quantity, and (4) the inclusion of DB in any amount presented a greater risk to foreseeable intentional inhalation.

31.    Yet, despite these known problems with DB, the Bitterant Defendants warrant on each of their duster cans that the added bitterant will help to deter or discourage inhalant abuse, as shown in the images below. This warranty is false, intentionally misleading, and increases the danger to consumers.



*Figure 1 – Ultra Duster Warranty*



*Figure 2 – Office Depot/OfficeMax Warranty*

32.     In 2008, CRC Industries added DB to its duster product to, purportedly, deter misuse. During the period in which CRC Duster contained DB, CRC Industries provided a nearly identical warranty in its MSDS:

**Product Name: Duster™ Moisture-Free Dust & Lint Remover**
**Product Number (s): 05185, 05185-6**

product container.  No testing is required to certify compliance with the above

**State Regulations**

California Safe Drinking Water and Toxic Enforcement Act (Prop 65):

This product may contain the following chemicals known to the state of
California to cause cancer, birth defects or other reproductive harm:          None

State Right to Know:

New Jersey:       75-37-6
Pennsylvania:     75-37-6
Massachusetts:    75-37-6
Rhode Island :    75-37-6

**Additional Regulatory Information:**    This product contains a bittering agent to help to prevent inhalant abuse.

*Figure 3 – CRC Duster Warranty*

33.     All Defendants' labels are inadequate for multiple reasons, including insufficient or non-existent warnings about foreseeable dangers.

34.     Despite the ineffectiveness of the bitterant and the dangers of DFE, the Bitterant Defendants provided express assurances that DB would "discourage inhalant abuse."

35.     In 2012, unable to find any evidence that DB deterred intentional inhalation, CRC Industries removed the bitterant from its dusters. However, CRC Duster continued to be sold in its original design for over a *decade,* despite CRC Industries—and Home Depot—fully knowing that CRC Duster products were being intentionally inhaled. CRC Industries and Home Depot sold CRC Duster products for years *knowing* the products were dangerously defective and without any safety features.

36.     All Defendants only provide minimal, general warnings that abuse of the products "may be harmful" or "fatal," which the Bitterant Defendants then cancel out by reassuring consumers that their products were designed to prevent abuse. Additionally, no Defendants'

14

products provide *any* express warnings on addiction and the specific injuries that can result from intentional inhalation.

37.     When an individual passes away from cardiac arrest or Sudden Sniffing Death Syndrome attributed to intentional inhalation their official cause of death is generally termed "1,1 difluoroethane toxicity." Tommy Byers's official cause of death was volatile inhalant toxicity due to 1,1-difluoroethane.

38.     During the brief, debilitating weeks of his addiction, Tommy routinely huffed products manufactured and/or sold by each of the Defendants. He visited numerous retail stores to feed his addiction. Thus, each Defendant caused his fatal addiction, injuries, and subsequent death.

39.     In the days leading up to his death, Tommy purchased over $150 worth of dusters from a Home Depot store in Plymouth, Minnesota and a Menards store in Golden Valley, Minnesota. At the scene of Tommy's death—his apartment—police found cans of Ultra Duster, CRC Duster, and Office Depot private-label brand duster; receipts from Home Depot and Menards, and plastic bags from Home Depot, Menards, and OfficeMax.

40.     Tommy's death, and the deaths of many others, could have been avoided had Defendants not negligently and defectively designed, tested, labeled, marketed, and distributed their duster products.

## II.     PARTIES

41.     Plaintiff Katie O'Meara is an adult resident citizen of Hennepin County, Minnesota. Plaintiff is decedent Thomas "Tommy" Byers' legal and biological mother, legal heir, and was appointed Trustee for the Next-of-Kin of Thomas Byers, decedent, by the Hennepin County District Court on September 8, 2025. (A copy of the Order of Appointment is attached hereto as Exhibit A). Katie O'Meara is hereafter referred to as "Plaintiff" or "Plaintiff O'Meara." Tommy

15

Byers was a citizen of Minnesota at the time of his death and during all times that Defendants' products injured him.

42.    Defendant AW Distributing, Inc. ("AW Distributing") is a California corporation with its reported principal place of business at 204 E. 2nd Ave., Unit 343, San Mateo, California 94401. It represents that it may be served through its registered agent, Kennic Ho, at the same address. AW Distributing's reported principal place of business and location for service corresponds to a P.O. box at UPS Store #294 in San Mateo, California.

43.    Defendant AW Product Sales & Marketing, Inc. ("AW Product Sales") is a California corporation with its reported principal place of business at 204 E. 2nd Ave., Unit 343, San Mateo, California 94401. It represents that it may be served through its registered agent, Kennic Ho, at the same address. AW Product Sales' reported principal place of business and location for service corresponds to a P.O. box at UPS Store #294 in San Mateo, California.



*Figures 4 (left) and 5 (right) - AW Distributing's and AW Products Sales' Registration with the California Secretary of State as of August 2025.*



*Figure 6 – Address of UPS Store #294 as of September 2025.*

44.     The P.O. Box at UPS Store #294 has not been a viable address for AW for several years. In 2021, a letter from the San Mateo County Superior Court addressed to Kennic Ho's wife Alice Ho and sent to 204 E. 2nd Ave, #343, San Mateo was returned to sender as "not deliverable as addressed." *Blaine Boccignone v. AW & Ho (Holdings), Inc.*, 17-SCS-00668, Sup. Ct. San Mateo Cty. 2021.



*Figure 7 – Letter addressed to Alice Ho at the UPS Store address, marked as "not deliverable to addressed" in 2021.* Blaine Boccignone v. AW & Ho (Holdings), Inc., 17-SCS-00668, Sup. Ct. San Mateo Cty. 2021.

45.     Attempts in other cases to serve AW Distributing and AW Product Sales at the address represented for service of process have been unsuccessful. In December 2024, two unsuccessful attempts were made to serve the AW Defendants at 204 E. 2nd Avenue, #343, San

Mateo, California. The process server was unable to serve the AW Defendants because the address is a UPS mailbox, and the manager of the UPS store was unable to accept service on AW's behalf because they were "unknown to him."

46.     Upon information and belief, Defendant Shanghai AW Custom Manufacturing & Aerosol Propellant Co., Ltd. ("AW Custom Manufacturing") is a Chinese company based in Shanghai, China. China's Regulations on the Registration and Management of Enterprise Names require the names of Chinese companies to follow a specific format: (1) registered location, (2) brand name, (3) industry, and (4) company type.[13] AW Custom Manufacturing's name thus represents that it is a company (1) registered in Shanghai (2) with the brand name AW (3) which operates in the custom manufacturing and aerosol propellant industry (4) as a limited liability corporation. Safety Data Sheets for air dusters supplied by AW Distributing and AW Product Sales identify AW Custom Manufacturing as a manufacturer of the Subject Products.

47.     AW represents on its website that it is a "world-class industrial gas manufacturer offering the lowest and most competitive prices on compressed gas private labeling with the highest in product quality. We currently private label compressed gas for many small and large companies."

48.     AW also represents that it owns its manufacturing facilities. On its website, it states: "Due to the fact we own the factories in China gives us the ability to offer aerosol manufacturing for compressed gas at a much lower price than any aerosol filling facilities worldwide." And later claims, "AWD own its packaging and aerosol filling facilities in the Japan and in China. Our manufacturing facilities can promptly produce many customized products of various quantities."

---

[13] Sayari, *Breaking Down Chinese Company Names* (Feb. 27, 2019), https://sayari.com/resources/breaking-down-chinese-company-names/ (last accessed Sep. 25, 2025).

49.    AW set the design parameters for Ultra Duster's composition and label. It was Mr. Ho's decision to add a bitterant to the computer duster products.[14] Manufacturers and distributors "began using bitterant [in their computer dusters] based on the recommendations and instructions of [Kennic] Ho."[15]

50.    AW also set the design parameters by requiring its overseas suppliers to include the statement "contains a bitterant to help discourage inhalant abuse" on the Ultra Duster label.[16] On its website, AW represented that it provided "Complimentary Assistance with Label Design. Our design and marketing team is standing by to assist you."

51.    AW Distributing, AW Product Sales, AW Custom Manufacturing, and any of their affiliates, subsidiaries, successors or assigns are referred to collectively as "AW" or "AW Defendants."

52.    At all material and relevant times, AW Defendants designed, manufactured, tested, labeled, marketed, distributed, and placed in the stream of commerce Ultra Duster and private label versions of Ultra Duster, including but not limited to Innovera and Office Depot's/OfficeMax's private-label air duster product(s) for sale and use in the United States including within the State of Minnesota.

53.    Defendant Zhejiang Ludao Technology Co., Ltd. ("Green Island") is a company based in Zhejiang Province, China. Upon information and belief, it also does business under the names "Green Island," "Zhejiang Green Island Technology Co., Ltd.", and/or some variation

---

[14] Kennic Ho Dep. 113:1-4 (Feb. 15, 2016), *Michael Grieco et al. v. Amy Merrill et al.*, Case No. 502012CA021342 (Fla. 15th Cir. Ct.).

[15] Def. Daiho Sangyo, Inc.'s Answers to Plts. First Set of Interrogs., *Kelley et al. v. AW Distributing, Inc. et al.*, Case No. 420CV06942, Doc. 225-2, 23:11–14, 25:24–26:12 (N.D. Cal. Aug. 5, 2022).

[16] *Id.* 26:8–9.

thereof. Its principal place of business is No. 5 Industry Road, Hairun Street, Sanmen County, Taizhou, China. Upon information and belief, its general manager is Xiaobing Wang.

54. At all material and relevant times, on behalf of AW, Green Island also designed, manufactured, tested, labeled, marketed, distributed, and placed in the stream of commerce Ultra Duster and private label versions of Ultra Duster, including but not limited to Innovera and Office Depot's/OfficeMax's private-label air duster product(s) or products for sale and use in the United States including within the State of Minnesota.

55. Defendant Jiangsu Sprayvan Commodity Technology Development Co., Ltd. is a Chinese company. Its company phone number is 0086-025-8475 7136. Its principal place of business is located at Western Industrial Park, No. 1 Development Avenue, Maba Town, Xuyi County, Huai'An City, Jiangsu, China. Upon information and belief, its general manager is Li Xuhai.

56. At all material and relevant times, Sprayvan also designed, manufactured, tested, labeled, marketed, distributed, and placed in the stream of commerce Office Depot's private-label air duster product or products for sale and use in the United States including within the State of Minnesota.

57. Defendant CRC Industries, Inc. ("CRC Industries") is a Pennsylvania corporation with its principal place of business at 800 Enterprise Road, Suite 101, Horsham, Pennsylvania 19044. It may be served through its registered agent, CT Corporation System, at the same address.

58. Defendant Berwind Corporation ("Berwind") is a Pennsylvania corporation with its principal place of business at 2929 Walnut Street, Suite 900, Philadelphia, Pennsylvania 19104. It may be served through its registered agent, CT Corporation System, at the same address. Upon information and belief, CRC Industries is a wholly-owned subsidiary of Berwind Corporation.

59.     Berwind, as owner of CRC, has acted as Berwind's alter ego, dominating, managing, and controlling CRC's affairs as a shareholder, without regard to the separate existence of the corporate entity. Berwind has significant control of its subsidiaries. As it represents, Berwind "maintain 100% ownership in all of their operating companies and function[s] under a highly decentralized business model, offering operating management significant earned autonomy while providing financial, business and operational advice and assistance from a small, energized corporate team headquartered in Philadelphia."

60.     Berwind "actively manage[s]" its portfolio "to achieve an optimal mix of growth and cash," and presses portfolio companies for sustained revenue growth by "track[ing] and benchmark[ing] returns using a scorecard methodology, which is heavily weighted toward profit growth, while recognizing the importance of cash generation." Berwind "cultivate[s] companies to outperform the averages and use[s] *vigilant* scorecard practices to drive steady growth." (emphasis added).

61.     At all material and relevant times, CRC Industries designed, manufactured, tested, labeled, marketed, distributed, and placed in the stream of commerce CRC Duster for sale and use in the United States including within the State of Minnesota.

62.     Defendant The ODP Corporation is a Delaware corporation with its principal place of business at 6600 North Military Trail, Boca Raton, Florida 33496. It may be served by its registered agent, the Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801. Upon information and belief, The ODP Corporation is the parent corporation of ODP Business Solutions, LLC, Office Depot LLC, OfficeMax North America, Inc., and OfficeMax, LLC.

63.     Defendant ODP Business Solutions, LLC is a Delaware limited liability company with its principal place of business located in Boca Raton, Florida. It is registered to do business in Minnesota and may be served through its Minnesota registered agent, CT Corporation System, 1010 Dale St. N., Saint Paul, Minnesota 55117.

64.     Defendant Office Depot, LLC is a Delaware limited liability company with its principal place of business located in Boca Raton, Florida. It is registered to do business in Minnesota and may be served through its Minnesota registered agent, CT Corporation System, 1010 Dale St. N., Saint Paul, Minnesota 55117.

65.     Defendant OfficeMax North America, Inc. is an Ohio corporation with its principal place of business in Boca Raton, Florida. It is registered to do business in Minnesota and may be served through its Minnesota registered agent, CT Corporation System, Inc., 1010 Dale St. N., Saint Paul, Minnesota 55117.

66.     Defendant OfficeMax, LLC is a North Carolina-registered limited liability company with its principal place of business located in Boca Raton, Florida. It is registered to do business in Minnesota and may be served through its Minnesota registered agent, CT Corporation System, Inc., 1010 Dale St. N., Saint Paul, Minnesota 55117.

67.     Defendants The ODP Corporation, ODP Business Solutions, LLC, Office Depot, LLC, OfficeMax North America, Inc., and OfficeMax LLC are collectively referred to as "Office Depot" or "Office Depot Defendants."

68.     At all material and relevant times, the Office Depot Defendants designed, manufactured, tested, labeled, marketed, distributed, and/or sold Office Depot brand duster. The Office Depot Defendants offered dusters for sale and use in the United States including within the State of Minnesota. The Office Depot Defendants never took steps to meaningfully restrict the

availability of computer dusters in their store or track and monitor incidents involving computer dusters.

69.     Defendant The Home Depot, Inc. is a Delaware-registered corporation with its principal place of business at 2455 Paces Ferry Road, Atlanta, Georgia 30339. It may be served through its registered agent CSC of Cobb County, Inc. at 192 Anderson Street S.E., Suite 125, Marietta, Georgia 30060.

70.     Defendant Home Depot U.S.A., Inc. is a Delaware-registered corporation with its principal place of business at 2455 Paces Ferry Road, Atlanta, Georgia 30339. It is registered to do business in Minnesota and may be served through its registered agent Corporation Service Company, 2780 Snelling Avenue N., Suite 101, Roseville, Minnesota 55113.

71.     Upon information and belief, The Home Depot, Inc. is the parent company of Home Depot U.S.A., Inc. The two are collectively referred to as "Home Depot" or "Home Depot Defendants."

72.     At all material and relevant times, the Home Depot Defendants marketed, distributed, and/or sold computer dusters. The Home Depot Defendants offered dusters for sale and use in the United States including within the State of Minnesota. The Home Depot Defendants never took steps to meaningfully restrict the availability of computer dusters in their store or track and monitor incidents involving computer dusters.

73.     Defendant Menard, Inc. ("Menards") is a Wisconsin corporation with its principal place of business at 5101 Menard Drive, Eau Claire, Wisconsin 54703. It is registered to do business in Minnesota and may be served through its registered agent Prentice-Hall Corp. System Inc. at 2780 Snelling Avenue N., Suite 101, Roseville, Minnesota 55113.

74.     At all material and relevant times, Menards marketed, distributed, and/or sold DFE dusters for sale and use in the United States including within the State of Minnesota. Menards never took steps to meaningfully restrict the availability of computer dusters in its stores or track and monitor incidents involving computer dusters. In fact, Menards provided Tommy with an 11% rebate on his purchases of computer duster products.

75.     The ODP Corporation, ODP Business Solutions, LLC, Office Depot, LLC, OfficeMax North America, Inc., Office Max LLC, The Home Depot, Inc., Home Depot U.S.A., Inc., and Menard, Inc. are referred to collectively as the "Retailer Defendants."

76.     John Doe Company Defendants #1–10, whose specific identities are currently unknown to Plaintiff, are the individuals, business entities, and corporations within the chain of commerce that sold, distributed, designed and/or manufactured CRC Duster, Ultra Duster, and Office Depot private-label brand duster for marketing, sale, and distribution into the stream of commerce, including within the State of Minnesota, to Tommy Byers and other consumers and users. The pseudonymous designations are being used to preserve claims against these parties who will be named more fully if and when their identities are discovered.

### III.     JURISDICTION & VENUE

77.     <u>Subject Matter Jurisdiction</u>. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendants, and (4) there are more than 100 class members. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and (c), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff is diverse from Defendants.

78.    <u>Personal Jurisdiction</u>. The Court has personal jurisdiction over AW Distributing, Inc., AW Product Sales & Marketing, Inc., Shanghai AW Custom Manufacturing & Aerosol Propellant Co., Ltd., Zhejiang Ludao Technology Co., Ltd., Jiangsu Sprayvan Commodity Technology Development Co., Ltd., CRC Industries, Inc., Berwind Corporation, The ODP Corporation, ODP Business Solutions, LLC, Office Depot, LLC, OfficeMax North America, Inc., OfficeMax LLC, The Home Depot, Inc., Home Depot U.S.A., Inc., and Menard Inc. (collectively, "Defendants") because Defendants regularly conduct business in the State of Minnesota, sold their computer dusters in the State of Minnesota,  actively sought to serve the market for their computer duster products in the State of Minnesota, and/or committed acts which caused injury in Minnesota.

79.    Additionally, the Court has personal jurisdiction over ODP Business Solutions, LLC, Office Depot, LLC, OfficeMax North America, Inc., Home Depot U.S.A., Inc., and Menard, Inc. because each is registered to do business in the State of Minnesota and has appointed an agent for service of process in Minnesota, meaning each has "irrevocably consent[ed]" to service of process and personal jurisdiction in Minnesota. *Rykoff-Sexton, Inc. v. Am. Appraisal Assocs., Inc.*, 469 N.W.2d 88, 90 (Minn. 1991); Minn. Stat. § 303.01 *et seq.*

80.    The Court has personal jurisdiction over CRC Industries because CRC has employees in the State of Minnesota, including a Regional Sales Manager who is a resident of Minnesota, and because CRC's sales and marketing specifically and purposefully target the State of Minnesota.[17]

---

[17] *David McDougall v. CRC Industries Inc. et al*, Case No. 0:20-cv-01499-JRT-LIB, (Compl., Doc. 1, ¶18) (D. Minn., July 1, 2020); John Kochis, *LinkedIn*, https://www.linkedin.com/in/john-kochis-b5338433 (last visited Aug. 26, 2025).



81.    Minnesota law grants the Court personal jurisdiction over a foreign corporation or non-resident individual who "(1) owns, uses, or possesses any real or personal property situated in this state; or (2) transacts any business within the state; or (3) commits any act in Minnesota causing injury or property damage; or (4) commits any act outside Minnesota causing injury or property damage in Minnesota, subject to the following exceptions when no jurisdiction shall be found: (i) Minnesota has no substantial interest in providing a forum; or (ii) the burden placed on the defendant by being brought under the state's jurisdiction would violate fairness and substantial justice." Minn. Stat. § 543.19, Subd. 1.  All of the Defendants designed, marketed, manufactured, tested, labeled, and distributed their duster products for nationwide sale and consumption, including to some of the largest national retailers—none sought to avoid distribution and sale in Minnesota. Each sold millions of duster cans every year, including large numbers in Minnesota. Plaintiff's claims arise out of Defendants' tortious acts, committed both in and outside of Minnesota, which caused the death of a Minnesota resident in Minnesota. Thus, Minnesota has a substantial interest in providing a forum, and Defendants have established contacts in the State of

Minnesota sufficient to permit the exercise of personal jurisdiction, without violating fairness and substantial justice.

82.    <u>Venue</u>. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred in this judicial district, namely Defendants sold their respective computer dusters through representatives and resellers located in this judicial district, Tommy and the other decedents whose deaths give rise to the claims in this action purchased computer dusters from representatives and resellers located in this judicial district, and Tommy resided in this judicial district at the time of his death and intended to continue residing in this judicial district. Further, Defendants through their representatives and resellers, marketed, distributed, and sold their respective computer dusters to millions of consumers across the United States, including in the District of Minnesota.

## IV.    FACTS

### A.    Tommy Byers' death

83.    Tommy Byers was born on April 25, 1988. He began inhaling Defendants' computer duster products around September 2022 and quickly became addicted, his use intensifying by the end of October 2022. Within three weeks of starting to use Defendants' products, Tommy was dead.

 

84.     Tommy was Katie's only child. In 2016, he moved in with her to take care of her while she battled cancer. For over six years, Tommy was her emotional and financial support. He paid her car payments, cable, rent, groceries, and other expenses. He provided her with money to supplement her Social Security payments. He gave her gifts and cards. When Katie became dependent on a wheelchair because of her cancer treatment, Tommy cooked and cleaned for her.

  



85.     Tommy was a sommelier and Certified Specialist of Wine (CSW) who had worked at Bacio, an Italian restaurant in Minnetonka, for over a decade. As a Christmas present, Katie had wanted to surprise him with a trip to Italy to go wine tasting, something the two of them had always dreamed of. But Tommy's addiction was swift and devastating and he did not make it to that Christmas.



86.    Tommy Byers passed away in his bathroom between October 31 and November 1,

2022, slumped over next to a can of computer duster. He died with a load of laundry still in his

washing machine, his television on, and food defrosting in his kitchen. He was 34 years old.



87.    Cans of CRC Duster, Ultra Duster, and Office Depot private-label brand duster were found throughout Tommy's apartment, along with plastic bags from Home Depot, Menards, and OfficeMax. Receipts at the scene showed Tommy had purchased at least eight 8-oz cans of CRC Duster from Home Depot and at least twenty 12-oz cans of Ultra Duster from Menards between October 29 and 31, 2022.

88.    Each of these dusters, and the retailers who sold them, contributed to Tommy's addiction to DFE, injuries, and subsequent death.

89.    Tommy's death certificate lists "volatile inhalant toxicity (1,1-Difluoroethane toxicity)" as his cause of death. Tommy left behind grieving parents, Katie O'Meara and Thomas Richard Byers ("Tom Sr.").







**B.    The emergence of computer dusters as the most commonly abused inhalant—the data reveals a public health crisis**

### 1.    <u>The National Survey on Drug Use and Health</u>

90.    Tommy is not alone. The National Survey on Drug Use and Health ("NSDUH"), administered annually by the Substance Abuse and Mental Health Services Administration, found that 678,000 Americans initiated inhalant use in 2020.[18] Inhalants outpaced cocaine, sedatives, methamphetamine, and heroin as the choice of substance for first-time abuse.[19]

91.    Since 2020, the inhalant abuse epidemic has grown. NSDUH found that 688,000 Americans initiated inhalant use in 2024, likewise outpacing cocaine, heroin, LSD, PCP, ecstasy, methamphetamine, stimulants, and sedatives as the choice of substance for first-time abuse.[20] Of the drugs tracked by the NSDUH, only marijuana, hallucinogens, pain relievers, and tranquilizers saw more first-time use than inhalants in 2024.[21] In fact, there were more first-time users of inhalants in 2024 than there were first-time users of *cocaine, heroin, and methamphetamine combined*.[22]

92.    These statistics are not surprising considering that cocaine, methamphetamine, and heroin are illegal and sedatives are controlled substances, while most inhalants are neither illegal

---

[18] NSDUH is an authoritative source for epidemiological data on tobacco, alcohol, and drug use; mental health; and other health-related issues in the U.S. This survey is conducted in all 50 states and in the District of Columbia. *See* SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMINISTRATION, U.S. DEPT. HEALTH & HUMAN SERVICES, Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health, 25 (Oct. 2021).

[19] *Id*. at 23–25.

[20] SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMINISTRATION, U.S. DEPT. HEALTH & HUMAN SERVICES, *Results from the 2024 National Survey on Drug Use and Health: Detailed Tables*, Table 4.5B - Past Year Initiation of Substance Use, https://www.samhsa.gov/data/data-we-collect/nsduh-national-survey-drug-use-and-health/national-releases (2025)

[21] *Id.*

[22] *Id.*

nor controlled. Computer dusters, in particular, are inexpensive, readily available, and, in the vast majority of states even today, there are no controls on frequency of purchase or number of cans per purchase. No controls existed in Minnesota in 2022, when Tommy became addicted and died.

93.    In terms of overall inhalant use, the 2024 NSDUH found that among those individuals aged 12 or older, 3.2 million people reported using inhalants in the past year.[23] This figure is up from 2.6 million in 2023,[24] 2.4 million in 2020,[25] and 2.0 million in 2018.[26] The data from 2018 to 2023 represents *a 30% percent increase in yearly inhalant use over just five years.*[27] NSDUH did not include dusters as a discrete inhalant type in its survey until 2015. Prior to 2015, the survey only asked if individuals had abused any "other" products and relied upon the individual to recall computer dusters. When individuals were specifically asked whether they had abused computer dusters, a more accurate picture of intentional inhalation emerged—an exponential increase compared to the prior method of estimating. As shown below, including dusters in the

---

[23] SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMINISTRATION, U.S. DEPT. HEALTH & HUMAN SERVICES, Key Substance Use and Mental Health Indicators in the United States: Results from the 2024 National Survey on Drug Use and Health, 12 (July 2025).

[24] SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMINISTRATION, U.S. DEPT. HEALTH & HUMAN SERVICES, Key Substance Use and Mental Health Indicators in the United States: Results from the 2023 National Survey on Drug Use and Health, 16 (July 2024).

[25] SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMINISTRATION, U.S. DEPT. HEALTH & HUMAN SERVICES, Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health, 16 (Oct. 2021).

[26] *Id.* at 17.

[27] In 2024, the NSDUH's wording was changed slightly, asking respondents to report the use of inhalants "for fun or to get high" rather than "for kicks or to get high", which may have affected how some respondents self-reported inhalant use.  The figures for 2024 represent an approximately 23% increase from 2023 alone and a 60% increase from 2018. NSDUH Report 2024 at 12.

"other" category resulted in grossly underestimating the prevalence of intentional inhalation of computer dusters.[28]



### 2.    The National Poison Data System

94.    Data from the National Poison Data System ("NPDS") of the National Poison Control Center also shows alarming increases in duster use and resulting injury or death. A scientific study published in 2010 in the American Academy of Pediatrics found that while some

---

[28] *See* NSDUH, https://nsduhweb.rti.org/respweb/homepage.cfm.

types of inhalant use—such as sniffing gasoline or paint—have been declining since 1993, use of propellants like dusters has skyrocketed since 2003.[29]



95.     NPDS is a data warehouse for 55 poison control centers across the U.S. The results from this study involved human cases with an exposure route of inhalation with intentional use as a reason. Intentional use was defined as "an exposure resulting from the intentional, improper or incorrect use of a substance where the victim was likely attempting to achieve a euphoric or psychotropic effect."[30]

96.     An expert review of the NPDS data found that for the period of 1993 through 2008, the overall number of inhalant-related calls to poison control decreased by 33%. Yet, while there

---

[29] Melinda R. Marsolek, Nicole C. White, & Toby Litovitz, *Inhalant Abuse: Monitoring Trends by Using Poison Control Data*, 1993–2008, 125 PEDIATRICS 906, 906-913 (May 2010), available at https://publications.aap.org/pediatrics/article-abstract/125/5/906/72520/Inhalant-Abuse-Monitoring-Trends-by-Using-Poison?redirectedFrom=fulltext.

[30] *Id.*

was a general decline in inhalant use overall, there was a significant increase in use of propellants, with computer dusters being far and away the most commonly used propellant.[31]

The 25 Most Frequently Implicated Products Ranked According to Fatality Rate for All Single-Substance Cases

| Product | All | Major Effects | Deaths | Hazard Index[a] | Fatality Rate[b] |
|---|---|---|---|---|---|
| All substances | 30 094 | 705 | 167 | 29.0 | 5.5 |
| Butane | 620 | 19 | 36 | 88.7 | 58.1 |
| Propane | 270 | 9 | 7 | 59.3 | 25.9 |
| Air fresheners | 1239 | 22 | 27 | 39.5 | 21.8 |
| Nitrous oxide | 731 | 18 | 10 | 38.3 | 13.7 |
| Carburetor cleaners | 582 | 43 | 5 | 82.5 | 8.6 |
| Fluorocarbons/freon | 1631 | 59 | 14 | 44.8 | 8.6 |
| Dusters | 2457 | 69 | 13 | 33.4 | 5.3 |
| Nitrites/nitrates | 431 | 16 | 2 | 41.8 | 4.6 |
| Toluene/xylene | 1096 | 48 | 5 | 48.4 | 4.6 |
| Adhesive/glue | 1105 | 18 | 4 | 19.9 | 3.6 |
| Hair spray | 279 | 2 | 1 | 10.8 | 3.6 |
| Disinfectants | 347 | 4 | 1 | 14.4 | 2.9 |
| Polishes/waxes | 350 | 5 | 1 | 17.1 | 2.9 |
| Paint thinner | 458 | 14 | 1 | 32.8 | 2.2 |
| Typewriter correction fluid | 566 | 4 | 1 | 8.8 | 1.8 |
| Paint | 3036 | 80 | 5 | 28.0 | 1.6 |
| Gasoline | 4329 | 72 | 7 | 18.2 | 1.6 |
| Helium | 689 | 9 | 1 | 14.5 | 1.5 |
| Formalin/formaldehyde | 197 | 6 | 0 | 30.5 | 0.0 |
| Deodorant | 302 | 3 | 0 | 9.9 | 0.0 |
| Ethanol (nonbeverage) | 233 | 2 | 0 | 8.6 | 0.0 |
| Albuterol | 415 | 1 | 0 | 2.4 | 0.0 |
| Marker/ink | 419 | 1 | 0 | 2.4 | 0.0 |
| Nail polish remover | 182 | 0 | 0 | 0.0 | 0.0 |
| Nail polish | 160 | 0 | 0 | 0.0 | 0.0 |

[a] The hazard index was calculated as the number of cases that resulted in major effects or death per 1000 cases.
[b] The fatality rate was calculated as the number of cases that resulted in death per 1000 cases.

97.    To further illustrate the emergence of computer dusters as the drug of choice for inhalant users, Melinda Marsolek and her colleagues provided a breakdown of the 25 most frequently implicated inhalant products. According to this research, computer dusters ranked the

---

[31] *Id.*

7th most fatal inhalant product, ranked 3rd by all major effects, 4th by death, and 8th on the overall hazard index.[32]



Change in prevalence of propellant cases according to state, A, 2002–2004 vs B, 2006–2008.

98.    Another notable finding by Marsolek's study was the change in prevalence of propellants over four years by state—from 2002-2004 to 2006-2008. The data broken down by

---

[32] *Id.*

state showed a ***300% increase in total calls*** regarding propellants from 2003 to 2008. 47 states reported an increase, 14 states reported an exponential increase, and no states reported a decrease in total number of calls. And, again, the vast majority of these calls were attributed to use of computer duster.[33]

99.     Importantly, this data does not capture the full scope of computer duster use as some addicts seek treatment at acute care facilities, may die from cardiac arrest or Sudden Sniffing Death Syndrome, or forego treatment.

### 3.   The National Electronic Injury Surveillance System

100.     Data from the National Electronic Injury Surveillance System ("NEISS") is another resource which proves that the frequency of intentional inhalation has increased to the point of becoming a public health crisis.

101.     NEISS is a database maintained by the U.S. Consumer Product Safety Commission which catalogs injuries treated at a broad sampling of 100 hospital emergency departments which have at least 6 beds and 24-hour emergency care. Experienced coders review this data from emergency room ("ER") visits and enter demographic, injury, and treatment information into the NEISS database.[34] This database represents the core of the CPSC's Bureau of Epidemiology. A 2020 study by Mathias Forrester, published in the American Journal of Drug and Alcohol Abuse, used data from NEISS to estimate the number of ER visits due to use of dusters for the period 2001-2017.[35] Brian E. Perron, PhD, a Professor at the University of Michigan, updated Forrester's

---

[33] *Id.*

[34] U.S. CONSUMER PROD. SAFETY COMM'N, *National Electronic Injury Surveillance System (NEISS)*, https://www.cpsc.gov/es/Research--Statistics/NEISS-Injury-Data.

[35] Forrester, *supra* note 10, at 180–83.

findings through 2018 and included other inhalant types for comparison. The data shows that computer dusters account for more visits than all other categories of inhalants combined.



102. Overall, according to the analysis of NEISS records by Dr. Perron and Mr. Forrester, computer dusters accounted for more ER visits than any other inhalant on an annual

basis from 2011-2018.[36] Specifically, dusters account for 16,927 out of a total of 30,095 inhalant-related ER visits—56.2% of all inhalant-related ER visits.



4.   **Though Curated for the Benefit of Computer Duster Manufacturers and Suppliers, Media Reports Collected and Posted by the Alliance for Consumer Education Further Demonstrate the Scope of the Intentional Inhalation Problem**

103.   The Alliance for Consumer Education ("ACE") is a non-profit organization which was formed in 2000 by the Household and Commercial Products Association,[37] a trade

---

[36] *Id.*

[37] ACE, *Mission*, http://consumered.org/about [https://web.archive.org/web/20240709133433/https://www.consumered.org/about].

organization heavily supported by several of the Defendants.[38]

104.    ACE operates as a clearinghouse for media reports concerning inhalation abuse and purports to offer common sense suggestions to prevent inhalant abuse. [39] For example, ACE offers a tool kit including an inhalant abuse quiz and lesson plan for teachers about the dangers of inhalant abuse.[40]

105.    While ACE does report some data on the prevalence of inhalant abuse, its website makes no effort to track deaths attributed to intentionally inhaling computer dusters. Indeed, its website states: "[T]he number of lives claimed by inhalant abuse each year is unknown because these deaths often are attributed to other causes."[41] ACE makes no mention of the fact that acute 1,1-Difluoroethane intoxication is a cause of death specifically due to intentionally inhaling DFE, or that data tracking the number of annual deaths from this particular category is available upon request to individual medical examiners' offices.

106.    Nonetheless, ACE—the industry trade group—has repeatedly acknowledged media reports and press information demonstrating that intentionally inhaling DFE is addictive and is a

---

[38] ACE, *2017 Digital Annual Report*,
https://www.consumered.org/sites/default/files/20180821%20ACE%20Annual%20Report%20Page%20WEB.pdf
[https://web.archive.org/web/20240801134406/http://consumered.org/sites/default/files/20180821%20ACE%20Annual%20Report%20Page%20WEB.pdf].

[39] *See* ACE, https://www.consumered.org/
[https://web.archive.org/web/20240729031629/http://www.consumered.org/].

[40] ACE, *Teaching Resources*, https://www.consumered.org/programs/inhalant-abuse-prevention/teaching-resources

[https://web.archive.org/web/20240226194217/https://www.consumered.org/programs/inhalant-abuse-prevention/teaching-resources].

[41] ACE, *Data & Research*, https://www.consumered.org/programs/inhalant-abuse-prevention/data-research
[https://web.archive.org/web/20240227202325/https://www.consumered.org/programs/inhalant-abuse-prevention/data-research].

foreseeable use of computer dusters. Specifically, Brian E. Perron, PhD, analyzed the reports available on ACE's website through 2020 and found 1,012 reports of inhalant abuse attributed to computer dusters. This number far exceeded the reports attributed to all other types of inhalants combined.



5. **The Fox 9 Report**

107.     DFE duster abuse directly and specifically impacts Minnesota. As Fox 9 Minneapolis-St. Paul reported in 2018, "Minnesota men are dying from an inexpensive and easily accessible way to get high that appears to be perfectly legal."[42]

108.     The Fox 9 Investigators from KMSP made a public records request with the Hennepin County Medical Examiner in 2018 and uncovered sixteen deaths due to DFE products in the five previous years.[43] They were almost all men in their 30s and 40s.

109.     In 2018, the Hennepin County Medical Center's Poison Control Center reported to Fox 9 that they get about 300 calls a year about inhalants.

110.     In 2018, Fox 9 notified Menards of the problem and asked them for comment on their sale of the product.

---

[42] *Blown away: The perils of compressed air*, FOX 9 Minneapolis-St. Paul, (Nov. 5, 2018) https://www.fox9.com/news/blown-away-the-perils-of-compressed-air (last visited Sep. 3, 2025).
[43] *Id.*

### 6. **Tommy's Law**

111.  Following the tragic death of her son, Plaintiff campaigned for the passage of MN HF 3539, known as "Tommy's Law," to ban the sale of DFE computer dusters in excessive and unmonitored quantities across Minnesota. As director of the Minnesota Poison Control System Samantha Lee told the Minnesota House of Representatives, DFE dusters are "deceptively deadly" because they are "widely available at low-cost and usually not considered a poison or dangerous by the public[.]"[44]

112.  As of January 1, 2025, under Tommy's Law, retailers in Minnesota are required to keep DFE computer dusters behind the counter and are prohibited from selling more than three cans of duster in a single transaction. Retailers are also prohibited from selling computer dusters to those under the age of 21. Tommy's Law also introduces new labeling requirements for DFE dusters sold in Minnesota, requiring clearer warnings about the dangers of intentional inhalation.[45]

113.  Plaintiff will have to live the rest of her life without her son. But she fought for Tommy's Law, and continues to fight, to help ensure other parents in Minnesota will not have to suffer as she has, losing a child to DFE dusters.

### 7. **Joleen's Law**

1.  Minnesota is not the only state whose legislature has taken action against DFE dusters. On May 28, 2025, Oregon Governor Tina Kotek signed into law Oregon Senate Bill 1032 ("Joleen's Law"), which will take effect January 1, 2026.[46]

---

[44] Tim Walker, *House commerce panel advances bill to limit aerosols used in 'huffing'*, Minnesota House of Representatives - Session Daily (Feb. 26, 2024), https://www.house.mn.gov/sessiondaily/Story/18102.

[45] *Id.*; Corin Hoggard, *Minnesota huffing bill turns tragedy into triumph*, FOX 9 (July 9, 2024), https://www.fox9.com/news/minnesota-huffing-bill-turns-tragedy-triumph.

[46] https://gov.oregonlive.com/bill/2025/SB1032/ (last visited Sep. 3, 2025)

2.      Joleen's Law is named in honor of Joleen ("Jo") Braasch-Berry, a 26-year-old woman killed by a DFE duster-impaired driver in October 2020 while biking home from her job as an elementary school librarian.[47]  The driver was seen on security video only minutes before the accident, inhaling CRC Duster in a Home Depot parking lot.[48]

114.    Joleen's aunt Kim Braasch, along with family friend Ray Thomas, requested SB 1032 "to curtail future disasters." In Kim's words: "My heart goes out to families of people killed by inhaling Duster and the families of those imprisoned for inadvertently killing someone after inhaling Duster."

115.    Joleen's Law prohibits retailers in Oregon from selling or delivering DFE dusters to those under the age of 18, including through third-party delivery platforms, and from selling more than three DFE dusters to an individual in a single transaction. Retailers in Oregon will also be required to maintain their inventory of DFE dusters in a location not directly accessible to the public, to verify an individual's age through a government-issued ID, and to ensure that those receiving pick-up or delivery orders are at least 18 years old.[49]

---

[47] SB1032 Testimony in favor by Kim Braasch, https://olis.oregonlegislature.gov/liz/2025R1/Downloads/PublicTestimonyDocument/168745; Jonathan Masu, *Portland firm will file lawsuit against aerosol makers and sellers to protect road users from 'driving zombies',* BikePortland (Aug. 5, 2021)

[48] Jonathan Masu, *Portland firm will file lawsuit against aerosol makers and sellers to protect road users from 'driving zombies',* BikePortland (Aug. 5, 2021); Lisa Caballero, *Lawyers for deceased Salem cyclist say "duster" inhalants should be harder to buy*, BikePortland (Aug. 10, 2021).

[49] Enrolled Senate Bill 1032, 83rd Oregon Legislative Assembly – 2025 Regular Session, https://olis.oregonlegislature.gov/liz/2025R1/Downloads/MeasureDocument/SB1032

### 8. Locally enacted bans on sales of computer duster

116.    Issues related to intentional inhalation have also led to local bans on the sale of dusters altogether. Specifically, the small town of Bald Knob, Arkansas, population approximately 3,000, passed an ordinance in late 2020 banning the sale of computer dusters within city limits.[50]

117.    Police Chief Larry House reported that prior to the ban, the police were receiving 5-8 calls per week related to intentional inhalation. After the ordinance was passed instituting a ban, the calls related to intentional inhalation went to zero.

118.    The nearby town of Pangburn, Arkansas was reportedly considering instituting a similar ordinance banning sales of computer dusters.[51]

119.    Taken as a whole, this evidence points to an alarming increase in intentional inhalation which has impacted even communities across the U.S. including Minnesota. Intentionally inhalation of DFE dusters is a public health crisis.

### C.    Intentional inhalation and the addictive nature of DFE – a deadly combination

120.    According to the National Institute of Drug Abuse ("NIDA"), "addiction" is a chronic, relapsing disorder characterized by compulsive drug seeking, continued use despite harmful consequences, and long-lasting changes in the brain. "Abuse" is defined as misusing a substance to get high.

---

[50] Greg Geary, *Bald Knob Council Approves Banning Sale of Air Duster if City Legally Can*, WHITE CNTY. CITIZEN (Oct. 12, 2020), https://www.thedailycitizen.com/news/bald-knob-council-approves-banning-sale-of-air-duster-if-city-legally-can/article_ae0ccf7d-6f38-5474-8399-d7df401415d2.html?utm_medium=social&utm_source=email&utm_campaign=user-share. *See also* Greg Geary, *Bald Knob Council Goes Through with Ban on Sale of Air Duster Products*, WHITE CNTY. CITIZEN, https://www.thedailycitizen.com/news/bald-knob-goes-through-with-ban-on-sale-of-air-duster-products/article_3ed7df37-1a25-5146-9204-19d9fd19f1ee.html (last updated Dec. 7, 2020).

[51] Tara Thomas, *Pangburn Watching Bald Knob's Duster Ban*, WHITE CNTY. CITIZEN (Oct. 22, 2020), https://www.thedailycitizen.com/news/pangburn-watching-bald-knobs-duster-ban/article_53297891-adee-5f4a-9c31-71c100839517.html.

121.     If a person compulsively uses computer dusters and meets the Diagnostic and Statistical Manual of Mental Disorders ("DSM") criteria for inhalant use disorders, as shown below, the person would be assigned this disorder with a DFE specifier.

*Table 1 – Criteria for the diagnosis of inhalant use disorders from the 5th version of the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-5)*

**Diagnostic Criteria**

A. A problematic pattern of use of a hydrocarbon-based inhalant substance leading to clinically significant impairment or distress, as manifested by at least two of the following, occurring within a 12-month period:

  1. The inhalant substance is often taken in larger amounts or over a longer period than was intended.

  2. There is a persistent desire or unsuccessful efforts to cut down or control use of the inhalant substance.

  3. A great deal of time is spent in activities necessary to obtain the inhalant substance, use it, or recover from its effects.

  4. Craving, or a strong desire or urge to use the inhalant substance.

  5. Recurrent use of the inhalant substance resulting in a failure to fulfill major role obligations at work, school, or home.

  6. Continued use of the inhalant substance despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of its use.

  7. Important social, occupational, or recreational activities are given up or reduced because of use of the inhalant substance.

  8. Recurrent use of the inhalant substance in situations in which it is physically hazardous.

  9. Use of the inhalant substance is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance.

  10. Tolerance, as defined by either of the following:

      a. A need for markedly increased amounts of the inhalant substance to achieve intoxication or desired effect.

      b. A markedly diminished effect with continued use of the same amount of the inhalant substance.

*Specify* **the particular inhalant:** When possible, the particular substance involved should be named (e.g., "solvent use disorder").

122.     Per the NIDA, a substance is considered addictive if: (1) the substance impacts the brain's circuitry; and (2) changes produce compulsive use despite harmful consequences.

123.     At least 12 case studies support the broad consensus that DFE is highly lipophilic, crosses the blood-brain barrier, directly affects the central nervous system, stimulates the gamma-

aminobutyric acid ("GABA") receptors, and inhibits the N-methyl-D-aspartate ("NMDA")

receptors. These studies indicate that DFE meets the first element for being an addictive substance:

| Causal Explanation from Case Reports of Intoxication from DFE |
|---|
| "This refrigerant, used as a propellant in spray cans, is believed to exert its psychoactive effects by stimulating the GABA receptors and by inhibiting the NMDA receptors; other studies suggest that inhalants promote the release of dopamine in specific brain areas (Kurniali et al., 2012; Garland and Howard, 2012; Bass, 1970; Jevtovic-Todorovic et al., 1998 )..."[52] |
| "DFE is a central nervous system (CNS) depressant associated with a brief sensation of euphoria when inhaled. Prolonged or excessive use is associated with toxicity, and abrupt cessation can induce withdrawal ... DFE acts as a CNS depressant via glutamate and γ-aminobutyric acid receptors, causing a brief euphoria when inhaled."[53] |
| "Hydrocarbon inhalants rapidly access the central nervous system because of their lipophilicity. Here, these inhalants stimulate gamma-aminobutyric acid (GABA) receptors, causing inhibition in the central nervous system similar to the effects of ethanol. This can cause euphoria, disorientation, agitation, and impaired judgment. Because euphoria is often experienced, difluoroethane abuse is associated with patients presenting with anhedonia and other depressive symptoms, much like the patient of this case. It provides a rapid high which in turn dissipates within a matter of minutes, making it both highly desirable and highly dangerous for its abusers."[54] |
| The sought after euphoria or "high" can also be accompanied by central nervous system depression due to the extreme lipophilic properties of the gas and increased gamma-aminobutyric acid type A receptor affinity.[55] |
| "This compound has a high degree of lipophilicity which, when inhaled, crosses the blood brain barrier causing a state of euphoria and CNS depression. Serious toxicity from acute exposure is almost always from deliberate abuse or occupational exposure in a confined space, either from dysrhythmia or simple asphyxia from displacement of oxygen."[56] |

[52] Ermelinda Levari et al., *The Dangerous Use of Inhalants Among Teens: A Case Report*, 1 EMERGING TRENDS IN DRUGS, ADDICTIONS, AND HEALTH 100006, at 2 (2021).

[53] Adam Custer et al., *Difluoroethane Inhalant Abuse, Skeletal Fluorosis, and Withdrawal*, 37 FED. PRACTITIONER 288–89 (2020).

[54] Clara B. Novotny, Sarah Irvin & Eduardo D. Espiridion, *Acute Psychosis Following 1,1-Difluoroethane Inhalation*, 11 CUREUS e5565, at 2 (2019).

[55] Erika L. Faircloth, Jose Soriano & Deep Phachu, *Inhalation of 1-1-difluoroethane: A Rare Cause of Pneumopericardium*, 10 CUREUS e3503, at 1 (2018).

[56] Mohan Punja, Dennis Bradley Langston & Maurice Walter Smith, *Cryogenic Dermal Injuries to the Chest Secondary to Inhalational Abuse of Keyboard Cleaner*, 56 CLINICAL TOXICOL. 672, 672 (2018).

| |
|---|
| Inhaled DFE accumulates in high levels in the brain, causing euphoria, intoxication, and confusion.[57] |
| Dust Off [sic] contains 1,1-difluoroethane, a halogenated hydrocarbon that works similarly to other abused inhalant products. Inhalation avoids hepatic first-pass metabolism, and as a result generates high CNS concentrations and rapid onset of intoxication: euphoria, disinhibition, confusion, and in some cases obtundation.[58] |
| "It is known that they depress the central nervous system by stimulating γ-aminobutyric acid receptors and inhibiting N-methyl-D-aspartate receptors. Other studies suggest that inhalants causes in key regions of the brain."[59] |
| Like other volatile hydrocarbons, difluoroethane is lipophilic and quickly crosses the blood-brain barrier with immediate CNS effects. Peak blood concentrations occur 10-20 seconds after inhalation. The euphoric high that results from inhaling or "huffing" difluoroethane can last for 15-30 minutes. Clinical presentation varies and depends on dose and exposure time.[60] |
| As a halogenated hydrocarbon, 1,1-difluoroethane is well absorbed via the lung, and rapidly distributed to organs with high fat content such as brain. Due to its high blood gas partition coefficient, the onset of effects with inhalation of this substance can be as rapid as an intravenous injection although the peak effects may be delayed because of slower tissue diffusion."[61] |
| Inhalation of volatile hydrocarbons rapidly distributes them throughout the body, producing a quick "high" within seconds to minutes.[62] |
| The majority of hydrocarbons started their therapeutic use as anesthetics. The mechanism of action associated with the euphoria and disinhibition associated with hydrocarbon abuse is thought to involve N-methyl-d-asparate (NMDA) antagonism and/or gamma aminobutyric acid (GABA) stimulation. The NMDA receptor type that appears to be the most sensitive to solvents is also the most prevalent form in the brain during adolescence.[63] |

[57] Eric Cohen et al., *Rapid-Onset Diffuse Skeletal Fluorosis from Inhalant Abuse: A Case Report*, 4 JBJS CASE CONNECT e108, at 4 (2014).

[58] Kristen Calhoun et al., *Inhaling Difluoroethane Computer Cleaner Resulting in Acute Kidney Injury and Chronic Kidney Disease*, 2018 CASE REPORTS IN NEPHROLOGY 4627890 (2018).

[59] Peter C. Kurniali et al., *Inhalant abuse of computer cleaner manifested as angioedema*, 30 AM. J. EMERGENCY MED. 265.e3–5, 265.e3–4 (2012).

[60] C. Clinton Frazee et al., *Two Fatalities Involving 1,1-difluoroethane, in* TOXICOLOGY CASES FOR THE CLINICAL AND FORENSIC LABORATORY, 401, 402 (Hema Ketha & Uttam Garg, eds., 2020), available at https://linkinghub.elsevier.com/retrieve/pii/B9780128158463000806.

[61] Zhenggang Xiong et al., *Sudden Death Caused by 1,1-difluoroethane Inhalation*, 49 J. FORENSIC SCI., 627 (2004).

[62] H. Evan Dingle & Saralyn R. Williams, *Multi-Organ System Injury from Inhalant Abuse*, 23 PREHOSPITAL EMERGENCY CARE, 580, 581 (2019).

[63] Kathryn T. Kopec & Black Bauer, *ACMT Toxicology Visual Pearls: I'll Huff and I'll Puff…*, ALiEM (June 22, 2020), https://www.aliem.com/huffing/.

124.    Regarding the second element, "compulsive use" refers to a pattern of consumption that is stimulus-bound (*i.e.*, the person is seeking a reward), stereotyped (*i.e.*, repeated acts over time), and difficult to control.[64] "Harmful consequences" refers to disruptions in primary role functions in life (*e.g.*, relationships, employment, education) and negative impacts on a person's physical, mental, or emotional health.

125.    Real world case reports show that DFE's impact on the brain leads to compulsive use with harmful consequences:

| Narratives from Published Case Studies of Compulsive Behaviors Related to Intentional Inhalation |
|---|
| Inhalation of 16 cans of Dust-off [sic] in a single episode, including daily use for a few weeks[65] |
| Medical visit preceded by inhalation of 10 cans of Dust-off [sic] in a single episode[66] |
| Patient reported abusing a computer dust removal product "Dust Off" [sic] daily for the past 2 years. On day of presentation, he inhaled 10 cans[67] |
| Patient suffered a relapse and used 8 cans of Dust-Off® per day for 2 weeks[68] |
| Patient started to inhale this product 8 times daily for 7 years[69] |
| Patient self-reported a 6-month history of inhaling 20-25 cans of DFE per day[70] |

---

[64] S. T. Tiffany & B. L. Carter, *Is Craving the Source of Compulsive Drug Use?*, J. PSYCHOPHARMACOLOGY (Oxford, England), Vol. 12(1), 23–30 (1998), available at https://doi.org/10.1177/026988119801200104.

[65] A. Sidlak et al., *Severe cardiotoxicity and hypocalcemia from chronic inhalation of 1,1-difluorethane*, 57 CLINICAL TOXICOL. 1036 (2019).

[66] M. Patel et al., *Pneumomediastinum, acute kidney injury, rhabdomyolysis, and cryogenic dermal injuries secondary to inhalation abuse of keyboard cleaner*, 15 J. MED. TOXICOL. 78 (2019).

[67] K. Orjuela & V. Patil, *Duster abuse: A recurrent spell*, 14 EPILEPSY CURRENTS 164–65 (2014).

[68] I. Honkanen et al., *An unlikely source of periostitis*, 33 J. GENERAL INTERNAL MEDICINE 464 (2018).

[69] A.K. Gupta & G.M. Chan, *Chronic Difluoroethane Abuse Associated Peripheral Neuropathy Treated Successfully with Gabapentin*, 47 CLINICAL TOXICOL. 715 (2009).

[70] Custer, et al., *supra* note 53, at 288.

| |
|---|
| Patient was inhaling DFE every day, going through multiple 300 mL cans daily[71] |
| Patient reported abusing 9 to 11 cans daily for the previous 11 months[72] |
| Patient had been huffing up to 10 canisters daily for a period of 9 months[73] |
| Patient stated that the last thing he remembered was "huffing" 6-10 cans of the computer cleaning product, Dust-Off[74] |
| Patient admitted to an "inhalational binge" with at least 6 cans of this product over the past 3 days[75] |
| He admitted to huffing 2-7 cans of air dust cleaner on a weekly basis for 3 years[76] |

126.    The incidents described in each of these studies all occurred after Defendants introduced the bitterant DB into their computer dusters. Addition of a bitterant is discussed in Section G, *infra*.

127.    As demonstrated by these medical reports and studies, the compulsive behavior of inhaling DFE persisted despite very harmful consequences. Specifically, in addition to death from cardiac arrest or Sudden Sniffing Death Syndrome, the following medical conditions have been directly attributed to intentionally inhaling DFE: (1) skeletal fluorosis/bone deformities; (2) bone fractures from falls; (3) motor vehicle crashes; (4) chemical burns, blisters and rashes; (5) dysrhythmia; (6) toxic myopericarditis; (7) ventricular fibrillation, tachycardia and other cardiac

---

[71] Shiliang A. Cao et al., *Air Duster Inhalant Abuse Causing Non-ST Elevation Myocardial Infarction*, 12 CUREUS e8402, at 2 (2020).

[72] Alex Ponce et al., *Acute skeletal fluorosis in the setting of 1,1-difluoroethane abuse*, 57 CLINICAL TOXICOL. 374, 374 (2019).

[73] Regina Liu & Thomas Blair, *Skeletal Fluorosis and "Sniffer's Dermatitis" After Inhalant Abuse with 1,1-Difluroethane,* 23 PROCEEDINGS OF UCLA HEALTH (2019).

[74] Erika L. Faircloth et al., *Inhalation of 1-1-difluoroethane: A Rare Cause of Pneumopericardium*, 10 CUREUS e3503, at 2 (2018).

[75] Mohan Punja et al., *Cryogenic dermal injuries to the chest secondary to inhalational abuse of keyboard cleaner*, 56 CLINICAL TOXICOL. 672, 672 (2017).

[76] Katherine Peicher & Naim M. Maalouf, *Skeletal Fluorosis Due to Fluorocarbon Inhalation from an Air Dust Cleaner*, 101 CALCIFIED TISSUE INT'L, 545, 545 (2017).

dysfunction; (8) acute kidney injury and failure; (9) pneumomediastinum; (10) dyspnea; (11) seizures; (12) loss of motor control; and (13) psychosis.[77]

128.    The non-profit organization Families United Against Inhalant Abuse ("Families United") also tracks and reports the various harmful effects of intentionally inhaling DFE. Families United reports that, aside from causing death, intentional inhalation can lead to permanent brain damage, hearing loss, loss of smell, irregular heartbeat, liver damage, kidney damage, and bone marrow depression, as depicted on the following graphic.[78]

---

[77]  Clara B. Novotny et al., *Acute Psychosis Following 1,1-Difluoroethane Inhalation*, 11 CUREUS e5565 (2019).

[78] FAMILIES UNITED AGAINST INHALANT ABUSE, *Effects of Inhalant Abuse*, https://familiesunitedagainstinhalantabuse.org/our-story/effects-of-inhalant-abuse/ [https://web.archive.org/web/20231010055804/http://familiesunitedagainstinhalantabuse.org/our-story/effects-of-inhalant-abuse/] [hereinafter FUAIA, *Effects of Inhalant Abuse*].



129.    Moreover, recent research shows that intentionally inhaling DFE can lead to withdrawal psychosis.[79] Other studies have demonstrated that 47.8% of persons who met the criteria for inhalant dependence reported experiencing three or more inhalant-related withdrawal symptoms which were "clinically significant," a percentage nearly equivalent to the percentage of

---

[79] Custer, et al., *supra* note 53, at 288–89.

persons with cocaine dependence who reported clinically significant cocaine withdrawal symptoms.[80] This data indicates that DFE is highly addictive.

130.    The addictive nature of intentionally inhaling DFE, combined with the risks it poses creates a scenario similar to Russian Roulette every time a user inhales DFE. Cardiac arrest or Sudden Sniffing Death can occur the first time a duster is inhaled and lead to immediate death.[81] Non-fatal yet permanent damage to various organs, including permanent brain damage, can also occur as described above.[82]

### D.    The numbers of deaths attributed to intentional inhalation are significant and rising.

131.    The National Inhalant Prevention Coalition ("NIPC") reports that the number of inhalant-related deaths in the United States is approximately 100-125 people per year.[83] However, this number is far below the actual number of deaths. As the executive director for the Alliance for Consumer Education—the industry trade group—explained in a newspaper, inhalant-related deaths are underreported because many are recorded as something else.[84] Other researchers concur.

---

[80] Brian E. Perron et al., *The prevalence and clinical significance of inhalant withdrawal symptoms among a national sample*, 2 SUBSTANCE ABUSE AND REHABILITATION 69–76 (2011).

[81] M. Bass, *Sudden Sniffing Death*, 212 JAMA 2075–2079 (1970). *See also*, A. Groppi et al., *A Fatal Case of Trichlorofluoromethane (Freon 11) Poisoning. Tissue Distribution Study by Gas Chromatography-Mass Spectrometry*, 39 J. FORENSIC SCI. 871, 871–876 (1994); Xiong, *supra* note 61, at 627–29; J. Avella et al., *Fatal cardiac arrhythmia after repeated exposure to 1,1-difluoroethane (DFE)*, 27 AM. J. FORENSIC MED. PATHOL. 58, 58–60 (2006).

[82] FUAIA, *Effects of Inhalant Abuse*, *supra* note 78.

[83] Corey Reynolds, *How to Determine if a Death was Caused by Inhalants*, NAT'L TASC (Nov. 8, 2023), https://www.nationaltasc.org/determine-death.

[84] Carter Sherman, *Inhalants – The Easy to Acquire but Deadly Drug That Nobody Talks About*, HOUSTON PRESS (Sept. 6, 2016, 6:00 AM), https://www.houstonpress.com/news/inhalants-the-easy-to-acquire-but-deadly-drug-that-nobody-talks-about-8730670 [https://web.archive.org/web/20210801093232/https://www.houstonpress.com/news/inhalants-the-easy-to-acquire-but-deadly-drug-that-nobody-talks-about-8730670].

132.    Families United also tracks death statistics attributed to DFE inhalation. Their report is grim. In Virginia, Florida, Los Angeles and San Diego Counties in California, 17 counties in Pennsylvania, and Travis County, Texas alone, they found a total of 1,109 inhalant deaths from 2007 through 2019. Of these figures, an eye-popping *648 deaths* were attributed to DFE intoxication.[85]

133.    Perhaps the most compelling statistic on deaths attributed to DFE is from a clearinghouse maintained by the CPSC known as the Consumer Product Safety Risk Management System ("CPSRMS"), which is separate and distinct from NEISS. Between 2006 and 2022, CPSC received reports for 1,210 unique incidents involving inhalation hazards from aerosol dusters (of which 99.3% or 1,201 were fatal), and separately, 1,115 unique fatal incidents involving DFE toxicity (where dusters were not specifically mentioned, but were most likely the culprit). If all the remaining 1,115 DFE-related deaths can be attributed to dusters (which is likely based on anecdotal evidence referenced), this would amount to 2,324 aerosol duster incidents (including 2,316 fatalities) reported in CPSRMS.[86]

134.    The problem is getting worse. Over 80% of the duster inhalation incidents in CPSRMS occurred between 2013 and 2022. Similarly, 84% of the deaths attributed to DFE toxicity in CPSRMS occurred between 2013 and 2022.

---

[85] FAMILIES UNITED AGAINST INHALANT ABUSE, *Inhalant Deaths in US*, https://familiesunitedagainstinhalantabuse.org/inhalent-deaths-in-us/ [https://web.archive.org/web/20230325041644/https://familiesunitedagainstinhalantabuse.org/in halent-deaths-in-us/].

[86] U.S. CONSUMER PROD. SAFETY COMM'N, STAFF BRIEFING PACKAGE – AEROSOL DUSTER PETITION, July 26, 2023, at 14–17, available at https://www.cpsc.gov/s3fs-public/Petition-Requesting-Rulemaking-to-Establish-Safety-Standard-for-Aerosol-Duster-Products-Petition-CP-21-1.pdf?VersionId=.NohA6DG6WsXh_tsjhGuA7RuqMCOvxSW.

135.    The clearinghouse data reflects deaths in every state in the U.S., plus the District of Columbia and other U.S. territories. The CPSC data comes from death certificates and medical examiner and coroner reports, among other reliable sources. The states with the most aerosol duster inhalation incidents were Florida, Texas, California, Georgia, and Illinois. The states from which the most DFE-related death reports were received were Florida, Ohio, Pennsylvania, Illinois, and North Carolina. States with the most CPSRMS reports related to this analysis were Florida (222), Texas (121), Illinois (115), Ohio (105), Pennsylvania (105), and North Carolina (105). In Minnesota, there were a reported 38 aerosol duster inhalation incidents and 29 DFE-related deaths, the *11th* and *15th* highest in the country, respectively.  Upon information and belief, these numbers represent only the tip of the iceberg.[87]



Figure 3: Total CPSRMS Incidents Reported by State

# of Incidents (2006-2022): <10 | 10-24 | 25-49 | 50-99 | 100-149 | 150+

---

[87] *Id*. at 16–17, fig. 3.

136.    These figures undercount deaths for several reasons. First, there is a lag time between date of death and reporting to the CPSC.[88] Second, the tests for DFE are not part of the typical battery of tests performed during an autopsy. Acute 1,1-Difluoroethane intoxication is determined using a volatile test, which evaluates toxicity of the decedent's blood. A femoral blood sample is submitted to a reference laboratory for 1,1-Difluoroethane using a gas chromatograph/mass spectrometer. A case study co-authored by doctors at Children's Mercy Hospital, University of Missouri School of Medicine, and the Office of Jackson County Medical Examiner, all in Kansas City, Missouri, involving two deaths attributed to 1,1-Difluoroethane illustrates this problem. The authors write: "DFE is not typically included in routine postmortem toxicology screens and could be overlooked without appropriate scene investigation, case history and/or anatomical pathology findings."[89] This study and others like it have advocated for medical examiners to include volatile tests as part of routine autopsy screens to properly identify DFE-related deaths.

137.    Aside from delay in reporting and undercounting DFE-related deaths during autopsies, there are also numerous bystanders killed each year as a direct result of DFE abuse. Many of these bystanders are killed by vehicles operated by individuals driving under the influence of DFE. Yet, their deaths are not always attributed to DFE abuse.

**E.    The CPSC has proposed a rule to ban DFE-based dusters**

138.    On August 1, 2023, the CPSC voted 3-1 to grant a petition to initiate rulemaking "to adopt a mandatory safety standard to address the safety hazards associated with intentional

---

[88] *Id*. at 16.

[89] Frazee, *supra* note 60, at n.38.

inhalation of fumes from aerosol duster products" containing DFE.[90] Commissioner Trumka issued a statement in support of this action noting the abuse of duster cans "is a nationwide problem" and "one of the most abused substances among high school students"—the "social cost of injuries and deaths from aerosol duster abuse stands at over $1 billion per year." [91]

139.    On July 30, 2024, the CPSC published a notice of proposed rulemaking that would declare "any aerosol duster products that contain more than 18 mg in any combination of HFC-152a and/or HFC-134a" as "banned hazardous substances under the Federal Hazardous Substances Act (FHSA)."[92]

140.    The CPSC has proposed the rule to address the "deaths and injuries associated with the propellants HFC-152a [1,1-difluoroethane] and HFC-134a [1,1,1,2-tetrafluoroethane] used in aerosol duster products."[93]

141.    When broken down per can sold, the societal cost of the aerosol duster epidemic exceeds $50 per can. And this figure excludes property damages and injuries or fatalities of bystanders injured due to intentional inhalation.

---

[90] *See* U.S. CONSUMER PROD. SAFETY COMM'N, RECORD OF COMMISSION ACTION, Aug. 2, 2023, available at https://www.cpsc.gov/s3fs-public/RCAPetitionRequestingRulemakingtoEstablishSafetyStandardforAerosolDusterProductsPetitionCP21_1.pdf?VersionId=nQcgEM4wvCJE97zmhwYCdAkwuluYerIt (Families United was the petitioner in this matter).

[91] *Id*.

[92] Banned Hazardous Substances: Aerosol Duster Products Containing More than 18 mg in Any Combination of HFC-152a and/or HFC-134a, 89 Fed. Reg. 61363 (proposed July 30, 2024) (to be codified at 16 C.F.R. pt. 1500).

[93] *Id.*

**F.**     **Content of the duster cans and subsequent addition of bitterant due to foreseeable use as an inhalant.**

142.    During all times relevant to this case, Defendants designed, tested, labeled, marketed, and distributed Ultra Duster, CRC Duster, and/or Office Depot private label duster for sale across the United States, including in the State of Minnesota and each of the other 49 states and territories.

143.    Defendants were responsible for designing, manufacturing, testing, labeling, marketing and distributing the cans of computer duster that addicted, injured, and killed Tommy Byers.

144.    Defendants contract with big box retailers across the United States and in the Minneapolis, Minnesota area to stock and sell their dusters to consumers, many of whom purchase these products in multiple quantities and on a repeated basis to intentionally inhale. To maximize profit, Defendants offer their dusters for sale in multi-packs of up to 12 or more cans for as little as $1.89 per can. A single can deliver up to 100 "hits" of DFE, making it among the cheapest and most readily available drugs.

145.    Defendants prominently market their computer dusters on endcaps and near check out areas with prominent signage.

146.    Per the product's Safety Data Sheets, Ultra Duster is comprised 100% of 1,1-Difluoroethane.

# MSDS - SAFETY DATA SHEET

**Ultra Duster**
**10/25/2023**

## SECTION 1 - IDENTIFICATION

**Product Name:** Ultra Duster
**Trade Name/Chemical Name:** HFC-152a / Difluoroethane, R152a
**Mfg. Model No.:** UDS
**Recommended Use:** Remove dust and small particle
**Restrictions On Use:** Read back panel on can carefully before use.
          Keep out of reach of children. Misuse by deliberately concentrating and
          inhaling contents may be harmful or fatal
**Manufacturer:** SHANGHAI AW CUSTOM MANUFACTURING &AEROSOL PROPELLANT CO., LTD.
**Product Supplied By:** AW Product Sales & Marketing, Inc.
**Address:** 204 E. 2nd Ave #343, San Mateo, CA 94401
**Phone #:** 1-415-867-7734
**Emergency Phone #: Chemtrec 1-800-424-9300**

## SECTION 9 – PHYSICAL AND CHEMICAL PROPERTIES

**Boiling Point (°F)** -25 C (-13F) **Specific Gravity (H2O=1)**
**Vapor Pressure (MM Hg)** 87 psia at 25 deg C (77deg F)
**Percent Volatile by Vol.** 100 WT %
**Vapor Density (Air=1)** 2.4 at 25 deg C (77 deg F) **Density** 0.90 g/cc at 25 deg C (77deg F) - Liquid
**Solubility in Water** 0.28 WT% at 25 deg C (77deg F)
**Evap Rate (Ether = 1)**

147.    The Office Depot Defendants and CRC Industries publish very similar Safety Data Sheets for their trademark branded dusters.

148.    Below is the Safety Data Sheet for the Office Depot private label duster, manufactured by the AW Defendants, available on Office Depot's website:

**OFFICE Depot (Canned-Air/Compressed Gas) Duster**
-SKU# 911220 (Net 10Oz) Can
-SKU# 911245 (Net 10Oz) 3-Pack
-SKU# 110284 (Net 10Oz) 6-Pack
-SKU# 911280 (Net 3.5Oz) Can
-SKU#337-994 (Net 10Oz) 12-Pack

**SAFETY DATA SHEET**
**DUSTER OFFICE DEPOT**
1/17/2017

**SECTION 1 - IDENTIFICATION**
**Product Name:** DUSTER OFFICE DEPOT
**Trade Name/Chemical Name:** HFC-152a / Difluoroethane, R152a
**Mfg. Model No.:** ODP
**Recommended Use:** Remove dust and small particle
**Restrictions On Use:** Read back panel on can carefully before use.
                        Keep out of reach of children. Misuse by deliberately concentrating and
                        inhaling contents may be harmful or fatal
**Manufacturer:** SHANGHAI AW CUSTOM MANUFACTURING &AEROSOL PROPELLANT CO., LTD.
**Product Supplied By:** AW Distributing, Inc.
**Address:** 2024 Middlefield Rd., Redwood City, CA 94063
**Phone #:** 1-415-867-7734

**SECTION 3 – COMPOSITION/INFORMATION ON INGREDIENTS**
**Ingredients CAS # % TLV PEL UNITS**

1,1-Difluoroethane 75-37-6 100
Contains: Bitterant

149.    Below is the Safety Data Sheet for Office Depot private label duster, manufactured by Sprayvan:

**MATERIAL SAFETY DATA SHEET**



| Product number | OFFICE DEPOT  SKU# 110284# / 10 oz / pack of 6 |
| | OFFICE DEPOT  SKU# 337994# / 10 oz / pack of 12 |
| | OFFICE DEPOT  SKU# 911220# / 10 oz / singel pack |
| | OFFICE DEPOT  SKU# 911245# / 10 oz / pack of 3 |
| | OFFICE DEPOT  SKU# 911280# / 3.5 oz / singel pack |

### 1. Product and Company Identification

| | |
| --- | --- |
| Product name | Cleaning duster |
| Effective date | 18-Jan-2022 |
| Company information | Jiangsu Sprayvan Commodity Technology Development Co.,Ltd. |
| Company phone | 0086-025-8475 7136 |
| Version # | 02 |
| Supersedes date | 28-Oct-2018 |

### 3. Composition / Information on Ingredients

| Components | CAS # | Percent |
| --- | --- | --- |
| 1,1 Difluoroethane | 75-37-6 | > 99.5 |
| Non-hazardous and other components below reportable levels | | > 0.5 |
| Composition comments | This product is considered not hazardous under 29 CFR 1910.1200 (Hazard Communication). | |

150.    Below is the Safety Data Sheet for CRC Duster, manufactured by CRC Industries:



# SAFETY DATA SHEET

## 1. Identification

| | |
|---|---|
| Product identifier | Duster™ |
| Other means of identification | |
| Product code | No. 05185 (Item# 1003746) |
| Recommended use | Pressurized gas duster |
| Recommended restrictions | None known. |
| Manufacturer/Importer/Supplier/Distributor information | |
| Manufactured or sold by: | |
| Company name | CRC Industries, Inc. |
| Address | 885 Louis Dr. |
| | Warminster, PA 18974 US |
| Telephone | |
| General Information | 215-674-4300 |
| Technical Assistance | 800-521-3168 |
| Customer Service | 800-272-4620 |
| 24-Hour Emergency | 800-424-9300 (US) |
| (CHEMTREC) | 703-527-3887 (International) |
| Website | www.crcindustries.com |

## 3. Composition/information on ingredients

**Mixtures**

Material name: Duster™                                                      SDS US
No. 05185 (Item# 1003746)   Version #: 01   Issue date: 08-24-2017          1 / 7

| Chemical name | Common name and synonyms | CAS number | % |
|---|---|---|---|
| 1,1-difluoroethane | HFC-152a | 75-37-6 | 100 |

151.    The AW Defendants, Green Island Defendants (on behalf of AW), Sprayvan Defendants (on behalf of Office Depot), and Office Depot Defendants also place a warranty on the back of their duster cans. They state on their Ultra Duster and Office Depot private label duster cans: "Contains a bitterant to help discourage inhalant abuse." CRC Duster, during the period it contained bitterant, warranted, at least in its Safety Data Sheet, that "[the] product contains a bittering agent to help prevent inhalant abuse." Pictures of the warranties are set forth in I. Introduction, *supra*.

152.    Numerous cases have been filed against Defendants alleging wrongful death, products liability, and related claims arising from inhalation of DFE.

153.    In one such case, *McDougall v. CRC Industries, Inc. et al*, CRC's corporate representative Adam Selisker testified in a deposition that CRC Industries had been aware of DFE's intoxicating effects since the product was first sold in 2000.[94]

| | | |
|---|---|---|
| 09:38:58 | 2 | **Q.** Similar to the effect on the human body that |
| 09:39:01 | 3 | an individual would feel if they were applied |
| 09:39:05 | 4 | anesthesia in a medical setting; correct? |
| 09:39:08 | 5 | **A. Yes. Also I -- actually I should add** |
| 09:39:16 | 6 | **narcosis as well.** |
| 09:39:18 | 7 | **Q.** Okay. Is that it? I need to know all of |
| 09:39:22 | 8 | the effects that CRC knew of and understood could |
| 09:39:29 | 9 | result from inhaling difluoroethane. |
| 09:39:33 | 10 | **A. I think that's -- that's our.** |
| 09:39:38 | 11 | **Q.** Okay. What is "narcosis"? |
| 09:39:41 | 12 | **A. A -- An effect that like a drug would have.** |
| 09:39:43 | 13 | **Q.** All right. How long has CRC known of or |
| 09:40:02 | 14 | understood that the effects you have identified could |
| 09:40:07 | 15 | result from inhaling difluoroethane? |
| 09:40:12 | 16 | **A. I would say since we started to use the** |
| 09:40:14 | 17 | **product in 2000'ish, around 2000. And when I say "the** |
| 09:40:20 | 18 | **product," I mean 152a.** |
| 09:40:22 | 19 | **Q.** Thank you. |
| 09:40:23 | 20 | The sole ingredient in the CRC Duster; |
| 09:40:25 | 21 | correct? |
| 09:40:25 | 22 | **A. Yes.** |

154.    Despite being aware of the harms of DFE from the very beginning, CRC Industries did not monitor or track the intentional inhalation of its DFE-based computer duster for nearly *two decades*.[95]

---

[94] Adam Selisker Dep., 29:13–18, Feb. 15, 2015, *David McDougall v. CRC Industries Inc. et al*, Case No. 0:20-cv-01499-JRT-LIB (D. Minn.).

[95] *Id.* at 83:6–22.

```
11:06:03  6   in.  I'm asking about what policies or procedures CRC
11:06:08  7   has had in place that were established for the purpose
11:06:16  8   of monitoring and tracking inhalation abuse of CRC
11:06:21  9   Duster.
11:06:21  10        A.   We don't have a specific policy and
11:06:23  11  procedure for that.
11:06:24  12        Q.   And that's true prior to 2019; correct?
11:06:27  13        A.   Yes.
11:06:28  14        Q.   And it was --
11:06:29  15             And it's true from the entire period 2000 to
11:06:32  16  2019; correct?
11:06:33  17        A.   Yes.
11:06:34  18        Q.   All right.  So just so I'm clear, someone
11:06:38  19  could inhale CRC Duster in someplace like New Jersey,
11:06:45  20  get hurt, and unless somebody called and told CRC, CRC
11:06:50  21  wouldn't know about it; correct?
11:06:53  22        A.   We wouldn't know about it.
```

155.   Still, in response to outside reports of inhalant abuse, CRC began adding DB to its duster products as a deterrent in 2008, following a recommendation at a trade association meeting between 2006 and 2007.[96]

```
09:46:29  23        A.   First, we understood that it could be an
09:46:36  24  attempt to help prevent inhalant abuse.  We understood
09:46:41  25  that some association -- We understood that from some
                        STIREWALT & ASSOCIATES
                    1-800-553-1953  info@stirewalt.com
                                                              34
09:46:46  1   associations inhalant abuse was a problem, and adding
09:46:50  2   bitterant could be a way to prevent the misuse of a
09:46:53  3   duster.
```

---

[96] *Id.* at 33:23–34:3, 35:5–15, 37:17–38:18. The Consumer Specialty Products Association ("CSPA") is now known as the Household & Commercial Products Association ("HCPA").

09:48:43  5      Q.    When was the bitterant first introduced to
09:48:48  6   the CRC Duster?
09:48:52  7      A.    I don't have the exact date, but in the --
09:48:54  8   in -- in and around 2007, I believe, or '8.  Somewhere
09:48:58  9   in that timeframe.  I'd have to look at the actual
09:49:01  10  specification documents.
09:49:03  11     Q.    All right.  Certainly before 2019; correct?
09:49:06  12     A.    Yes.
09:49:07  13     Q.    All right.  What was the bitterant that was
09:49:09  14  added?
09:49:11  15     A.    Denatonium benzoate.

09:51:32  17     A.    When we heard about the potential to use
09:51:34  18  denatonium benzoate, I believe we heard it at a CSPA
09:51:40  19  meeting, somewhere in that timeframe, as I mentioned
09:51:45  20  earlier, it was presented to us and presented as a
09:51:51  21  good al -- a good -- a good bitterant to use for this
09:51:56  22  use.
09:51:58  23     Q.    What is CPSA, sir?  What's it stand for?
09:52:01  24     A.    CSPA, Consumer Specialty Products
09:52:04  25  Association.

38

09:52:05  1      Q.    That is a trade association for those
09:52:10  2   involved in the sale of consumer products; correct?
09:52:14  3      A.    Yes.
09:52:15  4      Q.    Including aerosols; correct?
09:52:17  5      A.    Yes.
09:52:17  6      Q.    All right.  Did you tell me if you knew the
09:52:23  7   date or CRC knows the date of when this presentation
09:52:28  8   was given at a CSPA gathering?
09:52:33  9      A.    I didn't have an exact date for you.
09:52:35  10     Q.    Do you have a rough timeframe?
09:52:37  11     A.    I --
09:52:38  12           Late 2006/early 2007, somewhere in that
09:52:42  13  area, I believe.
09:52:51  14     Q.    What is CRC's knowledge and understanding of
09:52:54  15  the use of denatonium benzoate in dusters manufactured
09:52:59  16  by other companies?
09:53:02  17     A.    We understand that they use it, but that's
09:53:06  18  about the extent of our understanding.

156.    However, CRC Industries later removed DB from their duster product because neither CRC Industries nor DuPont, the patent holder, had *any* evidence that DB was effective at preventing inhalant abuse.[97]

| | | |
|---|---|---|
| 10:04:10 | 16 | Q.    All right.  So tell me, please, all the |
| 10:04:16 | 17 | reasons why CRC decided to stop adding a bitterant to |
| 10:04:21 | 18 | the CRC Duster. |
| 10:04:24 | 19 | A.    Okay.  I'm going to check my notes. |
| 10:04:26 | 20 | Q.    Yes. |
| 10:04:27 | 21 | A.    CRC chose to remove the bitterant as we did |
| 10:04:30 | 22 | not have evidence that it was actually preventing |
| 10:04:33 | 23 | inhalant abuse of Dusters.  Recently we recalled a |

| | | |
|---|---|---|
| 10:08:14 | 8 | Q.    All right.  Did CRC ever inquire of DuPont |
| 10:08:21 | 9 | asking for evidence or proof that the bitterant was in |
| 10:08:26 | 10 | fact effective in deterring misuse? |
| 10:08:28 | 11 | A.    We did. |
| 10:08:29 | 12 | Q.    What did you learn? |
| 10:08:31 | 13 | A.    We learned that they did not have specific |
| 10:08:33 | 14 | evidence that supported that it actually did deter |
| 10:08:38 | 15 | inhalant abuse. |

---

[97] *Id.* at 46:16–23, 49:8–15.

157.    In another deposition in *McDougall*, Michelle Rudnick, CRC Industries' Global Director for Regulatory Affairs CRC Industries, confirmed that CRC Dusters manufactured after 2012 do not contain any bitterant.[98]

```
13:21:44   5        Q.   All right.  And with respect to 152a-based
13:21:49   6    Duster, you would agree that this document tells us
13:21:55   7    that as of June twenty -- June 28, 2012, all remaining
13:22:02   8    cans referring to bitterant would be exhausted;
13:22:07   9    correct?
13:22:09   10       A.   That...
13:22:20   11            That was correct, yes.
13:22:21   12       Q.   And that going forward as of approximately
13:22:24   13   July 5, 2012, 152a-based CRC Duster would no longer
13:22:32   14   contain bitterant.
13:22:35   15       A.   The products manufactured, correct.
13:22:39   16       Q.   Got it.
13:22:41   17            So it looks like we can narrow the timeframe
13:22:44   18   down for when the bitterant came out of the product to
13:22:47   19   2012; fair?
13:22:49   20       A.   Okay.  Yes, that's fair.
```

158.    Intentional inhalation was a known and foreseeable use of CRC Duster, of which CRC Industries had actual knowledge.[99]

---

[98] Michelle Rudnick Dep., 145:12–14, Sep. 1, 2022, *David McDougall v. CRC Industries Inc. et al*, Case No. 0:20-cv-01499-JRT-LIB (D. Minn.).

[99] *Id.* at 83:14–84:3.



```
10:57:58  14      Q.    Okay.  Do you know the bases that were
10:58:03  15   employed for determining that inhalant abuse was an
10:58:07  16   unintended use of this product?
10:58:11  17      A.    The original basis, no.
10:58:16  18      Q.    It was a known unintended use as of the time
10:58:21  19   you came aboard CRC in the regulatory group; correct?
10:58:25  20      A.    That's correct.
10:58:26  21      Q.    And it remained a known unintended use of
10:58:30  22   the product throughout your tenure at CRC; correct?
10:58:33  23      A.    Yes.
10:58:35  24      Q.    Something a -- Excuse me.
10:58:36  25            An unintended use that was foreseeable to
                              STIREWALT & ASSOCIATES
                        1-800-553-1953  info@stirewalt.com
```
                                                                    84
```
10:58:39   1   CRC throughout your tenure at -- at the company;
10:58:44   2   correct?
10:58:45   3      A.    Yes.
```

159.    Home Depot was also aware of the intentional inhalation of duster. On at least two separate occasions prior to Tommy's death, Home Depot employees mentioned to CRC Industries that CRC Duster was potentially being used for intentional inhalation.[100]

---

[100] Adam Selisker Dep., 73:4–74:6, Sep. 15, 2022, *David McDougall v. CRC Industries Inc. et al*, Case No. 0:20-cv-01499-JRT-LIB (D. Minn.).

```
10:52:56   4        Well we had two incidents of Home Depot
10:52:58   5    contacting us. I'd really have to look at the -- I
10:53:01   6    think they were in the quality report. But one of
10:53:05   7    them -- one of them was that Home Depot reported to us
10:53:10   8    that we had no spray product, which means that the
10:53:14   9    aerosols were returned to them for not spraying. Upon
10:53:18  10    our investigation we found that it appeared that
10:53:21  11    somebody refilled the cans with something to make it
10:53:26  12    feel like there was Duster in it, but it was not. And
10:53:31  13    we had just one piece of information when we talked to
10:53:36  14    that store manager, he made a comment to the effect
10:53:38  15    that "maybe they're inhaling the product," and that
10:53:40  16    was in our report. So it wasn't confirmed, but that
10:53:45  17    was a report.
10:53:46  18            I think we had another similar one with --
10:53:49  19    from Home Depot where they just contacted us and asked
10:53:52  20    us maybe for a Safety Data Sheet, I think that was in
10:53:55  21    there.
10:53:56  22            And then we had one from Fairmont -- Oh, you
10:53:59  23    said Home Depot, I'm sorry.
10:54:01  24        Q.  Yeah. The --
10:54:04  25            The latter report where -- where Home Depot
                    STIREWALT & ASSOCIATES
              1-800-553-1953  info@stirewalt.com
                                                              74
10:54:07   1    asked for a Material Safety Data Sheet, was that -- I
10:54:13   2    mean, did they -- did Home Depot say it was due --
10:54:17   3    they wanted the sheet due to some inhalation concerns?
10:54:20   4        A.  As I interviewed the people somebody
10:54:22   5    recalled that. Not a lot of information around it
10:54:25   6    other than that.
```

160.   CRC Industries continued selling CRC Duster despite knowing that DFE could cause severe health problems, that CRC Duster was being intentionally inhaled, and that CRC Duster could not be made safer with the addition of bitterant.

161.   In a case similar to *McDougall* out of Florida, *Michael Grieco et al v. Amy Merrill et al*, AW Distributing produced their corporate representative, Kennic Ho, for deposition. Mr. Ho is also the current registered agent of both the AW Distributing and AW Product Sales. Mr. Ho was asked about the bitterant and was unable to identify it by name. He stated simply that the

bitterant was "bitter and stinky."[101]



```
11:41   1          Do you know what the bitterant is that's
11:41   2   contained within Ultra Duster?
11:41   3      A.    From what I know, bitterant is just -- tastes
11:41   4   bitter and stinky.
11:41   5      Q.    Have you ever heard of something called
11:41   6   "denatonium benzoate"?
11:42   7          THE INTERPRETER:  Counsel, can I research that
11:42   8   word in Chinese?
11:42   9          MR. KOLTON:  Yeah.
11:42   10         THE INTERPRETER:  Can you spell that for me.
11:42   11         MR. KOLTON:  Sure.
11:42   12   D-e-n-a-t-o-n-i-u-m b-e-n-z-o-a-t-e.
11:42   13   It's two --
11:42   14   And let me --
11:42   15         THE INTERPRETER:  Denatonium; right?
11:42   16         MR. WARING:  Object to form.
11:42   17         THE WITNESS:  No.
```

162.    Later in his deposition, Mr. Ho recalled that the bittering agent was DB.[102]

---

[101] Kennic Ho Dep. 47:1–17 (Feb. 15, 2016), *Michael Grieco et al v. Amy Merrill et al.*, Case No. 502012CA021342 (Fla. 15th Cir. Ct.).

[102] *Id.* at 48:1–49:5.

48

| 11:43 | 1 | E-mail string, Mr. Ho, between you and somebody named |
| 11:43 | 2 | Hosoi-San that appears to be forwarding an E-mail |
| 11:43 | 3 | between you and a Mitch Moses. |
| 11:43 | 4 | Can you take a look at it, please. |
| 11:44 | 5 | Do you agree with me that this a conversation |
| 11:44 | 6 | you're having with Mitch Moses about denatonium |
| 11:44 | 7 | benzoate? |
| 11:44 | 8 | MR. WARING:  Object to form. |
| 11:44 | 9 | THE WITNESS:  Yes. |
| 11:44 | 10 | BY MR. KOLTON: |
| 11:44 | 11 | Q.    So you do know what "denatonium benzoate" is? |
| 11:44 | 12 | MR. WARING:  Object to form. |
| 11:44 | 13 | THE WITNESS:  So, looking at this E-mail, what |
| 11:44 | 14 | I was doing is I was just helping two parties to |
| 11:45 | 15 | exchange information. |
| 11:45 | 16 | BY MR. KOLTON: |
| 11:45 | 17 | Q.    Which two parties were you helping? |
| 11:45 | 18 | A.    Looking at this document here, one party is |
| 11:45 | 19 | the Japanese side, I hope. |
| 11:45 | 20 | The other side will be the American supplier. |
| 11:45 | 21 | Q.    Do you remember what American supplier it was |
| 11:45 | 22 | or can you tell from this E-mail? |
| 11:45 | 23 | A.    I believe they were called Tulstar. |
| 11:45 | 24 | Q.    What is Tulstar, if you know? |
| 11:45 | 25 | A.    It's a company name. |



163.    According to a Safety Data Sheet, revision dated March 17, 2010, AW's Ultra

Duster was then comprised 100% of 1,1-Difluoroethane.

---

**MSDS INFORMATION**

**MATERIAL SAFETY DATA SHEET**
Ultra Duster

**Revised:** 3/17/2010

**SECTION I - CHEMICAL INFORMATION**

Trade Name: HFC-152a
Chemical Name: Difluoroethane, R152a
Product Supplied By: AW Distributing, Inc.
Address & Phone #: 2024 Middlefield Rd., Redwood City, CA 94063
Emergency Phone #: Chemtrec 1-800-424-9300
Mfg. Model No.: AE420BWON

**SECTION II - HAZARDOUS INGREDIENTS**

Ingredients CAS # % TLV PEL UNITS
1,1-Difluoroethane 75-37-6 100

**SECTION III - PHYSICAL DATA**

Boiling Point (°F) -25 C (-13F)
Specific Gravity (H2O=1)
Vapor Pressure (MM Hg) 87 psia at 25 deg C (77 deg F)

---

10/12/2020                                    Welcome..Best shop for Canned Air Dusters

Percent Volatile by Vol. 100 WT %
Vapor Density (Air=1) 2.4 at 25 deg C (77 deg F)
Density 0.90 g/cc at 25 deg C (77 deg F) - Liquid
Solubility in Water 0.28 WT% at 25 deg C (77 deg F)
Evap Rate (Ether = 1)
Appearance and Odor Slight ethereal, Clear, colorless
Form Gas

164.    Several months later, a company named Bureau Veritas provided a Non-Corrosive

Certificate for Ultra Duster. Per this certificate, dated November 12, 2010, Ultra Duster cans were

comprised of 99.90% DFE and .10% 2,6-xylylcarbamoylmethyl (another name for denatonium

benzoate or DB). The certificate also refers to "intentional misuse (*i.e.*, deliberate inhalation of the

product)" indicating that AW Defendants were aware Ultra Duster was used as an inhalant.



CONSUMER PRODUCTS SERVICES DIVISION

**AW DISTRIBUTING, INC**

| **Technical Report:** | **(5110)308-0100** | November 12, 2010 |
|---|---|---|
| Date Received: | November 04, 2010 | Page 1 of 3 |

KENNIC HO
AW DISTRIBUTING, INC
2024 MIDDLEFIELD RD
REDWOOD CITY, CA 94063
UNITED STATES

| Sample Description: | ULTRA DUSTER CANNED AIR | | |
|---|---|---|---|
| Manufacturer: | AW CAL CUSTOM | PO No.: | N/A |
| Buyer: | N/A | Style: | N/A |
| Country of Origin: | CHINA | Country of Destination: | N/A |
| Color: | N/A | SKU No.: | UDS-10-P12 |
| Protocol No.: | N/A | | |

**EXECUTIVE SUMMARY:**

The sample(s) was tested to the following requirement(s) and the data provided is for informational purposes only:

- Toxicological Risk Assessment, based on the review of the submitted formulation(s) by a board certified toxicologist, evaluated for acute toxicity, skin irritation, eye irritation, corrosive agent to the eyes or skin and strong sensitization hazards defined in 16 CFR 1500.3(b)(5), (7) – (9).

Conclusion: As per the toxicologist:

Based on the available data, the product is classified as an eye irritant as defined in 16 CFR 1500.3 under circumstances involving reasonable foreseeable misuse (*i.e.*, accidental spray into the eyes) based on the presence of 1,1-difluoroethane at a concentration of 99.9%. The product is not classified as toxic (acute), corrosive, skin irritant, or strong sensitizer as defined in 16 CFR 1500.3, when used as intended or under circumstances involving reasonable foreseeable misuse.

Note:    While not considered in the context of intended use or reasonable foreseeable misuse, with intentional misuse (*i.e.*, deliberate inhalation of the product) the product may be toxic (acute) due to the presence of 1,1-difluoroethane. Human exposure data indicate that inhalation of high concentrations of 1,1-difluoroethane may be associated with serious cardiovascular effects or prove fatal. Due to the presence of 1,1-difluoroethane, direct skin or eye contact with the liquid product may cause frostbite and direct inhalation exposure of high concentrations may result in respiratory tract irritation. The concentration of benzyldiethyl (2,6-xylylcarbamoylmethyl)(CAS No. 3734-33-6) found in the product (100ppm) is higher than the typically used (20-50ppm) when added with the intention of rendering a formulation aversively bitter.

165.    Comparing the March 17, 2010, Safety Data Sheet to the November 12, 2010 Bureau Veritas Certificate, it appears that the formulation of Ultra Duster was changed to include DB.

166.    AW has included DB in its Ultra Duster formulation since 2010, including its formulation of Office Depot's private label air duster product.

167.    AW directed testing of both bitterants and alternative deterrents, such as pepperants.[103]

168.    Neither AW nor its suppliers ever tested Ultra Duster to see whether the bitterant would actually come *out* of the can.[104]

169.    All Defendants knew, or should reasonably have known, of the epidemic of inhalant abuse in Minnesota and in the Minneapolis area specifically. On November 5, 2018, almost exactly four years *prior* to Tommy's death, Fox 9 reported that "Minnesota men are dying from an inexpensive and easily accessible way to get high"—intentional inhalation of dusters.[105]

170.    According to records from the Hennepin County Medical Examiner, sixteen people died from inhaling DFE between 2013 and 2018, almost all of them men in their 30s and 40s— just like Tommy.[106] One of the deceased men was a Hennepin County resident who had been

---

[103] Compl., *Kelley et al. v. AW Distributing, Inc. et al.*, Case No. 420CV06942, Doc. 1, ¶ 184 (N.D. Cal. Oct. 5, 2020); Def. Daiho Sangyo, Inc.'s Answers to Plts. First Set of Interrogs., *Kelley et al. v. AW Distributing, Inc. et al.*, Case No. 420CV06942, Doc. 225-2, 24:18–20 (N.D. Cal. Aug. 5, 2022).

[104] Def. Daiho Sangyo, Inc.'s Answers to Plts. First Set of Interrogs., *Kelley et al. v. AW Distributing, Inc. et al.*, Case No. 420CV06942, Doc. 225-2, 28:23–25 (N.D. Cal. Aug. 5, 2022).

[105] *Blown Away: The Perils of Compressed Air*, Fox9 (Nov. 5, 2018), https://www.fox9.com/news/blown-away-the-perils-of-compressed-air.

[106] *Id.*

regularly purchasing multiple cans of Ultra Duster daily from his local Menards—just like Tommy.[107]

171.    Lastly, sales figures for DFE duster products appear to be inflated by intentional inhalation. In 2022 alone, household consumers purchased approximately 9.8 million units of computer dusters, totaling $99.7 million in sales.[108] Because 95% of consumer retail dusters use DFE as the propellant,[109] this means there were approximately ***9.3 million units of DFE duster*** sold to household consumers in the United States in a single year, enough for ***one in every fourteen*** American households.[110] And this number does not take into account the fact that dusters are very often sold in multi-packs of two, four, or even twelve or more cans. Even so, this is a vast number which is inexplicable without considering the massive scope of the huffing epidemic.

---

[107] *Id.*

[108] Euromonitor Consulting Report to the CPSC: "Aerosol Duster Study: Final Report" 19 (July 17, 2023).

[109] *Id.* at 14.

[110] Between 2019 and 2023, the U.S. Census Bureau recorded 127,482,865 households in the United States. https://www.census.gov/quickfacts/fact/table/US/HSD410223.

Table 3: Estimated Annual Aerosol Duster Market Size

| Aerosol Dusters | Units sold (million) | Value sold US$ (million) |
|---|---|---|
| **Consumer Use** | **14.1** | **$143.4** |
| *Household Consumers* | 9.8 | $99.7 |
| *Purchased by Professional Consumers through retail channels* | 4.3 | $43.7 |
| **Industrial and Commercial Use (Purchased by Professional Consumers through professional channels)** | **15.8** | **$160.8** |
| **Total Aerosol Dusters** | **29.9** | **$304.2** |

172.    A reasonably prudent manufacturer, supplier, and/or seller would have kept reasonably familiar with news events and stories, scientific studies, and other reliable information concerning the foreseeable intentional inhalation of Defendants' computer duster products which have caused addiction, injury, and death to users.

**G.     DB is ineffective at deterring intentional inhalation and may increase the risks of intentional inhalation.**

**1.    DB—A bitter denaturant used to prevent accidental poisoning**

173.    Denatonium benzoate, known as DB, is an alcohol denaturant which has been heavily promoted for inclusion in household products, gardening products, and cosmetics to prevent accidental ingestion by children.[111]

---

[111] C. Pulce & J. Descotes, *Denatonium Benzoate*, in HUMAN TOXICOLOGY (Jacques Descotes ed., 1996), available at https://www.sciencedirect.com/topics/medicine-and-dentistry/denatonium-benzoate.

174.    According to the Guinness Book of World Records, DB (also known by its tradename "Bitrex") is "the most bitter substance in the world." Despite being the most bitter substance, the manufacturer of Bitrex openly advertises that the bitter taste can be easily averted with a sugary substance, like chocolate.

175.    Kristin Cordz, Vice President of Business Development at Market Actives LLC, Bitrex's exclusive distributor in the United States, even stated in an interview with The Chemical Show in 2023 that "the "antidote to Bittrex [sic.] is chocolate".[112]



---

[112] Madeline Meyer, *Enhancing Product Safety with the Bitter Gal Kristin Cordz of MarketActives*, The Chemical Show, Oct. 17, 2023

**Do you have to wash it down with water? You know how when you eat hot peppers and your mouth is hot and burning, and you're trying to figure out, now what am I gonna do? I'm gonna eat something? Am I gonna drink milk? I gotta do something. Is there a counter to the bitter Bittrex taste?**

The antidote is chocolate.

**Oh, that's beautiful. Are you serious?**

I am serious. The antidote to the Bittrex is chocolate, and milk chocolate works best, but I usually recommend people eat a couple pieces because it'll help coat the taste buds, and then it'll help neutralize the Bittrex.

**Alright. So Bittrex and chocolate.**

You get to bribe people to try the bad stuff to eat the chocolate.

176.    Defendants knew that DB can be neutralized easily. For example, during the time CRC Industries used DB in their duster product, employees would use chocolate to quickly counteract the bitter taste.[113]

| | | |
|---|---|---|
| 10:05:42 | 13 | bitterant to supply.  We also heard that eating |
| 10:05:55 | 14 | chocolate was a easy way to defeat the taste of |
| 10:06:01 | 15 | bitterant, and it was actually some of our own plant |
| 10:06:05 | 16 | people were doing that when we filled the product if |
| 10:06:08 | 17 | they got the taste.  And we also heard of folks in our |
| 10:06:13 | 18 | lab, when we were making the bitterant blend to put |
| 10:06:17 | 19 | into the Duster, of getting that bitterant taste and |
| 10:06:19 | 20 | also using chocolate to defeat it fairly quickly. |

177.    DB has a modest effect on deterring accidental ingestions. For example, in a 1991 study, authors Sibert and Frude examined DB as a deterrent among 33 children aged 17–36 months.  The children were provided orange juice containing 10 ppm of DB. Thirty children took a drink of orange juice with DB. Among those 30 children, nearly one-fourth of the children

---

[113] Adam Selisker Dep., 47:14–20, Feb. 15, 2015, *David McDougall v. CRC Industries Inc. et al*, Case No. 0:20-cv-01499-JRT-LIB (D. Minn.).

proceeded to drink after the initial exposure.[114] Notably, the concentration of DB in this study was more than 25 times the concentration expected in the vapor phase of computer dusters.

178.    Per the 2008 Cosmetic Ingredient Review Expert Panel, DB has the following perceptual characteristics:

| Perceptual characteristics in measurement terms parts per million or parts per billion |
| --- |
| DB is *detectable* at .01 ppm (10 ppb) |
| DB is *recognizably* bitter at .05 ppm (50 ppb) |
| DB is *unpleasantly* bitter at 10 ppm (10,000 ppb) |
| DB is *aversively* bitter at 20-50 ppm (20,000-50,000 ppb)[115] |

**2.    DB has not been added at the necessary concentration to deter abuse**

179.    Detection and recognition are critical concepts related to the theory of bitterants as deterrents to inhalant huffing. Keast and Roper, in a 2007 article, defined these concepts as follows:

> [A] chemical may be in a solution at a concentration that the sample population could not detect. As a concentration of the chemical increases, a detection threshold will be reached, the level at which the chemical in solution may be discriminated from water. As the concentration of the chemical increases further, the recognition threshold is reached, the point at which the quality (e.g. bitter) can be identified. As concentration of the chemical increases still further, the intensity of the bitterness mutually increases to a theoretical asymptote where concentrate increases no longer cause subsequent increases in intensity.[116]

---

[114] J. R. Sibert & N. Frude, *Bittering agents in the prevention of accidental poisoning: children's reactions to denatonium benzoate (Bitrex)*, 8 ARCHIVES OF EMERGENCY MED. 1 (1991).

[115] *Final Report of the Safety Assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the Denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate1*, 27 INT'L J. OF TOXICOLOGY 1 (2008), available at https://doi.org/10.1080/10915810802032388 [hereinafter *Alcohol Denat. Final Report*].

[116] Russell S. J. Keast & Jessica Roper, *A Complex Relationship Among Chemical Concentration, Detection Threshold, and Suprathreshold Intensity of Bitter Compounds,* 32(3) CHEM. SENSES 245, 245 (2007).

180.    The following graphic illustrates these concepts:



181.    As this graphic shows, aversely bitter is the threshold level of a true deterrent. The level of DB which is added to dusters per the DuPont patent is 5–50 ppm, which should fall within the range of being unpleasantly bitter to adversely bitter.[117] Yet, the data shows that intentional inhalation continues to increase. So, where is the disconnect? The science of addiction and the chemical properties of DB provide foreseeable reasons why it is ineffective in DFE duster products.

### 3.  **Differences between accidental ingestion and intentional ingestion have been ignored.**

182.    While accidental ingestion by children is often the result of normal exploratory behavior, intentionally inhaling DFE is a fundamentally different proposition. Specifically, the underlying motivation is completely different.

183.    A 2010 study authored by Bromberg-Martin et al. observed:

> We seek rewards and assign them a positive value, while we avoid aversive events and assign them a negative value. In other respects we treat rewarding and aversive events in similar manners, reflecting their similar motivational

---

[117] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en.

salience. Both rewarding and aversive events trigger orienting of attention, cognitive processing, and increases in general motivation.[118]

184.     While an unpleasant taste can plausibly disrupt accidental ingestion, whether DB produces a taste so disgusting that avoiding the aversive state (*i.e.*, unpleasant bitter taste) is more desirable than achieving the rewarding state (*i.e.*, euphoria or intoxication) must be considered. The patent Defendants follow fails to mention this consideration.[119]

185.     According to the original patent, people would be deterred from inhalant use if they simply "detected" DB in an intentional inhalation scenario.[120] However, to achieve a true deterrent effect, the concentration of DB must be at a level to make the experience sufficiently noxious or disgusting. While this may be true related to accidental ingestion, research suggests that inhalant huffing is entirely different. For example, if a person is motivated to get drunk, an unpleasant taste may not deter them from drinking alcohol. Similarly, exposing someone to the lowest possible concentration of DB that can be detected or recognized will likely not affect a goal-seeking behavior (*i.e.,* the intent to get high).

186.     Per the DuPont patent, DB is added in solid form to the can of liquid DFE aerosol. DB dissolves within the can. The can is pressurized and the liquids are expressed in a gas vapor.[121] There is no evidence to suggest that DB's detection levels, recognition, and aversiveness in a concentrated vapor spray are equivalent to a liquid.

187.     Indeed, Stephen Willson, an individual who intentionally inhaled DFE duster products, testified regarding the taste of bitterant in Dust-Off, a brand identical in composition to

---

[118] E.S. Bromberg-Martin et al., *Dopamine in motivational control: Rewarding, aversive, and altering*, 68 NEURON 815, 815–34 (2010).

[119] *See* DB Formula Patent, *supra* note 117.

[120] *Id*.

[121] *Id*.

the products at issue here. Willson could identify the bitterant taste but stated it "wasn't overwhelming" and compared it to the taste of vodka.[122]

```
 2    A.    It had a taste, but it wasn't an overwhelming --
 3    it wasn't pleasant, but it wasn't overwhelming.
 4         Q.    So if I understand -- I want to make sure I heard
 5    correctly.   You said it was not a pleasant taste?
 6    A.    Uh-huh.
 7         Q.    Is that correct?
 8    A.    Yes.
 9         Q.    Okay.   I'm just trying to make sure the record is
10    clear.   That's why I was asking --
11    A.    Okay.   Yeah.
12         Q.    And despite this unpleasant taste, was it your
13    desire to -- to get high that made you overcome this --
14    this unpleasant taste or --
15    A.    Not un --
16         Q.    -- suffer through it?
17    A.    Not unlike vodka, which isn't particularly
18    pleasant, either.   Yes.
```

188.    Willson's testimony indicates that the concentration of DB in the gas vapor phase is significantly less than the 5–50 ppm range which is contemplated by the DuPont patent. Willson

---

[122] Stephen Willson Dep. 58:1–18 (June 10, 2014), *Shannon Cheney v. Stephen Willson et al*, Case No. 502013CA007140 (Fla. 15th Cir. Ct.).

describes his detection level as being in the .01–.05 ppm range and certainly below the level of being aversely bitter.

189.    Researchers have noted that addition of the bitterant to computer dusters does not appear to deter intentional inhalation. Specifically, a study published in the Journal of American Toxicology notes: "Companies that manufacture [dusters] are aware of [inhalant abuse] and add a bittering agent to deter abuse, but it is unknown whether this reduces the prevalence or not."[123]

### 4.    Other considerations make DB an improper bitterant in this application

190.    Even if DB has a deterrent effect—which the evidence indicates it does not—its impact has limited effect among the broader population of inhalant users. A CPSC report on aversive agents states:

> The ability to detect the bitter taste of certain propylthiourea derivatives is a genetic trait. Between *15-30%* of *the adult population are unable to detect the bitter taste of this class of compounds*. Psychological studies have shown that non tasters may also be unable to detect other bitter molecules, *including saccharin and denatonium benzoate*.[124]

191.    In addition, there are serious potential harmful effects of DB as a bitterant. In a letter to the journal Forensic Toxicology authored by Perron, et al. (2010), certain individuals are at increased risk when inhaling DB-containing DFE due to DB being a bronchodilator. Specifically, they state:

> The absorption of DFE and similar volatile anesthetics is rapid and minimally influenced by bronchial airway tone, but the potent relaxation induced by DB may impact the way DFE behaves in the body. While DB-induced bronchial relaxation may not overly impact most individuals who inhale DB-containing DFE products, there is a potential risk that those with symptomatic asthma or

---

[123] Chris Vance et al, *Deaths Involving 1,1-Difluoroethane at the San Diego County Medical Examiner's Office*, 36 J. ANAL. TOXICOL. 626, 626–33 (2012), available at https://academic.oup.com/jat/article/36/9/626/784617.

[124] *See* U.S. CONSUMER PROD. SAFETY COMM'N, FINAL REPORT: STUDY OF AVERSIVE AGENTS 18 (1992) (emphasis added); *see also Alcohol Denat. Final Report*, *supra* note 115.

other bronchoconstrictive disease may experience increased effects from DFE when inhaled with DB.

192.    Likewise, a study published in Nature Medicine by Deshpande, et al. (2010), identified that certain bitterants, including denatonium, caused a *three-fold increase* in the dilation of human airway smooth muscle cells compared to dilation caused by β-adrenergic receptor agonists,[125] a class of drugs administered primarily *by inhalation for the treatment of asthma and COPD.*[126] When the researchers administered aerosolized denatonium to lab mice, they found an approximately 44% and 57% reduction in airway resistance in mice without and with acute airway inflammation, respectively.    This result was so significant that the researchers concluded aerosolized bitterant's relaxation mechanisms could be used as "efficacious bronchodilators for treating obstructive lung diseases[.]"[127]

193.    DB's bronchodilatory effects, particularly when aerosolized, means the Bitterant Defendants' air dusters' airway dilation function is much like that of rescue inhalers for asthma. As a person inhales an aerosolized bronchodilator, the muscles in their airways rapidly dilate and open up their lungs. For victims of an acute asthma attack, this effect is lifesaving. For victims of duster addiction, it can be fatal.

---

[125] Deshpande et al., *Bitter taste receptors on airway smooth muscle bronchodilate by localized calcium flux and reverse obstruction*,  Nat Med. Author manuscript; available in PMC 2011 May 01, published in final edited form as *Nat Med.* 2010 November; 16(11): 1299-1034. Doi: 1038/nm.2237.

[126] *What are Beta-Agonists?*, American Thoracic Society, https://web.archive.org/web/20100613033401/http://thoracic.org/clinical/copd-guidelines/for-patients/what-kind-of-medications-are-there-for-copd/what-are-beta-agonists.php (last accessed Sep. 24, 2025).

[127] Deshpande et al., *Bitter taste receptors on airway smooth muscle bronchodilate by localized calcium flux and reverse obstruction*, Nat Med. 2010 November; 16(11): 1299–1304. doi:10.1038/nm.2237.

194.     The Bitterant Defendants designed, manufactured, distributed, marketed, and sold their DFE air duster products on the premise that a potential inhalant abuser would start to inhale their duster, taste the DB, and be so disgusted by the bitterness that they would be unwilling or even physically unable to continue inhaling. However, DB *increases* the amount of DFE inhaled at a time and causes *more* air to be displaced from a user's lungs. Using DB to deter DFE inhalation is like using a gunshot to stanch the bleeding from a stab wound.

195.     Moreover, the rapid effects of DFE simply make it unlikely that a person under the influence will be thinking about an unpleasant bitter taste in the same way that a sober individual would.

196.     Not only is there no evidence that DB, particularly in aerosol form, is an effective deterrent, but even if DB did have the potential to deter intentional inhalation, the levels at which it is added to the Bitterant Defendants' computer dusters have foreseeably failed to deter such use. Thus, intentional inhalation continues to occur, and Tommy Byers is one of thousands of victims.

**H.     Independent tests show that DB is not present in the quantity Defendants represent or at the threshold level of detectability to most human subjects**

197.     An independent test of three 12 oz. cans of Ultra Duster, Dust Off, Endust, and Surf onn. was conducted by Research Triangle Park Laboratories, Inc. Specifically, the lab used a validated testing method to expel and measure the contents of each can. Cans were weighed before and after each phase of testing. The testing method mimicked an individual putting the can straw into their mouth and inhaling the product.

198.     The lab utilized a capture apparatus that collected gas in a Tedlar sampling bag—a bag designed by DuPont and validated by the Environmental Protection Agency as appropriate for testing products in the gas phase.

199.    The results were shocking: This test revealed that only trace amounts of DB were present in the gas phase of the Ultra Duster cans, and zero DB was present in the gas phase of the Dust Off, Endust, and Surf onn. cans. The test also showed wild fluctuations in the amount of DB inside the cans.

|  | Ultra Duster | Dust Off | Endust | surf onn |
|---|---|---|---|---|
| DB in Gas Phase (ppbv) | 3.38 | 0.00 | 0.00 | 0.00 |
| Total DB in Can (ppm) | 0.019 | 0.001 | 62.869 | 10.432 |





200.    This amount of DB is less than the recognized level at which a bitterant would be detectable to humans according to testing sponsored by the CPSC and presented by the Cosmetic Ingredient Review Expert Panel.[128]

| Perceptual characteristics in measurement terms parts per million or parts per billion |
|---|
| DB is *detectable* at .01 ppm (10 ppb) |
| DB is *recognizably* bitter at .05 ppm (50 ppb) |
| DB is *unpleasantly* bitter at 10 ppm (10,000 ppb) |
| DB is *aversively* bitter at 20-50 ppm (20,000-50,000 ppb)[129] |

201.    This testing coupled with the foregoing test data shows that Defendants knew or should have known that the bitterant they represented would help deter inhalant abuse neither discourages nor deters the foreseeable intentional inhalation because DB is not present in a sufficient quantity.

202.    Ultra Duster, Office Depot duster, and all other bitterant-containing dusters currently on the market are manufactured in a similar manner, also lack the necessary concentration of DB in the gas phase to reach a deterrent effect, and the manufacturing process for addition of DB to the cans is in a similarly inconsistent fashion resulting in wild fluctuations in quantity of the bitterant per can.

203.    Defendants failed to adequately test to determine if the bitterant they advertise as a deterrent was added in a proper manner to perform as warranted, specifically to "discourage inhalant abuse." Or worse, Defendants intentionally failed to add the proper amount of bitterant to cut costs and increase their own profits.

204.    Upon their own warranty on their cans, Defendants undertook a duty to improve the safety of their computer dusters by adding bitterant to deter inhalant abuse. Defendants were

---

[128] *Id.*

[129] *Id.*

also aware that, absent a bitterant, their computer dusters presented an unreasonable risk of harm to consumers.

205.    Defendants knew or should have known that the formulation in which the bitterant is added does not deter abuse and, thus, rendered their computer dusters defective. Yet, Defendants continued to design, manufacture, label, market and distribute the products in a defective manner.

206.    Further, Defendants knew or should have known that intentional inhaling DFE is addictive and continues to lead to injuries and death, yet intentionally failed to warn consumers like Tommy Byers that foreseeable intentional inhalation of the product could lead to inhalant addiction, inhalant abuse disorder, bone deformity and other injuries, and, ultimately, death.

207.    Defendants labeled their computer dusters in a manner which contains false claims, specifically that each can "contains a bitterant to help discourage inhalant abuse" or similar language. Defendants are aware that the bitterant is ineffective and fails to discourage inhalant abuse.

208.    Defendants placed their dusters into the stream of commerce in a defective and unreasonably dangerous manner.

209.    The bitterant put into these cans does not come out of the cans in a sufficient quantity to deter intentional inhalation.

## V.    CLASS ACTION ALLEGATIONS

210.    Plaintiff seeks certification on behalf of a Rule 23(c)(4) issue class defined as follows (the "Minnesota Issue Class"):

> All citizens of Minnesota, and their heirs and survivors, who have (1) suffered or presently suffer injury or addiction; and/or (2) died from DFE intoxication (including acute 1,1-Difluoroethane intoxication or equivalent post-mortem cause of death terminology), arising from inhaling DFE-based liquid aerosol transferred in the course of business by AW Distributing, Inc., AW Product Sales & Marketing, Inc., Shanghai AW Custom Manufacturing & Aerosol Propellant Co., Ltd.,

Zhejiang Ludao Technology, Co., Ltd., Jiangsu Sprayvan Commodity Technology Development, Co., CRC Industries, Inc., Berwind Corporation, The ODP Corporation, ODP Business Solutions, LLC, OfficeMax North America, Inc., OfficeMax, LLC, The Home Depot, Inc., Home Depot U.S.A., Inc., and Menard, Inc.

211. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as immediate family members; (b) Defendant and Defendant's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which Defendants or their parents have a controlling interest, as well as Defendant's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendant; and (f) the legal representatives, successors, and assigns of any such excluded persons.

212. Plaintiff reserves the right to modify or refine the definitions of the Class based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

213. Plaintiff seeks certification on behalf of a Rule 23(c)(4) class defined as above for particular issues including the following:

    a.    whether Defendants' computer duster products were defectively designed;

    b.    Whether Defendants failed to warn users;

    c.    whether Defendants negligently designed their computer duster products;

    d.    whether Defendants negligently failed to warn users;

    e.    whether Defendants knew or should have known that inhaling computer dusters was a foreseeable use of the product;

f.      whether Defendants knew or should have known that inhaling computer dusters could lead to addiction, inhalant abuse disorder, injury, and/or death;

g.      Whether the Bitterant Defendants knew or should have known that the bitterant it allegedly added to computer dusters was ineffective in its stated purpose of being a deterrent to intentional inhalation;

h.      whether the Bitterant Defendants negligently warned by stating that the bitterant was added to discourage inhalant abuse or similar language in the written warning on their computer dusters;

i.      whether the Bitterant Defendants knew or should have known that the bitterant allegedly added to computer dusters was not capable of coming out of the can in sufficient quantity to prevent inhalation abuse and was ineffective in its stated purpose of being a deterrent to intentional inhalation;

j.      whether the Bitterant Defendants knew or should have known that a significant portion of consumers cannot detect the bitterant allegedly added to computer dusters;

k.      whether the Bitterant Defendant knew or should have known that the bitterant allegedly added to computer dusters was a bronchodilator; and

l.      whether the Bitterant Defendants knew or should have known that the allegedly added to computer dusters made intentionally inhaling their products more dangerous.

214.    Numerosity (Rule 23(a)(1)). The Class is so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class, as herein identified

and described, is not known, but upon information and belief, hundreds of individuals have died in Minnesota because of DFE intoxication or DFE inhalation arising from DFE-based aerosol dusters.

215.   Commonality (Rule 23 (a)(2)). Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

      a.    whether Defendants engaged in the conduct alleged herein;

      b.    whether Defendants knew or should have known that computer dusters posed health risks;

      c.    whether Defendants knew or should have known that computer dusters were frequently used by purchasers with the intent to get high;

      d.    whether Defendants knew or should have known that inhaling computer dusters was a foreseeable use of the product;

      e.    whether Defendants knew or should have known that inhaling computer dusters could lead to addiction, inhalant use disorder, injury, or death;

      f.    whether the Bitterant Defendants knew or should have known that the bitterant allegedly added to computer dusters was ineffective in its stated purpose of being a deterrent to inhalant use;

      g.    whether the Bitterant Defendants knew or should have known that the bitterant it allegedly added to computer dusters was ineffective in its stated purpose of being a deterrent to intentional inhalation;

h.    whether the Bitterant Defendants negligently warned by stating "SAFETY BITTERANT ADDED to help discourage inhalant abuse" or providing similar warranties on their cans of computer dusters;

i.    whether the Bitterant Defendants knew or should have known that the bitterant allegedly added to computer dusters was not capable of coming out of the can in sufficient quantity to prevent inhalation abuse and was ineffective in its stated purpose of being a deterrent to intentional inhalation;

j.    whether the Bitterant Defendants knew or should have known that a significant portion of consumers cannot detect the bitterant allegedly added to computer dusters;

k.    whether the Bitterant Defendants knew or should have known that the bitterant allegedly added to computer dusters was a bronchodilator;

l.    whether the Bitterant Defendants knew or should have known that the bitterant allegedly added to computer dusters made intentionally inhaling their products more dangerous;

m.    whether the Bitterant Defendants wrongfully represented that the bitterant allegedly added to computer dusters could in fact be detected by inhalant abusers and, thus, operate to deter use;

n.    whether Defendants placed computer dusters into the stream of commerce in a defective and/or unreasonably dangerous manner;

o.    whether the Bitterant Defendants negligently designed computer dusters by adding DB as a bitterant and adding an insufficient quantity of bitterant;

p.    whether Defendants negligently manufactured computer dusters;

q.      whether Defendants negligently failed to warn that intentionally inhaling DFE was extremely addictive which increased the risk of injury or death;

r.      whether the Bitterant Defendants negligently warned consumers by stating that the bitterant was added to discourage abuse or by including similar language on the computer dusters; and

s.      whether Plaintiff and members of the Class are entitled to actual, statutory, and punitive damages.

216.    Typicality (Rule 23(a)(3)). Plaintiff's claims are typical of the claims of the other members of the proposed Class. Plaintiff and members of the Class (as applicable) suffered injuries because of Defendants' wrongful conduct that is uniform across the Class.

217.    Adequacy (Rule 23(a)(4)). Plaintiff's interests are aligned with the Class she seeks to represent. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interest of the Class. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class.

218.    Superiority. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and

Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

219.    Manageability. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

220.    Class certification on the defined issues, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.    CLAIMS FOR RELIEF

### COUNT I:    STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### Against All Defendants

221.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

222.    Plaintiff brings this claim for strict liability pursuant to Minn. Stat. § 544.41.

223.    Defendants all transferred the products at issue in this case in the course of their business.

224.    Tommy Byers used Defendants' products in a manner reasonably foreseeable to Defendants; and at all times material and relevant, his addiction, injuries, and death were a reasonably foreseeable result of Defendants' defective design. At all material and relevant times,

it was reasonably foreseeable that Tommy Byer could be injured and/or killed as a result of the design defect of Defendants' computer duster products at issue in this case.

225.   At all times relevant herein, Defendants' computer dusters were in substantially the same condition as when they left Defendants' control.

226.   All Defendants' computer dusters possessed numerous design defects that rendered them unreasonably dangerous.

227.   The danger posed by all Defendants' computer duster products went beyond that which would be contemplated by a consumer with ordinary knowledge common to the community as to its characteristics. Alternatively, the benefits of the design are outweighed by the design's inherent risk of danger.

228.   At all material and relevant times, safer, technologically feasible, and practical alternative designs were, have been, and are available to Defendants that would have prevented foreseeable intentional inhalation, Tommy Byers' injuries and death, and the resulting damages to his family, without substantially impairing the reasonably anticipated and/or intended function of Defendants' computer duster products.

229.   Reasonable, safer alternative designs include, but are not limited to: (1) modifications in packaging; (2) modifications in the formulation, and/or amount, and/or inclusion altogether of the propellant, DFE, found in Defendants' computer duster products; (3) adequate warnings and instructions on Defendants' computer duster product packaging.

230.   All Defendants knew or should have known by reasonable care of the defects described in the factual allegations.

231.    At all material and relevant times, the risk of harm caused by Defendants' defective design has outweighed and continues to outweigh any utility from Defendants' computer duster products.

232.    For example, DFE is a highly addictive and dangerous chemical which is unfit to be sold in a consumer product. Each can of computer duster was comprised of 99.9% DFE, a dangerous refrigerant which is highly addictive and creates intense euphoria when intentionally inhaled.

233.    The inclusion of DFE, a highly addictive substance, within computer dusters which are generally sold over-the-counter and can be obtained in bulk at big-box and small retailers including hardware, office supply, and grocery stores constitutes a design defect that renders the products unreasonably dangerous to individuals.

234.    DFE effects the brain after an individual begins to engage in intentional inhalation because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates neurotransmitter GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.[130]

235.    Based on publicly available data from verifiable sources such as the National Poison Data System (a data warehouse for the 55 poison control centers across the U.S.), the National Electronic Injury Surveillance System ("NEISS") (a database managed by the U.S. Consumer Product Safety Commission which catalogs injuries treated at a broad sampling of hospital emergency departments), and the National Survey of Drug Use and Health (an annual

---

[130] *See* Chart: Causal Explanation from Case Reports of Intoxication from DFE and citations thereto, *supra* ¶ 125, notes 52–63.

survey conducted in all 50 states which is an authoritative source for epidemiological data on tobacco, alcohol and drug use, mental health, and other health-related issues in the U.S.), intentionally inhaling computer dusters is increasing *exponentially* in terms of frequency, and results in significant numbers of injuries and fatalities on an annual basis. According to the NEISS hospital record database, computer dusters accounted for more ER visits than any other category of inhalant *combined*, with 16,927 such visits during the period 2011–2018, a figure over three times more than the next-highest category.[131] Moreover, since 2015, 2.5 million people have reported misusing computer dusters[132] and, between 2006 and 2022, at least 2,316 people have died from DFE inhalation.[133] Also, the total cost to society of injuries and deaths from aerosol duster abuse "stands at over $1 billion per year."[134]

236.    All Defendants were aware that intentional inhalation is a common and foreseeable use of their computer duster products and of the risks posed by this foreseeable use.

237.    All Defendants are also aware that DFE has addictive properties and increases the risk of intentional inhalation.

238.    Additionally, the Bitterant Defendants did not add DB, the bitterant, in a proper quantity or manner to deter intentional inhalation. Ostensibly to deter the foreseeable use of

---

[131] Forrester, *supra* note 10, at 180–83.

[132] *See* discussion *supra* Section IV.B.1.

[133] U.S. CONSUMER PROD. SAFETY COMM'N, STAFF BRIEFING PACKAGE – AEROSOL DUSTER PETITION, July 26, 2023, at OS 72, https://www.cpsc.gov/s3fs-public/Petition-Requesting-Rulemaking-to-Establish-Safety-Standard-for-Aerosol-Duster-Products-Petition-CP-21-1.pdf?VersionId=.NohA6DG6WsXh_tsjhGuA7RuqMCOvxSW.

[134] *See also* U.S. CONSUMER PROD. SAFETY COMM'N, STATEMENT FROM COMMISSIONER RICH TRUMKA, JR., Aug. 2, 2023, https://www.cpsc.gov/s3fs-public/RCAPetitionRequestingRulemakingtoEstablishSafetyStandardforAerosolDusterProductsPetitionCP21_1.pdf?VersionId=nQcgEM4wvCJE97zmhwYCdAkwuluYerIt.

intentional inhalation, All Defendants re-designed the computer dusters at issue to add the bitterant DB, though CRC would later remove the bitterant due to a lack of evidence of DB's effectiveness at deterring intentional inhalation. Defendants included the bitterant under pressure from their retail partners who began refusing to sell dusters without bitterant in their stores.[135]

239.    Each of the Bitterant Defendants' computer dusters contain approximately .01% of the bitterant DB.

240.    The Bitterant Defendants all followed the same patented procedure pertaining to addition of bitterant as other suppliers and manufacturers of computer dusters. Specifically, DB is added in a solid form to the liquified DFE gas aerosol at a target quantity of 5 to 50 parts per million (ppm). DB is dissolved in the liquified DFE gas aerosol and theoretically is intended to mix evenly throughout the can so it may be expressed from the can in the same concentration.[136] However, when pressurized and expressed from the can, DB is not present in a sufficient quantity to be detectable, much less aversively bitter.

241.    The Bitterant Defendants affixed labeling to the computer dusters cans at issue which warranted that a bitterant was added to "help discourage inhalant abuse," or similar language warranting that the bitterant was safe and had a deterrent effect to prevent intentional inhalation.

242.    The DB formulation used by the Bitterant Defendants in the design of their computer dusters is neither safe nor does it have the intended and warranted deterrent effects to prevent use as an inhalant as evidenced by the fact that the incidence of intentional inhalation has increased exponentially since bitterant was added to the computer dusters.

---

[135] *See* discussion *supra,* Section I.

[136] *See* DB Formula Patent, *supra* note 117.

243.    Additionally, the selection of DB as a bitterant is problematic because a significant percentage of people cannot taste it in any quantity. Namely, DB is among the class of bitter compounds which cannot be detected by approximately 15–30% of the adult population. These individuals lack a genetic trait which allows them to taste the bitter properties of certain "propylthiourea derivatives."[137]

244.    Due to DB's reduced effectiveness as a deterrent in all cases and its complete ineffectiveness in a large subsection of the population, its inclusion as a safety feature is a design defect.

245.    The bitterant chosen by Defendants, DB, also increases the amount of DFE inhaled. In addition to the other design flaws described above, DB is a "bronchodilator" that operates to relax the muscles in the lungs. Similar to the effect of an asthma inhaler, DB operates to widen a person's airway upon being inhaled. This is the opposite of the desired effect and renders DB unreasonably dangerous for its intended purpose of deterring intentional inhalation.

246.    As a result, users who inhale the contents emitted from the computer dusters may breathe in a greater quantity of DFE than if the bitterant were not included at all.

247.    As a direct, substantial, and proximate result of the design defects, it was reasonably foreseeable that users like Tommy Byers would become addicted to DFE (more so than if Defendants used another less or non-addictive substance) by using all Defendants' products in the foreseeable manner of intentional inhalation. Additionally, it was reasonably foreseeable that users like Tommy Byers would inhale more DFE due to the addition of the bitterant, and ultimately at an increased risk of suffering addiction, injury, and/or death by using the Bitterant Defendants'

---

[137] *See* U.S. CONSUMER PROD. SAFETY COMM'N, FINAL REPORT: STUDY OF AVERSIVE AGENTS (1992); *see also Alcohol Denat. Final Report*, *supra* note 115.

products, which contained a component that was unreasonably dangerous for its intended purpose of deterring inhalant abuse.

248.    As a direct, substantial, and proximate result of the design defects, Tommy Byers became addicted to DFE, suffered serious bodily injury, and died due to using all Defendants' defectively designed products in a reasonably anticipated manner.

249.    Plaintiff and the members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

### COUNT II:    STRICT PRODUCTS LIABILITY – FAILURE TO WARN
#### Against all Defendants

250.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

251.    Plaintiff brings this claim for strict liability pursuant to Minn. Stat. § 544.41.

252.    At all times material and relevant, Defendants failed to provide an adequate warning on their computer duster products at issue in this case.

253.    Tommy Byers used Defendants' products in a manner reasonably foreseeable to Defendants. At all material and relevant times, Defendants knew or should have known that individuals intentionally inhaled their products and such use could cause addiction, injury, and/or death.

254.    At the time of sale, Defendants' computer dusters were in substantially the same condition as when they left Defendants' control.

255.    At all times material and relevant herein, all Defendants provided false and misleading warnings, labels, promotions, marketing, and information including about the deterrent effect of Defendants' bitterant.

256.    Plaintiff was damaged as a direct result of the products being sold without an adequate warning.

257.    The inadequate warning included both missing warnings and deficient warnings.

258.    The warnings that were on the cans were not legally adequate to warn of the dangers inherent in improper usage because of the type and manner of the warnings provided and the misleading nature of representations about the bitterant. The warnings also did not include resources to users to help deal with the issues arising out of intentional inhalation including addiction help and resources.

259.    All Defendants' failed to adequately warn of: (1) the known high risk of addiction from the primary ingredient, DFE, accompanied by the risk of withdrawal psychosis; (2) the specific injuries that can result from intentional inhalation including permanent brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, and involuntary passing of urine and feces; and (3) the risk of death in a clear and effective manner. The Bitterant Defendants further: (4) failed to warn that DB was not added in a quantity or manner that would have a deterrent effect; (5) failed to warn that DB is undetectable to a broad swath of the population in any quantity; and (6) failed to warn that the bitterant DB has a dilating effect on the respiratory system, which can lead to increased inhalation of DFE, a highly volatile and addictive substance. The general warnings provided by the Bitterant Defendants were also cancelled out by reassuring consumers that its products were designed to prevent abuse.

260.    Defendants knew or should have known by exercising reasonable care of the defects described herein and the attendant risks they posed to consumers and users.

261.    Defendants had a duty to warn users about these risks.

262.    Each can of computer duster at issue in this case was comprised of 99.9% to 100% DFE, a dangerous refrigerant which is highly addictive and can create a euphoric sensation when intentionally inhaled.

263.    DFE is a volatile substance that stimulates a neuro-chemical reaction that produces euphoria and, with repeated or prolonged use, can cause injury or death and abrupt cessation can induce withdrawal. DFE affects the brain after an individual begins to engage in intentional inhalation because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.[138]

264.    Defendants knew or should have known of the risks associated with exposure to DFE, including the risk of permanent brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, involuntary passing of urine and feces, and death as well as the high risk that users could become addicted to inhaling DFE.

265.    Despite ample publicly-available scientific data on the addictive nature of DFE, Defendants failed to warn of this inherent risk, danger, or hazard in their computer duster products. This failure to warn renders these computer dusters unreasonably dangerous.

266.    The Bitterant Defendants also failed to warn that the bitterant DB was not added in a quantity or in a manner that could ever have a deterrent effect on individuals engaged in the foreseeable intentional inhalation, even though the intended use of DB was to deter intentional inhalation.

---

[138] *See* Chart: Causal Explanation from Case Reports of Intoxication from DFE and citations thereto, *supra* ¶ 125, notes 52–63.

267.    The Bitterant Defendants are aware or should have been aware that, in order to be minimally effective as a deterrent, DB must be added to computer duster cans in a quantity sufficient to be aversively bitter to human taste. Also, even if added to the cans at the minimum threshold level, DB must convert to the gas phase and be expressed from the cans at the same minimum threshold level to achieve a deterrent effect. Yet, the bitterant DB was neither added to the can nor capable of being expressed from the can in sufficient quantities to be detectable, much less aversively bitter, rendering it unreasonably dangerous for its intended use of deterring intentional inhalation.

268.    The Bitterant Defendants failed to warn that the bitterant DB is among a class of compounds which a broad swath of the population cannot taste in any quantity. The ability to detect the bitter taste of DB is a genetic trait which many individuals lack. Defendants knew or should have known that this renders DB an ineffective and unsafe choice of bitterant which was unreasonably dangerous for its intended use of deterring intentional inhalation.

269.    The Bitterant Defendants also failed to warn that the bitterant DB is a bronchodilator that operates to relax the muscles in the lungs and to widen a person's airway when inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk of harmful levels of DFE and increasing the risk a user will become addicted to the substance—the opposite of the purported deterrent effect which was the component's intended use.

270.    These failures to warn, as well as the DB component of the Bitterant Defendants' computer dusters, rendered Defendants' computer dusters defective and unreasonably dangerous under Minn. Stat. § 544.41.

271.    Tommy Byers and members of the Class were not adequately warned by any of the Defendants of the inherent risks, dangers, or hazards of becoming addicted to, developing inhalant abuse disorder from, or becoming injured or dying from DFE.

272.    Tommy Byers and members of the Class were not adequately warned by the Bitterant Defendants that: (1) DB could not deter them from intentional inhalation, (2) they may have been among the group of individuals unable to taste DB, and (3) they could inhale a deadly quantity of DFE from the computer dusters at issue due to the presence of DB.

273.    As a direct, substantial, and proximate result, Tommy Byers suffered addiction, physical injuries, and died.

274.    Tommy Byers' and the class's use of Defendants' computer duster products for intentional inhalation was reasonably foreseeable. Indeed, Defendants were well aware that their products were being used in this manner well before Tommy ever purchased a can of computer dusters.

275.    Plaintiff and members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

### COUNT III:  STRICT PRODUCTS LIABILITY –MANUFACTURING DEFECT
**Against Bitterant Defendants**

276.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

277.    Plaintiff brings this claim for strict liability pursuant to Minn. Stat. § 544.41.

278.    Defendants all transferred the products at issue in this case in the course of their business.

279.    At all times material and relevant, Defendants' computer duster products were in substantially the same condition as when they left Defendants' control.

280.    At all times material and relevant, Defendants' computer duster products at issue in this case were not altered in any way since the time they left Defendants' control.

281.    At all times material and relevant, Defendants' computer dusters possessed manufacturing defects that rendered them unreasonably dangerous when put to a reasonably foreseeable use.

282.    The aforementioned computer duster products at issue in this case were defective, unreasonably dangerous, not merchantable, and not reasonably suited for the use intended in that they were manufactured in such a manner that in reasonably foreseeable usage, the user would suffer harm and/or death.  Such defects were unreasonably dangerous and ultimately proximately caused and/or contributed to damages including, but not limited to, the resultant death of Tommy Byers and injury and death to thousands of other users.

283.    Defendants manufactured or had sufficient input into the making of the computer dusters to subject them to liability under this count and sold said computer dusters as a new product.  The defects existed at the time the computer dusters left Defendants' control.  Such defects proximately caused and/or contributed to the resultant death of Tommy Byers and injury and death to thousands of other users.

284.    At the time of their sale and/or use, Defendants' computer dusters possessed numerous latent manufacturing defects that rendered them unreasonably dangerous to an extent beyond which would be contemplated by a consumer with ordinary knowledge common to the community as to its characteristics.

285.    The Bitterant Defendants' products do not contain the amount of bitterant called for in the patented design. Thus, in the gas phase, the concentration of DB is far below a level which would be detectable and nowhere near the level that could deter intentional inhalation.

286.    The Bitterant Defendants manufactured the computer dusters in such a way that the levels of DB present in an individual computer duster varies significantly and reasonable further investigation and discovery may show that Defendants' computer duster products at issue in this case did not contain a bittering agent whatsoever.

287.    Independent testing shows wild fluctuations in the amount of DB inside the cans despite patented formulation amounts. For example, only trace amounts of DB were present in the gas phase of the Ultra Duster cans, and zero DB was present in the gas phase of the Dust Off, Endust, and Surf onn. cans. Because Inland Air Duster and Office Depot duster and other brands are manufactured following the same process, these cans also exhibit the same manufacturing issues. These variations are a flaw in the manufacturing process and a deviation from the Bitterant Defendants' design specifications.

288.    These levels are less than the recognized level at which a bitterant would be detectable to humans.

289.    The Bitterant Defendants failed to ensure that their products were manufactured to meet the patented formulation.

290.    The bittering agent also does not uniformly mix with the DFE and, thus, the bitterant simply rested inside the can and did not disperse from the can along with the DFE.

291.    The Bitterant Defendants failed to adequately test manufactured products to determine if the bitterant they advertise as being safe and a deterrent was added in a proper manner to perform as warranted, specifically to "discourage inhalant abuse" and/or the Bitterant

Defendants intentionally failed to add the proper amount of bitterant to cut costs and increase profits.

292.    The manufacture of the Bitterant Defendants' computer dusters does not have the intended and warranted deterrent effects to prevent use of their products for intentional inhalation as evidenced in part by the fact that the incidence of intentional inhalation has increased exponentially since bitterant was added to the dusters.

293.    The Bitterant Defendants knew or should have reasonably known that these variations in amounts of DB in final products could lead to inhalant addiction, inhalant abuse disorder and, ultimately, death and concealed the same.

294.    Due to these manufacturing defects, the Bitterant Defendants' products, when sold, were not merchantable and reasonably suited for their intended use, nor was the component DB merchantable and reasonably suited for its intended use.

295.    The defective products at issue were the proximate cause of Tommy's addiction, injury, and untimely death.

296.    Bitterant Defendants knew or should have reasonably known by exercising reasonable and/or ordinary care of the defects described herein and the attendant risks they posed to consumers and users and concealed the same.

297.    As a direct and proximate result of the aforementioned manufacturing defects, Plaintiff and members of the Class have suffered damages including, but not limited to, special, general, pecuniary and other damages.

## COUNT IV:  NEGLIGENCE
### Against all Defendants

298.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

299.    At all material and relevant times, Defendants had a duty to exercise reasonable care in the design, research, formulation, manufacture, production, marketing, testing, supply, promotion, packaging, sale, distribution, and/or monitoring of their computer duster products, including a duty to assure that the product would not cause foreseeable injuries through foreseeable intentional inhalation.

300.    At all material and relevant times, Defendants owed a duty to exercise reasonable care in providing reasonable, clear, conspicuous, accurate, and adequate warnings of the risks and dangers associated with the foreseeable misuses of Defendants' computer duster products, including the risks of addiction, injury, and death caused by the foreseeable intentional inhalation.

301.    At all material and relevant times, Defendants' conduct, acts, and omissions were negligent and wrongful.

302.    All Defendants utilized the volatile chemical compound DFE as the primary substance in its computer dusters, despite its known addictive properties.

303.    DFE is a highly addictive, volatile substance that stimulates a neuro-chemical reaction that produces euphoria and with repeated or prolonged use can cause injury or death and abrupt cessation can induce withdrawal. DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.

304.    By defectively formulating, testing, researching, designing, manufacturing, producing, marketing, supplying, promoting, packaging, selling, distributing, labeling, and monitoring a product that utilizes a highly addictive chemical compound known to encourage

misuse and cause injury, including death, all Defendants breached the standard of care owed to consumers and users of their products.

305.    At all relevant and material times, Defendants also failed to exercise reasonable care in that they failed to use due care in providing reasonable and adequate warnings of the risks and dangers associated with foreseeable intentional inhalation of their products including the risk and danger of addiction, injury, and death from intentional inhalation.

306.    Further, the Bitterant Defendants assumed a voluntary and additional duty to make their computer dusters "safe" by adding a substance, DB, to the duster cans as a bitterant, purportedly to deter inhaling abuse. Yet, the Bitterant Defendants failed to add DB in the proper quantity and manner to render DFE aversively bitter.

307.    Each computer duster can from the Bitterant Defendants consists of approximately .01% of the bitterant DB.

308.    The Bitterant Defendants all followed the same patented procedure to add DB to each of the brands of computer duster at issue in this case. In the gas phase, the concentration of DB is far below a level which would be detectable and nowhere near the level that would prevent intentional inhalation.

309.    Specifically, according to the patent that the Bitterant Defendants allegedly followed, DB is added in a solid form to the liquified DFE gas aerosol at a target quantity of 5 to 50 parts per million (ppm). DB is dissolved in the liquified DFE gas aerosol and theoretically is intended to mix evenly throughout the can.

310.    However, when placed under pressure and expressed from the can, DFE and the small quantity of the bitterant DB are converted to a gas vapor. Pursuant to the patented design for addition of the bitterant, in the gas phase the concentration of DB is only 50 to 500 ppb.

311.    At 50 to 500 ppb, the concentration of DB is at best *recognizably* bitter but does not rise to the level of being *aversively* bitter, which is the scientifically-validated threshold at which DB would deter intentional inhalation.

312.    The Bitterant Defendants do not add the amount of bitterant called for in the patented design. Thus, in the gas phase, the concentration of DB is far below a level which would be detectable and nowhere near the level that would deter intentional inhalation.

313.    The DB formula concentration used by the Bitterant Defendants in the design and manufacture of their computer dusters does not have the intended and warranted deterrent effects to prevent misuse as evidenced in part by the fact that the incidence of huffing has increased exponentially since bitterant was added to the dusters.

3.    Further, DB is an ineffective choice of bitterant. Namely, DB is among the class of bitter compounds which cannot be detected by approximately 15–30% of the adult population. These individuals lack a genetic trait which allows them to taste the bitter properties of certain "propylthiourea derivatives."[139]

314.    DB is not only ineffective as a deterrent to intentional inhalation, it actually increases the risk and amount of DFE inhalation.

315.    DB is a "bronchodilator" that operates to relax the muscles in the lungs and to widen a person's airway upon being inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk a user will become addicted to DFE and increasing the risk of inhaling a deadly quantity of the substance. The Bitterant Defendants therefore failed to exercise reasonable care in making

---

[139] *See* U.S. CONSUMER PROD. SAFETY COMM'N, FINAL REPORT: STUDY OF AVERSIVE AGENTS, (1992); *see also Alcohol Denat. Final Report*, *supra* note 115.

the warranted safety modifications; instead, it made the computer dusters less safe and therefore breached their voluntarily assumed duty.

316.    All Defendants relied on the fact that computer dusters were widely misused in order to maintain and/or enhance sales of computer dusters.

317.    All Defendants failed to exercise reasonable care in designing, manufacturing, testing, researching, formulating, marketing, promoting, packaging, labeling, assembling, selling, distributing, and monitoring their products.

318.    At the time of sale, All Defendants breached their duty because their computer duster products did not adequately warn users of foreseeable and latent dangers related to the foreseeable use of the products because the products failed to warn: (1) of the known high risk of addiction from the primary ingredient, DFE, accompanied by the risk of withdrawal psychosis; (2) of the specific injuries at risk including permanent brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, and involuntary passing of urine and feces; and (3) clearly the risk of death. The Bitterant Defendants further failed to warn: (4) that DB was not added in a quantity or manner that would have a deterrent effect; (5) that DB is undetectable to a broad swath of the population in any quantity; (6) that the bitterant DB has a dilating effect on the respiratory system, which can lead to increased inhalation of DFE, a highly volatile and addictive substance. The general warnings provided by the Bitterant Defendants were cancelled out by reassuring consumers that their products were designed to prevent abuse. Additionally, the warnings that were present were not presented in a manner that would have alerted an ordinary user of the danger.

319.    All Defendants knew or should have known by exercising reasonable care of the foregoing defects described herein and the attendant risks they posed to users.

320.    All Defendants had a duty to warn users about these risks.

321.    Each can of computer duster at issue in this case was comprised of 99.9% to 100% DFE, a dangerous refrigerant which is highly addictive and can create a euphoric sensation when intentionally inhaled.

322.    DFE is a volatile substance that stimulates a neuro-chemical reaction that produces euphoria and with repeated or prolonged use can cause injury or death and abrupt cessation can induce withdrawal. DFE affects the brain after an individual begins to engage in intentional inhalation because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.

323.    All Defendants knew or should have known of the risks associated with exposure to DFE, including the risk of permanent brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, involuntary passing of urine and feces, and death as well as the high risk that users could become addicted to inhaling DFE.

324.    DB is ineffective as a bitterant. The Bitterant Defendants all followed the same patented procedure to add DB to each of the aforementioned brands of computer duster at issue in this case. Specifically, DB is added in a solid form at a target quantity of 5 to 50 ppm. DB is dissolved in the liquified gas aerosol and theoretically is intended to mix evenly throughout the can and be expressed from the can in an amount which makes DFE aversively bitter. However, in the gas phase, the concentration of DB is far below this level and nowhere near the level that could potentially deter intentional inhalation.

325.    The Bitterant Defendants failed to warn that the bitterant DB is among a class of bitter compounds which cannot be detected by approximately 15–30% of the population. Selection of DB as a bitterant despite its ineffectiveness in a large subsection of the population constitutes negligence.

326.    The Bitterant Defendants also failed to warn that the bitterant DB is a "bronchodilator" that operates to relax the muscles in the lungs and to widen a person's airway upon being inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk a user will become addicted to DFE and increasing the risk of inhaling a deadly quantity of the substance—the opposite of the purported deterrent effect.

327.    CRC Industries and the Home Depot Defendants were aware of the misuse of CRC Duster and the ineffectiveness of DB as a bitterant but continued to sell CRC Duster. CRC and Home Depot failed to warn that CRC Duster products contained no safety features whatsoever to protect against intentional inhalation. Continuing to manufacture, distribute, market, and sell CRC Dusters without any safety features, knowing that the products were being intentionally inhaled with potentially deadly consequences, constitutes negligence.

328.    All Defendants failed to warn ordinary users, including Tommy Byers, about the addictive properties of DFE. The Bitterant Defendants failed to warn ordinary users, including Tommy Byers, that DB was ineffective as a bitterant in the quantity and manner it was added to the computer dusters, failed to warn that he may have been unable to taste DB, and failed to warn of the increased risk of DFE inhalation due to the dilating effects that DB has on the respiratory system.

329.    These failures to warn as well as the inadequate warnings rendered all Defendants' computer dusters defective and unreasonably dangerous.

330.    The negligent and wrongful acts and omissions of all Defendants as alleged herein had a substantial part in bringing about Tommy Byers' addiction, injuries, and death.

331.    At all material and relevant times, all Defendants' carelessness and negligence were a substantial, direct, and proximate cause of Tommy Byers' addiction, injuries, and death and the resulting damages to him and his family.

332.    Plaintiff and members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

### COUNT V:    NEGLIGENCE
**Against Retailer Defendants**

333.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

334.    The Office Depot Defendants, Home Depot Defendants, and Menard, Inc. (collectively, the "Retailer Defendants") did not act as reasonably prudent retailers, because a reasonably prudent retailer would have kept reasonably familiar with news events and stories, scientific studies, and other reliable information concerning the foreseeable misuse of the products at issue in this case. By no later than 2018, Menards was aware that dusters were abused and were enough of a public health issue to warrant media attention.[140]  Home Depot was likewise aware of the potential for intentional inhalation of DFE dusters.[141]

335.    Despite this knowledge, the Retailer Defendants continued to sell, market, promote, and distribute computer duster products in multi-packs and in prominent displays. The Retailer

---

[140] *Blown Away: The Perils of Compressed Air*, Fox9 (Nov. 5, 2018), https://www.fox9.com/news/blown-away-the-perils-of-compressed-air.

[141] Adam Selisker Dep., 73:4–74:6, Sep. 15, 2022, *David McDougall v. CRC Industries Inc. et al*, Case No. 0:20-cv-01499-JRT-LIB (D. Minn.).

Defendants also turned a blind eye on individuals, like Tommy Byers and other members of the Class, who made multiple purchases of multi-cans during short periods.

336.    Defendant Menard, Inc. never took steps to meaningfully restrict the availability of computer dusters in their stores or track and monitor incidents involving computer dusters. To the contrary, Menards provided Tommy with an 11% rebate on his purchases of computer duster products.

337.    Receipts at the scene of Tommy's death showed Tommy had purchased at least twenty 12-oz cans of Ultra Duster from Menards between October 29 and 31, 2022.

338.    Menards displayed computer duster multi-packs in prominent spaces in their retail stores.



339.    Office Depot Defendants never took steps to meaningfully restrict the availability of computer dusters in their stores or track and monitor incidents involving computer dusters.

340.    OfficeMax plastic shopping bags and receipts for the purchase of Office Depot brand computer duster were found at the scene of Tommy's death.

341.    Office Depot and OfficeMax displayed their multi-packs in prominent end-cap spaces in their retail stores.



342.    The Home Depot Defendants never took steps to meaningfully restrict the availability of computer dusters in their stores or track and monitor incidents involving computer dusters.

343.    Receipts at the scene of Tommy's death show that Tommy purchased at least eight 8-oz cans of CRC Duster from Home Depot between October 29 and 31, 2021.

344.    The negligent and wrongful acts and omissions of the Retailer Defendants as alleged herein had a substantial part in bringing about Tommy Byers's addiction, injuries, and death.

345.    At all material and relevant times, the Retailer Defendants' carelessness and negligence were a substantial, direct, and proximate cause of Tommy Byers's addiction, injuries, and death and the resulting damages to him and his family.

346.    Plaintiff and members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

### COUNT VI:   BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
**Against all Defendants and Against Bitterant Defendants**

347.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

348.    By operation of law, all Defendants impliedly warranted that their computer dusters products were of merchantable quality, safe for personal or household use, and adequately fit for foreseeable use.

349.    By operation of law, the Bitterant Defendants impliedly warranted that their computer dusters containing a denatonium benzoate bitterant component were of merchantable quality, safe for personal or household use, and adequately fit for foreseeable use, including that their computer duster products conformed to the promises or affirmations of fact made on the container or label that the products designed to deter or discourage intentional inhalation.

350.    An implied warranty of merchantability, contained in the U.C.C. § 2-314, has been codified in Minnesota under Minn Stat. § 336.2-314.

351.    At the point of sale, all Defendants' computer dusters contained inherent design defects that rendered them unsuitable, unsafe, and inadequate for foreseeable personal or household use.

352.    At all material and relevant times, all Defendants were aware that consumers, including Tommy Byers would intentionally inhale Defendants' computer duster products.

353.    At all material and relevant times, consumers including Tommy Byers reasonably relied upon the judgment and sensibility of Defendants to sell computer duster products only if they were indeed of merchantable quality and safe and fit for their foreseeable uses.

354.    All Defendants breached the implied warranty of merchantability in connection with the sale and/or distribution of the computer dusters at issue.

355.    As a direct and proximate result of all Defendants' breach of implied warranty of merchantability, Plaintiff and members of the Class have sustained damages in an amount to be determined at trial.

356.    At the point of sale, the Bitterant Defendants' computer duster products were not merchantable because they failed to conform to the promises or affirmations of fact made on the container or label that their products contained a bitterant and that the products were designed to discourage or deter inhalant abuse.

357.    Additionally, at the point of sale, the DB in the Bitterant Defendants' dusters rendered the Bitterant Defendants' computer duster products inherently defective because the DB in these dusters was a defective component unsuitable for its intended purpose of deterring intention inhalation.

358.    Although DB is designed, marketed, and sold as a deterrent, a large subset of the population cannot detect DB at *any* concentration. Even among those who are able to detect it, DB has little to no deterrent effect, particularly when ingestion of a product is driven by addiction. There is also no evidence that DB is an effective deterrent when, as in the Bitterant Defendants' products, it is aerosolized. In fact, injuries and deaths due to computer dusters have increased

nationwide since manufacturers and retailers began adding DB to their DFE dusters at a rate far outpacing all other major categories of inhalants, such as gasoline, paint, or glue. Thus, the Bitterant Defendants' computer duster products breached the implied warranty of merchantability (1) by failing to conform to the promises or affirmations of fact made on the label that the bitterant in the product could deter inhalant abuse and that the product was designed to deter inhalant abuse, and (2) by including a defective component, DB, unfit for its intended purpose of deterring the inhalant abuse.

359.    Even if DB could effectively deter intentional inhalation, the Bitterant Defendants' products did not include DB in quantities sufficient to be detected as bitter, let alone aversively bitter. Independent testing of Ultra Duster, for example, revealed that only trace amounts of DB were present in the gas phase of the product. The Bitterant Defendant's dusters thus fail to conform to the promises of affirmations of fact on their labels that the products were designed to deter inhalant abuse.

360.    Furthermore, the DB in the Bitterant Defendants' computer dusters can only serve its intended deterrent purpose upon a user inhaling it, meaning the DB component of the Bitterant Defendants' products was intended to be inhaled. However, DB is a bronchodilator, which, when inhaled as part of a the Bitterant Defendants' dusters, causes a user to also take in more of the DFE in the duster, *increasing* the likelihood of addiction, injury, and death.  This is reflected in data showing that there are more emergency room visits due to computer dusters than there are all other major inhalants *combined.*

361.    Consequently, the Bitterant Defendants' inclusion of DB in their air duster products is a defect which renders the dusters *more* dangerous than they would have been otherwise. This is contrary to the Bitterant Defendants' label representing the bitterant as a safety feature which

would deter inhalant abuse. The Bitterant Defendants' air duster products are like defective cars fitted with exploding airbags—an already dangerous product rendered even more dangerous by its safety features in the exact scenario in which the safety feature was intended to operate.

362.    At all material and relevant times, consumers, including Tommy Byers, would not have discovered the breached warranty and realized the danger of Defendants' computer duster products by the use of reasonable care.

363.    The Bitterant Defendants' dusters failed to conform to the promises or affirmations of fact made on their labels that the products was designed with a bitterant that would discourage inhalant abuse. As a result, the Bitterant Defendants' dusters were not merchantable at the point of sale. Additionally, because the DB within Bitterant Defendants' dusters was unsuitable for its intended purpose of helping deter intentional inhalation, the Bitterant Defendants breached the implied warranty of merchantability as to a component of their computer dusters and thus as to their dusters as a whole.

364.    As a direct and proximate result of the Bitterant Defendants' breach of implied warranty of merchantability as to the DB component of their products, Plaintiff and members of the Class have sustained damages in an amount to be determined at trial.

### COUNT VII: <u>BREACH OF EXPRESS WARRANTY</u>
#### Against the Bitterant Defendants

365.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

366.    The elements of an express warranty, defined in the U.C.C. § 2-313, has been have been codified in Minnesota under Minn Stat. § 336.2-313. As such, Plaintiff brings these claims for breach of express warranty pursuant to Minn. Stat. § 336.2-313.

367. The Bitterant Defendants made express, written affirmations of fact or promise relating to their computer duster products warranting that the dusters contained a bitterant which deters inhalant abuse. Specifically, the Bitterant Defendants warranted that their dusters contained a bitterant to "help discourage inhalant abuse" or other similar language.

368. The Bitterant Defendants made these express warranties about product safety through websites, packaging, and labeling to assuage retailer concern for rising inhalant abuse injuries and deaths and to keep their defective and unreasonably dangerous products on the shelves.

369. In reality, the bitterant DB was not added at a concentration that would be an effective deterrent and was an inappropriate choice of bitterant in the first instance due to the inability of a broad swath of the population to taste it and due to the dilating effects DB has on the respiratory system. DB rendered Defendants' computer dusters unsafe in direct contradiction to their express warranty.

370. The Bitterant Defendants encouraged retailers to sell their dusters in multi-packs and market them in high visibility end caps without regard for quantity of cans sold, despite knowing that intentional inhalation was a prevalent and entirely foreseeable use of their products, due to the highly addictive nature of DFE, and even though the bitterant DB would not deter such use and could increase the risks of inhalation. The Bitterant Defendants made these marketing decisions directly, for their own benefit, despite their knowledge of the falsity of the respective warnings on their computer dusters.

371. The Bitterant Defendants' products did not conform to the express warranties made as to product safety.

372. Tommy Byers could not have discovered the breached warranties and realized the danger of Defendants' computer duster products.

373.    As a direct and proximate result of The Bitterant Defendants' breach of express warranties, Plaintiff and members of the Class have suffered pecuniary and other losses.

374.    Plaintiff and members of the Class seek recovery of actual damages of an amount to be determined at trial and any other relief that is deemed proper and just.

**COUNT VIII:    <u>PUBLIC NUISANCE</u>**
**Against All Defendants**

375.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

376.    The elements of a public nuisance are codified in Minn. Stat. § 609.74. A private plaintiff may bring a public nuisance claim where she "has suffered an injury special or peculiar to [herself] which is not common to the general public." *Hill v. Stokely-Van Camp, Inc.*, 260 Minn. 315, 321 (1961).

377.    At all material and relevant times, all Defendants knew or should have known that people intentionally inhaled their air duster products.

378.    At all material and relevant times, all Defendants knew or should have known that their air duster products were highly addictive if intentionally inhaled.

379.    At all material and relevant times, all Defendants knew or should have known that people were using their air duster products in a manner that would result in addiction, severe health problems, and death.

380.    At all material and relevant times, the Bitterant Defendants knew or should have known that people continued to intentionally inhale their air duster products despite the advertised bitterant to "discourage inhalant abuse."

123

381. At all material and relevant times, the Bitterant Defendants knew or should have known that the bitterant denatonium benzoate (DB) was a bronchodilator and that the inclusion of DB in their air duster products would render them *more* dangerous.

382. At all material and relevant times, the Bitterant Defendants knew or should have known that the quantity of DB in their air duster products was insufficient to discourage intentional inhalation.

383. At all material and relevant times, the Bitterant Defendants knew or should have known that there is no evidence that DB has an aversive effect when in aerosol form.

384. At all material and relevant times, all Defendants engaged in deceptive, unconscionable, unfair and misleading commercial practices in the marketing and sale of their air duster products that Defendants knew to be dangerous and defective, including but not limited to selling their air duster products in multi-packs, failing to track or impose limits on purchases of these products, and failing to place these products behind the counter.

385. At all material and relevant times, all Defendants provided inadequate, false, and/or misleading warnings, labels, promotions, marketing, and information about the risks and dangers associated with the foreseeable misuse of their air duster products, including but not limited to failing to warn of the risk of addiction, failing to warn of the specific physical health risks posed by their air duster products, and failing to adequately warn that intentional inhalation can lead to *instantaneous* death.

386. At all material and relevant times, the Bitterant Defendants provided false and misleading warnings, labels, promotion, marketing, and information about the effectiveness of the bitterant in their air duster products at deterring intentional inhalation.

387.    At all material and relevant times, all Defendants induced people to use their air duster products in a manner that resulted in the user's addiction, injury, and death, with the intent that people rely thereon in connection with the sale or advertisement of Defendants' air duster products through the use of deception, fraud, false advertising, false pretenses, misrepresentations, unfair and/or deceptive practices and the concealment and suppression of material facts, including but not limited to fraudulent statements, concealments, and misrepresentations identified herein and above.

388.    At all material and relevant times, Defendants' actions and omissions have created, maintained, and permitted a public nuisance. Defendants' carelessness, negligence, recklessness, deception, and concealment constitutes an unreasonable interference with the exercise of the common rights of the health, safety, and welfare to the citizens of Minnesota, and has maintained or permitted a condition which unreasonably endangers the safety and health of the members of the general public in Minnesota, including but not limited to adult consumers of their products.

389.    All Defendants' failure to inform the public about the full extent of the risks and dangers associated with the foreseeable misuse of their air duster products has prevented the public from knowing of the real danger posed by these products, and has thereby endangered the safety and health of the members of the general public by allowing more people to continue to foreseeably misuse them, leading to an increasing number of people suffering addiction, physical harm, and even death.

390.    The Bitterant Defendants' failed to disclose that the DB in their air duster products was ineffective at discouraging intentional inhalation, that DB was not added to their products in a quantity that could potentially be aversive, that DB is undetectable by a sizeable portion of the population, that no evidence exists of DB's effectiveness in aerosol form, and that DB is a

bronchodilator which renders their products more dangerous. The Bitterant Defendants' failure has prevented the public from knowing of the ineffectiveness of this purported safety measure and has thereby endangered the safety and health of members of the general public by allowing more people to continue to foreseeably misuse Defendants' air duster products, leading to an increasing number of people suffering addiction, physical harm, and even death.

391.    Defendants' carelessness, negligence, recklessness, deception, and concealment is of a constant and continuing nature. Though Tommy's Law implements one important safeguard, it alone cannot address the full scope of the public nuisance created, maintained, and permitted by Defendants. As long as Defendants continue to design, manufacture, label, and market their air duster products as they have been, Defendants' actions and omissions will continue to have long-lasting effects on members of the general public in Minnesota, including, but not limited to, the addiction, physical injury, and death of those who foreseeably misuse Defendants' air duster products and whose suffering and death devastates families across Minnesota.

392.    The public nuisance created, maintained, and permitted by Defendants was specifically injurious to Tommy Byers and to Plaintiff. As a direct and proximate result of Defendants' carelessness, negligence, recklessness, deception, and concealment, and of their design, manufacture, distribution, and sale of their unreasonably dangerous products, Tommy Byers suffered addiction, physical injury, and death. As a direct and proximate result of Defendants' carelessness, negligence, recklessness, deception, and concealment, and of their design, manufacture, distribution, and sale of their unreasonably dangerous products, Plaintiff lost the significant mental, emotional, and financial support Tommy provided. Plaintiff suffered the loss of her only child and will continue to suffer permanent and substantial losses, harms and damages, including but not limited to those described above and herein.

## VII.    NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES

393.    Please be advised that after commencement of this action, Plaintiff O'Meara intends to move the Court for permission to amend this Complaint to allege a claim against all Defendants because, on information and belief, all Defendants acted with deliberate disregard for the rights and safety of others under Minn. Stat. § 549.20.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

394.    An order certifying this action on all counts, and the Class requested herein as an Issue Class Action, designating Plaintiff as the representative of the Minnesota Issue Class and appointing Plaintiff's counsel as Class counsel for the Minnesota Issue Class;

395.    An order declaring that Defendants' actions constitute:

a.      A strict liability design defect;

b.      A strict liability failure to warn;

c.      A strict liability manufacturing defect;

d.      Negligent design;

e.      Negligent failure to warn;

f.      A breach of implied warranty;

g.      A breach of express warranty;

h.      A public nuisance.

396.    A judgment awarding Plaintiff and the Class all compensatory and, if granted, punitive damages to be determined at trial in an amount reasonably in excess of Seventy-Five Thousand Dollars ($75,000);

397.    For injunctive relief:

    a.     Prohibiting the sale of computer duster products designed, manufactured, distributed, and sold by defendants containing difluoroethane; or in the alternative,

    b.     Prohibiting (1) the sale of more than one can of Defendants' computer duster products containing difluorethane per consumer within a 30-day period of time, and (2) prohibiting Defendants from designing, manufacturing, distributing, and selling computer duster products containing difluorethane without an effective physical mechanism or chemical composition to deter intentional inhalation.

398.    A judgment awarding Plaintiff and the Class pre-judgment and post-judgment interest in an amount prescribed by law;

399.    A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees, as prescribed by law, and costs of investigation pursuant to Minn. Stat. § 8.31, subd. 3a, 325D.13, 325D.44, 325F.67, and 325F.69; and

400.    Grant such other legal, equitable, or further relief as the Court may deem just and proper.

401.    **Plaintiff hereby demands a trial by jury for all issues so triable.**

RESPECTFULLY SUBMITTED, this the 29th day of September 2025.

BY: /s/ *Vincent J. Moccio*
Vincent J. Moccio, MN #0184640
**Bennerotte & Associates, P.A.**
3085 Justice Way Suite 200,
Eagan, MN 55121
Telephone: (612) 799-5160
vincent@bennerotte.com

Ruth Anne French, KS #28492
Rex A. Sharp, KS #12350
Sarah T. Bradshaw, KS #26551
Jennifer Salva-Cushing, KS #28244
Bradley Thomas, KS #27456
Monica Sandu, KS #30341
**Sharp Law, LLP**
4820 W. 75th St.
Prairie Village, KS 66208
Telephone: (913) 901-0505
Facsimile: (913) 261-7564
rafrench@midwest-law.com
rsharp@midwest-law.com
sbradshaw@midwest-law.com
jsalvacushing@midwest-law.com
bthomas@midwest-law.com
msandu@midwest-law.com

*Counsel for Plaintiff Catherine O'Meara*