**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Catherine O'Meara, *individually and as Trustee for the Next of Kin of Thomas Byers and on behalf of all others similarly situated*,

Plaintiff,

v.

AW Distributing, Inc.; AW Product Sales & Marketing, Inc.; Shanghai AW Custom Manufacturing & Aerosol Propellant Co., Ltd.; Zhejiang Ludao Technology Co., Ltd.; Jiangsu Sprayvan Commodity Technology Development Co., Ltd.; CRC Industries, Inc.; The ODP Corporation; ODP Business Solutions, LLC; Office Depot, LLC; OfficeMax North America, Inc.; OfficeMax, LLC; Home Depot U.S.A., Inc.; Menard, Inc.; and John Doe Company, *Defendants #1–10*;

Defendants.

No. 25-cv-3792 (KMM/DLM)

**ORDER**

---

Over the course of a few short weeks in the fall of 2022, Thomas Byers became addicted to intentionally inhaling the contents of aerosol computer duster canisters. On October 31 or November 1, 2022, Mr. Byers died tragically from volatile inhalant toxicity after purchasing and inhaling several of these duster products. His mother, Plaintiff Catherine O'Meara, filed this wrongful-death lawsuit against the manufacturers, distributors, and retailers who sell the duster products that Mr. Byers became addicted to

inhaling. Pending before the Court are Defendants' motions to dismiss for lack of personal jurisdiction and for failure to state a claim.

## BACKGROUND

### *The Parties*

Catherine O'Meara brings this case individually and as the trustee for the next of kin of Mr. Byers. The Complaint names several business entities involved in the manufacture, distribution, and sale of aerosol computer dusters. One group of Defendants manufactures and sells the computer dusters. This group includes AW Distributing, Inc. and AW Product Sales & Marketing, Inc. (collectively, AW Defendants). The AW Defendants are California corporations that manufacture a computer duster sold under the retail name "Ultra Duster," which they also manufacture for third party retailers to sell under private labels.[1] Another manufacturing defendant is CRC Industries, Inc. (CRC), a Pennsylvania corporation that makes and sells its own aerosol computer duster under the trade name "CRC Duster."[2]

The second group of Defendants includes retailers who sell the computer duster products ava. One of these retailers is Defendant Menard, Inc. (Menards). Menards is a

---

[1] The Defendants named in the Complaint also include three Chinese business entities that are also allegedly responsible for the manufacture and sale of Ultra Duster and private label computer dusters. These are Shanghai AW Custom Manufacturing & Aerosol Propellant Co., Ltd. (AW Custom Manufacturing), Zhejiang Ludao Technology Co., Ltd. (Green Island), and Jiangsu Spravan Commodity Technology Development Co., Ltd. (Sprayvan). As of the date of this Order, Plaintiff has not been able to serve AW Custom Manufacturing, Green Island, or Sprayvan.

[2] By September 2025, CRC Duster had been discontinued, but it was still being sold at all times relevant to this case. (Compl. ¶ 17.)

Wisconsin corporation that has retail home improvement stores in several states across the Midwest. Menards sells the AW Defendants' Ultra Duster products. Another retailer, Defendant Office Depot,[3] operates office-supply stores and sells a private label version of the Ultra Duster product manufactured by the AW Defendants. And Defendants Home Depot U.S.A., Inc. and The Home Depot, Inc. (collectively Home Depot) operate retail home improvement stores throughout the United States, where it sold CRC Duster. Menards, Office Depot, and Home Depot are referred to in the Complaint and in this Order as "Retail Defendants." Plaintiff also refers to the AW Defendants, Office Depot, and Menards as the "Bitterant Defendants" because, as explained below, these Defendants' aerosol products included a bittering agent intended to deter misuse of the products as intentional inhalants.

***Mr. Byers's Death***

Mr. Byers began inhaling computer duster products in September 2022 and quickly became addicted. (Compl. ¶ 83.) His use intensified through the end of October 2022. Within three weeks of starting to abuse inhalants, Mr. Byers died. (*Id.*) He passed away in his bathroom between October 31 and November 1, 2022, next to a can of computer duster. He was 34 years old. (*Id.* ¶ 86.) His death certificate identifies his cause of death as "volatile inhalant toxicity (1,1-Difluoroethane toxicity)." (*Id.* ¶ 89.)

After his death, cans of CRC Duster, Ultra Duster, and Office Depot's private-label duster were found throughout Mr. Byers's apartment, along with plastic bags from

[3] Like the Complaint, the Court uses "Office Depot" as a collective term referring to the following list of Defendants: The ODP Corporation; ODP Business Solutions, LLC; Office Depot, LLC; OfficeMax North America, Inc.; and OfficeMax, LLC.

Home Depot, Menards, and OfficeMax. (*Id.* ¶ 87.) The Complaint alleges that each of these dusters, and the retailers who sold them, contributed to Mr. Byers's addiction to inhalant abuse and, ultimately, his death.

Aerosol computer dusters are composed almost entirely of 1,1-Difluoroethane ("DFE"), which is an odorless gas. (*Id.* ¶ 9.) When inhaled, DFE causes intense and immediate intoxication, which is both short-lived and undetectable in workplace drug tests. (*Id.*) Intentionally inhaling DFE also results in a loss of motor control and impaired judgment, leading to numerous accidents and deaths. (*Id.*) Inhaling DFE can be highly addictive, and computer dusters containing DFE provide a relatively inexpensive means for a user to get high. (*Id.* ¶¶ 3–4.) Computer dusters are one of the most accessible and frequently used inhalants. (*Id.* ¶ 9.) Intentional misuse of DFE-based dusters as inhalants has been growing over several years, outpacing the illicit use of many other drugs, resulting in increased injuries to users and others, and leading to some local bans on their sale and other regulatory measures. (*Id.* ¶¶ 90–119.)

Because intentionally inhaling DFE can be highly addictive, the Bitterant Defendants began adding a trace amount of denatonium benzoate ("DB") to the canisters as a bitterant intended to deter abuse. (*Id.* ¶¶ 21–22, 25, 32.) Canisters of Ultra Duster and the Office Depot private-label dusters eventually included a notice on the cans themselves stating that they contain a bitterant to help discourage inhalant abuse. However, plaintiff alleges that the DB in computer dusters is not an effective deterrent for a variety of reasons. (*Id.* ¶¶ 26–29.) For example, the Bitterant Defendants allegedly failed to include enough DB in the canisters for it to act as a deterrent. In addition, DB

acts as a bronchodilator, causing a person's airways to open. This means that if a person intentionally inhales the contents of a duster canister, he can take in even more DFE and do so faster than he would if the DB had been left out of the canister altogether.

The Defendants' canisters include certain warnings about the risks of misusing the dusters as inhalants. For example, Office Depot's private label canister contains the following warnings regarding abuse of the product: "MISUSE BY DELIBERATELY CONCENTRATING AND INHALING MAY BE HARMFUL OR FATAL. PLEASE USE OUR PRODUCT RESPONSIBLY." (*Id.*; Dkt. 105-2.) Ultra Duster and CRC canisters contain similar warnings. (Dkt. 105-1; Dkt. 105-3.)[4]

According to the Complaint, all Defendants knew that DFE was highly addictive, that their duster products were being abused by consumers intentionally inhaling the canisters' contents, that the inclusion of DB was not an effective deterrent to inhalant

[4] Defendants provided complete copies of the relevant labels on the computer duster products. Although Plaintiff did not include the full warnings in the Complaint or in any attachments to the pleading, she does make the nature of the warnings on the canisters central to certain claims asserted against the Defendants. Accordingly, the Court finds it appropriate to consider these materials on a motion to dismiss for failure to state a claim. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) ("Though matters outside the pleadings may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading.") (quotations omitted).

abuse, and that their warning labels falsely claimed that the inclusion of DB was a deterrent to inhalant abuse. (*Id.* ¶¶ 202–09.)[5]

***Plaintiff's Claims***

Based on these allegations, Plaintiff asserts her claims in eight separate counts. In Count 1 she claims that all Defendants are strictly liable for defectively designing their computer duster products. Plaintiff claims that the Defendants had reasonable alternative designs available to them that would have used less or no DFE. Further, she alleges that the Bitterant Defendants' designs were defective because (1) they included an insufficient amount of DB to deter intentional inhalation; (2) the formulation of DB wasn't effective at achieving its purpose; (3) choosing to use DB was, itself, problematic because most people cannot detect it; and (4) choosing to use DB was a defective design because it acts as a bronchodilator.

Count 2 of the Complaint also alleges a strict product liability claim against all Defendants—failure to warn. Plaintiff alleges that the warnings provided by the Defendants were defective because (1) there were missing specific warnings; and (2) the warnings that were provided were deficient. Plaintiff says that the warnings did not warn of the risk of death in a clear and effective manner and that the notices on the canisters failed to discuss the risk of addiction and withdrawal at all. Further, Plaintiff asserts that

---

[5] After Mr. Byers' death, the Minnesota Legislature passed a statute commonly referred to as "Tommy's Law." The statute places restrictions on sales of aerosol dusters containing DFE, including requiring that the dusters: be kept behind a counter; be sold to purchasers over the age of 21; and be sold in quantities of no more than three cans in a single transaction. is codified at Minn. Stat. § 325E.078, subd. 2, 3. Tommy's Law also requires the dusters' labels to warn of the dangers of intentionally inhaling the contents of the can. *Id.* § 325E.078, subd. 5.

the warnings were insufficient because they did not alert the users to specific injuries that can result from intentional inhalation of DFE, including brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, and involuntary passing of urine and feces. With respect to the Bitterant Defendants, Plaintiff also claims that they failed to include warnings about DB's flaws as a deterrent.

In Count 3, Plaintiff asserts a strict product liability claim against the Bitterant Defendants based upon a manufacturing defect. Plaintiff asserts that the canisters do not contain the amount of DB called for in the patented design and the DB fails to mix uniformly with the DFE, so the cans will not disperse the bitterant at all or in sufficient quantities to act as a deterrent.

Plaintiff brings a common-law negligence claim against all Defendants in Count 4. She alleges that Defendants were negligent in several ways. Plaintiff asserts that Defendants were negligent in giving warnings to consumers given the foreseeability of misuse of the products. She also claims that Defendants were negligent in choosing to use DFE at all given their alleged knowledge of DFE's addictive qualities. Plaintiff claims all Defendants were negligent in "testing, researching, designing, manufacturing, producing, marketing, supplying, promoting, packaging, selling, distributing, labeling, and monitoring" the product. Finally, Plaintiff claims that the Bitterant Defendants were negligent in failing to add DB in sufficient quantities and negligent in choosing DB as the deterrent.

Count 5 asserts a negligence claim against the Retailer Defendants. Plaintiff alleges that the Retailer Defendants were negligent in continuing to sell dusters in multi-

packs after the prevalence of abuse and risks of addiction were widely known. In addition, Plaintiff claims the Retailer Defendants were negligent in failing to restrict availability of the dusters and not tracking incidents involving computer dusters

Counts 6 and 7 assert breaches of the implied warranty of merchantability and an express warranty. Count 6 asserts that al Defendants impliedly warranted that dusters were fit for their ordinary or intended use. Further, Plaintiff claims that the Bitterant Defendants impliedly warranted that dusters containing DB were fit for their foreseeable use but were not because (1) they did not contain enough DB for it to act as a deterrent and (2) the DB itself was not fit for purpose of deterring inhalant abuse. The breach-of-express-warranty claim in Count 7 is asserted against the Bitterant Defendants. Plaintiff alleges that the Bitterant Defendants' canisters have an express warranty that the cans contained a bitterant that deters inhalant abuse, but the canisters did not conform to that warranty.

Plaintiff alleges that all Defendants are liable for creating a public nuisance in Count 8 of the Complaint. She asserts that all Defendants knew consumers were abusing the air duster products, knew they were addictive, and knew that such misuse causes severe health problems and death. She asserts that all Defendants engaged in deceptive and misleading commercial practices, including selling dusters in multi-packs and failing to track or impose limits on purchases of the products, inducing misuse. And finally, she alleges that the Bitterant Defendants knew that the addition of DB was ineffective.

***Class Allegations***

Plaintiff seeks to pursue this case as a class action under Fed. R. Civ. P. 23(b)(3) and 23(c)(4).[6] In essence, Plaintiff proposes a bifurcated class action process where certain common issues would first be litigated, followed by individual actions regarding causation, damages, and similar issues. The class proposed in the Complaint includes "[a]ll citizens of Minnesota, and their heirs and survivors, who have (1) suffered or presently suffer injury or addiction; and/or (2) died from DFE intoxication … arising from inhaling DFE-based liquid aerosol" in Defendants' duster products. (Compl. ¶ 210.) Here, the complaint proposes that the Court would certify the class to resolve several issues bearing on the defendants' liability for (1) design-defect, manufacturing-defect, and failure-to-warn claims; (2) negligence claims; and (3) breach-of-warranty claims. (*Id.* ¶ 213(a)–(*l*).)

***Pending Motions***

The Defendants have filed six motions to dismiss under Federal Rules of Civil Procedure 12(b)(2) (personal jurisdiction), 12(b)(6) (failure to state a claim), and 12(f) (striking allegations). The AW Defendants move to dismiss the claims against them for lack of personal jurisdiction. (Dkt. 76.) All Defendants have jointly moved to dismiss Plaintiff's claims for failure to state a claim (Dkt. 103), and to strike Plaintiff's Rule 23

[6] Under Rule 23(b)(3), a class can be certified when a "court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(c)(4) allows a court to certify a class for purposes of litigating specific issues. Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

class action allegations (Dkt. 92). Office Depot (Dkt. 86), Menards (Dkt. 97), and Home Depot (Dkt. 108) each filed individual motions to dismiss the claims against them for failure to state a claim. Through these motions, the Defendants seek complete dismissal of the action, and alternatively, to have the class allegations stricken.

## DISCUSSION

## I. AW Defendants' Personal Jurisdiction Motion

### A. Legal Standard

AW Distributing, Inc. and AW Product Sales & Marketing, Inc. ask the Court to dismiss them from this case for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). On a motion to dismiss for lack of personal jurisdiction, the plaintiff must make a "prima facie showing of jurisdiction," and courts view the evidence in the light most favorable to the plaintiff. *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021). The plaintiff carries that burden if she pleads facts that allow the court to reasonably infer that the defendant is subject to personal jurisdiction in the forum. *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)) (alteration in *K-V Pharm Co.*). The "evidentiary showing required at the prima facie stage is minimal" and may be supported by affidavits and exhibits outside of the pleadings. *Id.*

In a diversity case, a court may exercise personal jurisdiction when "authorized by the forum state's long-arm statute and permitted by the Due Process Clause of the Fourteenth Amendment." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 593 (8th Cir. 2011); *Wade v. Pottawattamie Cnty.*, 100 F.4th 991, 992 (8th

Cir. 2024). In this case, these two questions collapse into a single inquiry because Minnesota's long-arm statute allows jurisdiction to the full extent permitted by the U.S. Constitution. *See Guinness Import Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 614 (8th Cir. 1998). The sole question is "whether the exercise of personal jurisdiction over [the AW Defendants] is consistent with due process." *Wade*, 100 F.4th at 992 (quotations omitted).

The exercise of personal jurisdiction over a defendant satisfies due process if the court has either general or specific jurisdiction. *Id.* at 993. The focus in this case is specific jurisdiction because no party contends that the AW Defendants are "essentially at home" in Minnesota. *See id.* (describing general jurisdiction). "A court has specific jurisdiction over an out-of-state defendant when the defendant purposely directed its activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Kendall Hunt Publishing Co. v. Learning Tree Publishing Corp.*, 74 F.4th 928, 930 (8th Cir. 2023) (quotation omitted). Courts must consider whether the defendant has "minimum contacts with the forum state" and whether the plaintiff's "claims arise out of or relate to those contacts." *Id.* (cleaned up).

Five factors guide the Court's analysis regarding the AW Defendants' contacts with Minnesota. *Id.*; *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 952 (8th Cir. 2022); *Johnson v. Arden,* 614 F.3d 785, 794 (8th Cir. 2010). The three "primary factors" include: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; [and] (3) the relationship of the cause of action to the contacts." *Arden*, 614 F.3d at 794. These factors are "closely interrelated" and often considered

together. *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996). The "secondary factors" are "(4) the interest of [the state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Arden*, 614 F.3d at 794.

In this context, courts are frequently called upon to consider a stream-of-commerce theory of specific personal jurisdiction. Under this theory, a court "does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980). However, "there is no simple test or standard to determine when placing an object in the stream of commerce is sufficient to establish minimum contacts in the forum state." *Chairez v. AW Distrib., Inc.*, No. 20-cv-1473 (NEB/TNL), 2021 WL 1600494, at *2 (D. Minn. Apr. 23, 2021). There are at least two different approaches—one is referred to as the "stream of commerce plus" approach and the other as the "more lenient view." *Id.* at *3.[7]

[7] Under the stream-of-commerce-plus approach, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state." *Asahi Metal Indus., Co. v. Superior Court of Cal.*, 480 U.S. 102, 112 (1987) (O'Connor, J., plurality opinion). Courts applying this view look for "something the defendant did that indicates that it had an 'intent or purpose to serve the market in the forum State.'" *Chairez*, 2021 WL 1600494, at *4 (quoting *Asahi*, 480 U.S. at 111–12 (plurality opinion)). Under the more lenient view, "[a]s long as a participant in [the anticipated flow of products from manufacture to retail sale] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring opinion). This approach is focused on the "foreseeability of litigation in a State where the defendant's product was regularly *sold*[.]" *Id.* at 119.

"The Eighth Circuit has not clearly adopted either approach." *Id.* But in several cases, the Eighth Circuit has held that courts may exercise specific jurisdiction under a stream-of-commerce theory when, based on the facts of a given case, the nature and quality of a defendant's contacts with the forum reveals some purposeful conduct intended to serve the market in that forum, either directly or indirectly. *See, e.g.*, *Falkirk Mining Co. v. Japan Steel Works*, 906 F.2d 369, 375 (8th Cir. 1990) (finding foreign defendant had insufficient contacts with the forum where the defendant had no knowledge it was manufacturing a part for ultimate installation in mining equipment used in North Dakota); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 615 (8th Cir. 1994) (finding foreign defendant had sufficient contacts with the Nebraska forum where it "poured its products into regional distributors throughout the country" and "reaped the benefits of its network"); *Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943, 947–48 (8th Cir. 1998) (finding a prima facie case of jurisdiction where the defendant's products did not end up in the Iowa forum "on an 'attenuated, random, or fortuitous' basis," but instead, the defendant designed the product for the U.S. market, agreed to distribute the product through a U.S. distributor, and had other contacts with a neighboring state); *Guinness Import Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607 (8th Cir. 1998) (finding foreign beer brewer defendant did not have sufficient contacts with Minnesota where the defendant sold its beer to an importer, the importer then selected a distributor, and the defendant exercised no control over the importer or the distributor); *Clune v. Alimak*, 233 F.3d 538, 543–44 (8th Cir. 2000) (finding the foreign defendant had sufficient contacts with Missouri forum where the defendant created a distribution system

that brought the equipment at issue to the state, designed its product for the U.S. market, had distribution agreements with U.S. distributors, and twenty to forty of the items had ended up in Missouri).

**B. Analysis**

The AW Defendants argue that they should be dismissed for lack of personal jurisdiction because they have no meaningful connection with Minnesota. For example, through the Declaration of Kennic Ho, Manager of AW Distributing, Inc. and CEO of AW Product Sales & Marketing, Inc., the AW Defendants emphasize their lack of any physical presence, bank accounts, or property in Minnesota, and the fact that they do not directly market or advertise here. (*See* Decl. of Kennic Ho, *passim*.) And their air duster products were manufactured in China and sold to Menards by delivering them to a Menards warehouse in Wisconsin, rather than to any location in Minnesota. (*Id.* ¶ 15.) They similarly sold the air duster products to Office Depot FOB[8] the port of Ningbo in China, did not deliver the Office Depot canisters to Minnesota, and Office Depot arranged to pick up the product in China through a freight carrier. (*Id.* ¶¶ 16–18.) According to the AW Defendants, "[a]fter a customer takes possession of a computer duster product, the AW Defendants do not control where, when, or how the product is further disseminated." (*Id.* ¶ 21.) Instead, "[r]etailers distribute the products to stores of their choosing, without any input or control by the AW Defendants." (*Id.* ¶ 22.) Thus, the

[8] "FOB" is short for "free on board," which is a "mercantile-contract term allocating rights and duties of the buyer and the seller of goods with respect to delivery, payment, and risk of loss, whereby the seller must clear the goods for export, and the buyer must arrange for transportation." *Free on Board*, Black's Law Dictionary (10th ed. 2014).

AW Defendants maintain that they do not have the minimum contacts with Minnesota necessary to support this Court's exercise of personal jurisdiction over them.

No doubt those "are facts supporting [the AW Defendants'] motion to dismiss for lack of personal jurisdiction." *Vandelune*, 148 F.3d at 948. But under the circumstances here, they do not require dismissal of the complaint against the AW Defendants. *See id.* (observing that the absence of a "direct marketing presence does not necessarily mean that [the defendant] has not purposefully marketed [the product] in" the forum state). Instead, the allegations in the Complaint and the evidence submitted in support of jurisdiction support the reasonable inference, at this early stage, that the AW Defendants have purposefully availed themselves of the privilege of making sales within Minnesota. Plaintiff has satisfied the minimal burden to establish a prima facie case of personal jurisdiction over the AW Defendants.

First, the record supports an inference that large numbers of the AW Defendants' Ultra Duster and private label products are sold in the State of Minnesota each year. Plaintiff alleges that annual nationwide sales of computer dusters to household users are in the tens of millions of units every year, including those sold by Defendants in this case. (Compl. ¶¶ 10, 171.) While these numbers are not specific to the AW Defendants, it is reasonable to infer that many of those sales are sales of the AW Defendants' Ultra Duster products available at Menards stores and the private label version sold at Office Depot. It is also reasonable to infer that AW Defendants make large numbers of sales nationwide given their relationships with major retailers, including Menards, Office Depot, and Walmart. (*Id.* ¶¶ 12–13, 15, 20, 25, 52.) While Walmart is not itself a named defendant in

this case, Ms. O'Meara has submitted evidence demonstrating millions of units of AW Duster products sold through Walmart stores between March 2011 and February 2012. (Decl. of Ruth Ann French ¶ 4, Ex. 1 [Dkt. 126-1].) All of these retailers have numerous locations in the State of Minnesota. The record lacks specific sales figures for the AW Defendants' products sold in Minnesota each year. But it is reasonable to infer that the AW Defendants' products are sold in significant numbers in Minnesota and that AW Defendants derive substantial revenue from their sales to nationwide retailers with a presence in the state. These facts and the reasonable inferences from them make it "difficult to characterize" the AW Defendants' Minnesota sales "as random, attenuated or fortuitous." *See Clune*, 233 F.3d at 543–44 ("Of the 700 construction hoists that were sold in the United States by the company's distributors, between twenty and forty ended up in Missouri.").

Second, Plaintiff has shown that the AW Defendants make their Ultra Duster products available for purchase directly by consumers online. For example, they sell Ultra Duster on Amazon, the largest e-commerce platform in the world. (French Decl., Exs. 3–5.) Similarly, they offer their products for sale through the website canned-air.com. (*Id.* Exs. 8–12.) Exploiting these channels of commerce and engaging in sales and shipments of products to consumers nationwide also readily suggests that a portion of those sales were made to consumers located in Minnesota. And the record indicates that AW Defendants labeled and packaged their products specifically for the U.S. market. *Clune*, 233 F.3d at 543–44 (noting that the construction hoists at issue were "designed for

the United States market" and sold through U.S. distributors, and a significant number of the products ended up in the forum).

Third, there is no doubt that AW Defendants distributed their products in Minnesota for several years. The complaint alleges that Mr. Byers purchased several Ultra Duster canisters in Minnesota over a short period of time. And Mr. Byers allegedly purchased and used products sold through several different nationwide retailers in Minnesota. These facts further support an inference that the AW Defendants placed their products into the stream of commerce with the expectation that it would benefit from sales in Minnesota. *Chairez*, 2021 WL 1600494, at *5 ("Several courts have similarly concluded that a manufacturer who sells its products through a nationwide retailer is subject to personal jurisdiction where the retailer sells its products.") (collecting cases). And they establish a connection between the AW Defendants' contacts with the forum and the allegations at the heart of this case. Indeed, AW Defendants' sales of its aerosol products to the Minnesota market have previously resulted in the companies being sued in federal district court here as far back as 2020, for an accident that occurred in December 2017. *Chairez*, 2021 WL 1600494. As a result, the AW Defendants cannot reasonably claim ignorance that they benefited from sales in the Minnesota market. Nor can they suggest that it was unforeseeable that they would be haled into a court in Minnesota as a result of their purposeful availment of the market here.

Altogether, these facts indicate that the AW Defendants had "an 'intent or purpose to serve the market in the forum State.'" *Chairez*, 2021 WL 1600494, at *4 (quoting *Asahi*, 480 U.S. at 111–12 (plurality opinion)). Plaintiff has, therefore, made out a prima

facie case of personal jurisdiction over the AW Defendants. *Id.*[9] For these reasons, the AW Defendants' motion to dismiss for lack of personal jurisdiction is denied.

## II. Joint Motion to Strike Class Allegations

Plaintiff's complaint seeks to certify the following class pursuant to Rules 23(b)(3) and 23(c)(4): "[a]ll citizens of Minnesota, and their heirs and survivors, who have (1) suffered or presently suffer injury or addition; and/or (2) died from DFE intoxication . . . arising from inhaling DFE-based liquid aerosol" in Defendants' duster products. (Compl. ¶ 210.) She proposes a bifurcated process where several common issues would first be litigated, followed by individual actions regarding causation, damages, and other matters.

The "issue classes" Plaintiff proposes are as follows:

> a. whether Defendants' computer duster products were defectively designed;
>
> b. whether Defendants failed to warn users;
>
> c. whether Defendants negligently designed their computer duster products;
>
> d. whether Defendants negligently failed to warn users;
>
> e. whether Defendants knew or should have known that inhaling computer dusters was a foreseeable use of the product;
>
> f. whether Defendants knew or should have known that inhaling computer dusters could lead to addiction, inhalant abuse disorder, injury, and/or death;

[9] Of course, this determination does not preclude the AW Defendants from later raising the personal jurisdiction issue through an appropriate motion. If they do, then "[Plaintiff] will have to establish the propriety of personal jurisdiction by a preponderance of the evidence, but at this early juncture," the allegations and other record evidence supports Plaintiff's "prima facie case that the AW Distributing defendants have done more than just put their products in the stream of commerce." *Chairez*, 2021 WL 1600494, at *4 (citing *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003).

> g. whether the Bitterant Defendants knew or should have known that the bitterant [they] allegedly added to computer dusters was ineffective in its stated purpose of being a deterrent to intentional inhalation;
>
> h. whether the Bitterant Defendants negligently warned by stating that the bitterant was added to discourage abuse or similar language in the written warning on their computer dusters;
>
> i. whether the Bitterant Defendants knew or should have known that the bitterant allegedly added to computer dusters was not capable of coming out of the can in sufficient quantity to prevent inhalation abuse and was ineffective in its stated purpose of being a deterrent to intentional inhalation;
>
> j. whether the Bitterant Defendants knew or should have known that a significant portion of consumers cannot detect the bitterant allegedly added to computer dusters;
>
> k. whether the Bitterant Defendants knew or should have known that the bitterant allegedly added to computer dusters was a bronchodilator; and
>
> l. whether the Bitterant Defendants knew or should have known that the [bitterant] allegedly added to computer dusters made intentionally inhaling their products more dangerous.

(*Id.* ¶ 213.) Defendants move to strike Plaintiff's class allegations.

**A. Legal Standard**

Motions to strike are governed by Fed. R. Civ. P. 12(f), which provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Striking a party's pleading is an extreme and disfavored measure." *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1092 (8th Cir. 2021) (cleaned up). But granting a motion to strike can sometimes be appropriate, "such as when a portion of the complaint lacks a legal basis." *Id.* This includes granting

"a motion to strike class-action allegations prior to the filing of a motion for class-action certification." *Id.*

Striking class allegations at the outset of litigation is appropriate under the following circumstances:

> It is "sensible . . . to permit class allegations to be stricken at the pleading stage" if it is "apparent from the pleadings that the class cannot be certified" because "unsupportable class allegations bring 'impertinent' material into the pleading" and "permitting such allegations to remain would prejudice the defendant by requiring the mounting of a defense against claims that ultimately cannot be sustained.

*Id.* (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1383 (3d ed.). Determining whether to strike class allegations "is not a decision on certification but merely a review of if the class is clearly uncertifiable as to avoid unnecessary litigation." *Jordan v. Best Buy Co.*, No. CV 24-1066 (DWF/TNL), 2025 WL 580894, at *6 (D. Minn. Feb. 21, 2025) (denying motion to strike class allegations), *reconsideration denied,* No. CV 24-1066 (DWF/DTS), 2025 WL 2336983 (D. Minn. Aug. 13, 2025).

**B. Analysis**

Defendants argue that the Court should exercise its discretion to strike the class allegations in this case because: (1) mass-tort product liability actions are not appropriate for class certification; (2) Plaintiff's putative Rule 23(c)(4) class violates the Seventh Amendment; (3) Plaintiff's putative Rule 23(c)(4) class fails to increase the litigation's efficiency; (4) Plaintiff cannot establish predominance of common issues; (5) the case will require individualized choice-of-law issues; (6) Plaintiff cannot establish that a class

action is the superior method of adjudication; and (7) any issue class in this case would be a "fail-safe class" where membership is not ascertainable. (Dkt. 94.) None of these arguments requires striking the class-action allegations under Rule 12.

First, at this stage of the proceedings, it is premature to decide most of the issues raised in Defendants' motion to strike. Start with Defendants' assertion that Plaintiff proposes a so-called "fail-safe class." A "fail safe" class is one that precludes membership unless a putative member would prevail on the merits. *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019). This sort of class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment, and because it is unmanageable. *Id.* However, in this case, even if the complaint's description of the class could be read as a fail-safe, striking the class allegations on this basis is unwarranted given the Court's "broad discretion to redefine the class in order to avoid issues that such a class definition may present." *St. Louis Heart Ctr., Inc. v. Caremark, L.L.C.*, No. 4:12-cv-2151 TCM, 2013 WL l076540, at *6 n.7 (E.D. Mo. Mar. 13, 2013).

Second, the Defendants' concerns about the Plaintiff's ability to establish predominance of common questions,[10] the superiority of class-wide adjudication, and the presence of too many individualized choice-of-law issues are better addressed at the class-certification stage. "[J]udges in the Eighth Circuit . . . typically deny as premature motions to strike class allegations filed significantly in advance of any possible motion for class certification." *In re Folgers Coffee Mktg. Litig.*, No. 21-2984-MD-W-BP, 2021 WL 7004991, at *4 (W.D. Mo. Dec. 28, 2021). Here, the Court finds early resolution of the predominance and superiority inquiries to be premature, and like other courts faced with similar motions to strike before "any class discovery or a motion for class certification," the Court defers consideration of these issues until Plaintiff moves for class certification. *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129-SRB, 2020 WL 4669185, at *2 (W.D. Mo. Jan. 28, 2020); *see also Legacy Gymnastics, LLC v. Arch Ins. Co.*, 2021 WL 2371503, at *3 & n.4 (W.D. Mo. June 9, 2021) ("Most district courts to encounter motions to strike class allegations before discovery reach the same result.") (collecting cases); *Katx v. CHW Gr., Inc.*, No. 5:22-cv-5198, 2023 WL 6445798, at *6 (W.D. Ark. Sept. 29, 2023) (expressing "no difficulty rejecting" the argument that common questions

---

[10] The parties dispute whether a Plaintiff seeking to certify one or more issue classes is required to establish predominance of common questions for an entire case or only within each proposed issue class. The Eighth Circuit has not expressly resolved that legal question, but the majority of Circuit Courts have agreed that under Rule 23(c)(4) common questions need not predominate in an entire lawsuit. *Black v. Occidental Pet. Corp.*, 69 F.4th 1161, 1186–88 (10th Cir. 2023) (observing that the Second, Fourth, Sixth, Seventh, and Ninth Circuits have found issue class certification under Rule 23(c)(4) "is appropriate when the issue class itself satisfies the requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3)"). Because the question of predominance is premature, it is unnecessary for the Court to opine on this issue now.

of fact and law did not predominate because they were "premature" on an early motion to strike class allegations).

Also premature are Defendants' arguments regarding the potential Seventh Amendment concerns that would be presented by trying issues of liability, causation, and damages separately. For one thing, Defendants do not cite cases where courts have stricken class allegations at the pleading stage due to Seventh Amendment concerns, and the cases they rely on involved more advanced proceedings.[11] Moreover, there is no categorical prohibition on bifurcation of trials imposed by the Seventh Amendment, and "if done properly, bifurcation will not raise any constitutional issues." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 417 (6th Cir. 2018) (quoting *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 n.6 (6th Cir. 2004) and explaining that it was premature to find a Seventh Amendment violation where the trial court had not "formalized any procedures for resolving either the common issues or the remaining individualized inquiries"). Any determination of how to manage a proposed bifurcation for purposes of trial is better examined when this case is closer to trial.

Finally, Defendants' assertion that mass-tort product liability actions are not appropriate for class certification is not persuasive at this stage. Defendants imply that a

---

[11] *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995) (appeal decided following district court's certification of a class); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987) (resolving post-trial appeal); *Christian v. Sony Corp. of Am.*, No. Civ. 00-932 (DWF/AJB), 2001 WL 739147 (D. Minn. June 26, 2001) (resolving class-certification motion); *E.E.O.C. v. McDonnell Douglas Corp.*, 960 F. Supp. 203 (E.D. Mo. 1996) (granting EEOC's motion for separate trials on issues of liability and damages); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90 (W.D. Mo. 1997) (resolving motion for class certification).

class can *never* be certified in such cases, but that is not the rule. True, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), a case that involved the claims of a class harmed by asbestos products, the Supreme Court found that the requirements for certification were not met because individual issues would predominate, and in doing so, observed that the Advisory Committee Notes for Rule 23 indicated that mass tort actions are "'ordinarily not appropriate' for class treatment." *Id.* at 625. But the Court also explained that "the text of the Rule does not categorically exclude mass tort cases from class certification," even if caution is warranted in the mass-tort context. *Id.* (emphasis added). A call for caution is different from a categorical exclusion and does not make it "apparent from [Plaintiff's complaint] that [a] class cannot be certified." *Donelson*, 999 F.3d at 1092. Defendants have not shown that the nature of this action necessarily precludes certification of a class.

In sum, even if it turns out that Defendants have meritorious arguments against class certification, they have not shown that a class is clearly uncertifiable, and their joint motion to strike is denied.

## III. Motions to Dismiss

### A. Legal Standard

In their remaining motions, Defendants ask the Court to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint

must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

**A. Joint Motion to Dismiss**

In their joint motion to dismiss, Defendants argue that the design-defect, failure-to-warn, and negligence claims should be dismissed for failure to plead facts showing the existence of a duty and proximate causation. Defendants also argue that their warnings were adequate as a matter of law. Defendants move to dismiss Plaintiff's implied-warranty-of-merchantability claim fails for a variety of reasons. Lastly, Defendants argue that Plaintiff's public-nuisance claim should be dismissed because the relevant Minnesota

statute does not create a private cause of action, and Plaintiff has not alleged a special injury. As explained below, the joint motion is granted in part and denied in part.[12]

**1. Design Defect, Failure to Warn, and Negligence**

Defendants move to dismiss the design-defect, failure-to-warn, and negligence claims in Counts 1, 2, and 4 of the complaint. The parties do not dispute, for purposes of the motions to dismiss, that the Court should apply any law other than Minnesota's in this diversity case. And under Minnesota law, these three claims have similar elements. *Sprafka v. Med. Device Bus. Servs., Inc.*, 139 F.4th 656, 658 n.1 (8th Cir. 2025) ("Under Minnesota law, negligence and strict liability theories merge into a single products liability claim in failure to warn and design defect cases."). The elements of a negligence claim under Minnesota law are: "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury." *McDougall v. CRC Indus., Inc.*, 523 F. Supp. 3d 1061, 1070–71 (D. Minn. 2021) (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011)).

A plaintiff asserting a "strict liability" design-defect claim must show that (1) the product was unreasonably dangerous for its intended use, (2) the defect existed when the

[12] Defendants also point out that Plaintiff's complaint is long—it runs to 129 pages and contains 401 numbered paragraphs—and that it includes narrative discussion about a public health crisis and other more general allegations. (Dkt. 105 at 27–30.) They ask the Court to dismiss the complaint because it "violates Rule 8's requirement of a short and plain statement." (*Id.* at 27.) Defendants do not argue that Plaintiff's complaint consists of rambling allegations that aren't germane to her claims, nor do they suggest that the form of her pleading leaves them guessing as to the nature of Plaintiff's allegations against them. Accordingly, the Court finds no violation of Rule 8, rejects this argument, and denies the motion to dismiss on this basis.

item left the manufacturer's control, and (3) the design defect proximately caused the plaintiff's injury. *Thompson v. Hirano Tecseed Co., Ltd.*, 465 F.3d 805, 808–09 (8th Cir. 2006) (citing *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 623, n.3 (Minn. 1984)). "A manufacturer has a duty to design its product to avoid an unreasonable risk of harm when the product is used as intended or in an unintended yet reasonably foreseeable manner." *Green Plains Otter Tail, LLC v. Pro-Environmental, Inc.*, 953 F.3d 541, 546 (8th Cir. 2020) (citing *Bilotta*, 346 N.W.2d at 621).

A failure-to-warn claim requires that: (1) the defendant had a duty to warn; (2) it instead provided no warning or an inadequate warning; and (3) the inadequate warning caused the plaintiff's damages. *Green Plains Otter Tail, LLC v. Pro-Environmental, Inc.*, 953 F.3d 541, 548 (8th Cir. 2020) (citing *Kapps v. Biosense Webster, Inc.*, 813 F.Supp. 2d 1128, 1155 (D. Minn. 2011)). "[A] supplier has a duty to warn end users of a dangerous product if it is reasonably foreseeable that an injury could occur in its use." *Id.* (quoting *Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 274 (Minn. 2004)).

***Duty***

Defendants first argue that "Plaintiff's design-defect, negligence, and failure-to-warn claims fail out of the gate because Plaintiff has not made the 'threshold' showing that Defendants owed a legal duty to Mr. Byers." (Dkt. 105 at 8.) The Court disagrees.

Whether a defendant owes a duty of care is generally a legal issue for a court to decide. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn. 1985). The key question is one of foreseeability of harm. *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011) (explaining that Minnesota's law of negligence "imposes a general duty of reasonable

care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff"). When considering the foreseeability of the harm to the plaintiff, courts "look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Foss v. Kincade*, 766 N.W.2d 317, 322 (Minn. 2009) (citation omitted).

When taken as true and viewed in the light most favorable to Plaintiff, the allegations in the complaint are sufficient to establish the Defendants owed a duty to Plaintiff. The complaint contains significant allegations that, prior to Mr. Byers' intentional inhalation of Defendants' computer duster products, Defendants were aware that their products were being widely used in precisely the same manner and with similar harmful effects. Plaintiff alleges that Defendants knew the products are readily accessible and frequently used as inhalants, that DFE is a powerful intoxicant, and that it is addictive. According to the Complaint, Defendants have received reports for two decades of injuries and deaths resulting from intentional inhalation of their products. Plaintiff also alleges that Defendants were aware that adding DB to the canisters was not an effective deterrent. (Compl. ¶¶ 9–11, 23–25, 30, 35, 158–60, 164, 169–72.) The foreseeability of the injury at issue here is also buttressed by the growing public health concerns around the use of inhalants as intoxicants and the specific use of computer dusters contributing to an increased number of emergency room visits and deaths in recent years. (*Id.* ¶¶ 90–102, 131–37.) Under these circumstances, the Court easily finds that the complaint sets forth sufficient allegations that it was objectively reasonable for Defendants to expect the specific danger at issue here—that a consumer would purchase Defendants' products for

the purpose of using them as an inhalant for their intoxicating effects, become addicted to that use, and suffer serious injury or death as a result.[13]

This conclusion is further supported by the recent decisions in *Chairez* and *McDougall v. CRC Industries, Inc.*, 523 F. Supp. 3d 1061, 1072 (D. Minn. 2021), where the plaintiffs claimed that drivers who had intentionally inhaled computer dusters became intoxicated, then operated motor vehicles, and caused automobile accidents involving the plaintiffs' vehicles. In *McDougall*, United States District Judge John R. Tunheim denied a computer-duster manufacturer's motion to dismiss because the complaint set forth facts establishing the existence of a duty:

> McDougall alleges extensive facts to support its claims that CRC was aware of the risk to people who would inhale duster (evidenced by the warning label it included on its product), that it was aware of duster abuse and the prevalence of driving while huffing, that it knew a significant portion of its duster sales were to people who intended to abuse the product, and that CRC responded by including a bittering agent in its product, which CRC knew to be ineffective. As such, the Court finds that McDougall has plausibly pleaded that CRC owed a duty to Ms. McDougall.

523 F. Supp. 3d 1061, 1072 (D. Minn. 2021). And in *Chairez*, United States District Judge Nancy E. Brasel rejected the manufacturer's argument that it owed no duty to the plaintiff, reasoning that the plaintiffs' allegations showed that the "dangers posed by the misuse of computer duster spray while driving are well-known," that the defendants

---

[13] Although Defendants argue that Plaintiff has only alleged they engaged in "nonfeasance" as opposed to "misfeasance," the Court disagrees because the allegations in the complaint "go beyond passive inaction—[Plaintiff has] alleged that the [Defendants] took active steps that worked positively to injure others." *Chairez*, 2021 WL 1600494, at *6 (quotations omitted).

knew of those risks, and that "it was reasonably foreseeable that [the plaintiffs] would be injured by" the defendants' conduct. 2021 WL 1600494, at *6.; *see also Diehl v. 3M Co.*, No. A19-0354, 2019 WL 4412976 (Minn. Ct. App. Sept. 16, 2019) (reversing dismissal of a complaint for lack of duty where "it was reasonably foreseeable that [a third-party] would misuse the dust remover and become acutely intoxicated" and present a danger to others when he chose to operate a vehicle). Given the allegations in Plaintiff's complaint in this case, the injury to a person using a highly addictive and dangerous inhalant for its intoxicating effects is at least equally foreseeable to the injury involved in *McDougall* and *Chairez*.

Defendants' arguments to the contrary do not convince the Court that a different outcome is required. Defendants assert that not every foreseeable danger gives rise to a legal duty to prevent it. For example, there is no legal duty owed under Minnesota law where the connection between the defendant's allegedly negligent act and the resulting harm is too remote to impose liability as a matter of public policy. (Dkt. 105 at 8.) Defendants suggest the facts of this case are analogous to those in *Laubach v. Isaacson*, where the Minnesota Court of Appeals found the manufacturer owed no duty to the plaintiff. No. C0-91-1984, 1992 WL 31367 (Minn. Ct. App. Feb. 25, 1992). In *Laubach*, the product was a flammable anti-freeze bottle that the 13-year-old plaintiff and his friends poured on a skateboard and lit on fire, causing plaintiff's injuries. The plaintiff claimed that the warnings on the bottle, which stated that the material was flammable and cautioned to keep the bottle away from flames—were inadequate. The court determined that there was no duty to include other warnings because the manufacturer would have

had to anticipate the failure to follow the explicit warnings on the bottle as well as the "intentional and obvious misuse of the product." *Id.* at *1–2. Even though the adequacy of warnings is usually a fact issue, the court determined that the defendant's warnings were accurate as a matter of law. *Id.* at *2.

But *Laubach* is readily distinguishable. The *Laubach* court found that, given the warnings provided on the bottle, the plaintiff's misuse of the anit-freeze that resulted in his injuries was not foreseeable. *Id.* at *1 ("[The defendant] had no duty to warn that the antifreeze was explosive because the boys' use of the product was not reasonably foreseeable" and concluding otherwise would "require [the defendant] to anticipate [the plaintiff's] failure to follow several explicit warnings . . . and . . . intentional and obviously dangerous misuse of the product"). While Mr. Byers may have misused the products at issue, the allegations in the complaint establish that his use was entirely foreseeable, and under Minnesota law, a manufacturer owes a duty "when the product is used in the manner for which [it] was intended, *as well as an unintended yet reasonably foreseeable use*." *Bilotta*, 346 N.W.2d at 621 (quoting *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 212 (Minn. 1982)) (emphasis added); *see also Whiteford ex rel. Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 919 (Minn. 1998) (explaining that a manufacturer's duty to protect users of a product can extend to "those who might be injured by [a product's] use or misuse, from foreseeable danger"). And for these same reasons, nothing about the facts of this case suggests that the connection between Defendants' actions and Mr. Byers's injuries is "too remote to impose liability as a matter of public policy." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn.

1986).[14] Accordingly, the Court rejects Defendants' motion to dismiss Counts 1, 2, and 4 of the complaint for lack of a duty owed to the Plaintiff.

***Proximate Cause***

Next, Defendants argue that these claims should be dismissed because the facts in the complaint fail to show Defendants' conduct was the proximate cause of Plaintiff's injuries. (Dkt. 105 at 13–16.) Under Minnesota law, proximate cause is generally a fact issue. *Lubbers v. Anderson*, 539 N.W.2d 398, 402 (Minn. 1995). A defendant's conduct proximately causes the plaintiff's injury "if 'the act is one which the [defendant] ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others' and the defendant's 'conduct was a substantial factor in bringing about the injury.'" *McDougall*, 523 F. supp. 3d at 1072 (quoting *Lubbers*, 539 N.W.2d at 401). Only when "reasonable minds can arrive at only one conclusion" is proximate cause a question of law. *Green Plains Otter Tail, LLC*, 953 F.3d at 547 (quoting *Lubbers*, 539 N.W.2d at 402).

Here, whether Defendants should have anticipated the likely injury to Mr. Byers "is ultimately a question of foreseeability." *McDougall*, 523 F. Supp. 3d at 1072. As discussed, Plaintiff adequately alleges facts showing that Defendants reasonably should

[14] While the Court has read and considered the authority from other jurisdictions cited by Defendants, the Court concludes that those cases do not require a different outcome. (*See* Dkt. 105 at 11–12 & n.9.) For example, while Defendants cite *Allen v. Walmart Stores, L.L.C.*, 907 F.3d 170 (5th Cir. 2018), where the court found there was no duty owed to a plaintiff whose daughter purchased 60 cans of computer duster and died in the store's parking lot from abusing it as an aerosol inhalant, *id.* at 179–80, that case applied Texas law, and Defendants provide no reason to conclude that state's law is consistent with Minnesota's, nor that the Minnesota Supreme Court would reach the same outcome if presented with the same scenario.

have foreseen the likelihood that someone who intentionally inhaled their products could become addicted to huffing the dusters' contents and experience serious harm.

Defendants also appear to argue that the Court should find Plaintiff failed to allege proximate cause as a matter of public policy. However, Defendants point to no Minnesota authority concluding that, as a policy matter, Minnesota would not hold manufacturers liable for the alleged defects in the computer dusters' designs or their alleged negligence in crafting warnings. This Court will not foreclose Plaintiff's claims as a matter of public policy, particularly where Plaintiff has alleged facts showing that Defendants ought to have anticipated the very injury that was the foreseeable result of their actions.

Finally, to the extent that Defendants argue that Mr. Byers's misuse of the product was a superseding cause of the injury, the Court concludes that question cannot be resolved at this stage. *See Chairez*, 2021 WL 1600494, at *8 (finding that the court could not "conclude, on a motion to dismiss, that the driver's choice to inhale Ultra Duster before driving was a superseding cause that broke the chain of causation" where the plaintiffs' allegations established that the defects in the computer duster and the failure to warn "brought about" the third-party's misuse of the product).

For these reasons, the Court rejects Defendants' argument that Plaintiff failed to plead facts establishing proximate cause, and the motion to dismiss on this basis is denied.

***Adequate Warnings***

Defendants next move to dismiss Plaintiff's failure-to-warn claims, arguing that the Plaintiff fails to allege that their warnings were inadequate as a matter of law.

(Dkt. 105 at 16–19.) For a warning to be "legally adequate," it needs to "(1) attract the attention of those that the product could harm; (2) explain the mechanism and mode of injury; and (3) provide instructions on ways to safely use the product to avoid injury." *Green Plains Otter Tail, LLC*, 953 F.3d at 548 (quoting *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 582 (Minn. 2012)); *McDougall v. CRC Indus., Inc.*, 523 F. Supp. 3d 1061, 1073 (D. Minn. 2021) (same) (quoting *Gray v. Badher Mining Corp.*, 676 N.W.2d 268, 274 (Minn. 2004)). Minnesota law does not require a manufacturer to warn against every injury that might occur from the use of a product. *Westerberg v. Sch. Dist. No. 792*, 148 N.W.2d 312, 316 (Minn. 1967) (stating that "it would be totally unreasonable to require that a manufacturer warn against every injury which may ensue from mishap in the use of its product"). And "[a] warning should render a product 'safe for use if it is followed.'" *Spencer v. Matula*, No. C2-90-1409, 1990 WL 195414, at *1 (Minn. Ct. App. Dec. 11, 1990) (unpublished).

Typically, whether the warning that a defendant provides is adequate is an issue "for jury resolution." *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn. 1987). However, it is not error for the trial court to determine that a warning was adequate as a matter of law when "the injury would not have occurred" if the warnings provided had been followed. *Spencer*, 1990 WL 195414, at *1 ("Here, had the warning that the product be kept from children and not used in a stoppered bottle been heeded, the injury would not have occurred. We do not believe the district court erred as a matter of law in determining the warning adequate under these circumstances."); *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128 (D. Minn. 2011) ("Under Minnesota law, if a plaintiff's proposed warning

would not have changed anyone's behavior, a product cannot be defective for lacking that warning.").

There is no dispute that Defendants' canisters contained warnings about the risk of harm associated with intentionally inhaling their contents. For example, the front of the CRC Duster canister states "WARNING: … READ WARNINGS ON BACK PANEL," and the rear of the label includes the following statement:

> Deliberate misuse by concentrating and inhaling the contents is illegal and can be harmful or fatal. Inhalation abuse can cause death.

(Dkt. 105-2.) Similarly, Ultra Duster canisters sold during the relevant time period included either of the following warnings:

> MISUSE BY DELIBERATELY CONCENTRATING AND INHALING CONTENTS MAY BE HARMFUL OR FATAL. PLEASE USE THIS PRODUCT RESPONSIBLY.

> DANGER:DEATH! BREATHING THIS PRODUCT TO GET HIGH CAN KILL YOU! INTENTIONAL MISUSE BY DELIBERATELY CONCENTRATING AND INHALING CONTENTS MAY BE HARMFUL OR FATAL. PLEASE USE THIS PRODUCT RESPONSIBLY.

(Dkt. 105-4.) And the back panel of Office Depot's duster label includes this warning:

> **Public Safety Announcement:**
> Misuse by deliberately concentrating and inhaling contents may be harmful or fatal. Please use our product responsibly.
> For more information on inhalant abuse visit:
> www.inhalant.org www.inhalants.com

(Dkt. 105-3.)[15]

---

[15] The image of the Office Depot label in the record is not as sharp as the others. The portion of the label included in this opinion contains a red box labeled "Public Safety Announcement," inside of which is the warning that "Misuse by deliberately concentrating and inhaling contents may be harmful or fatal. Please use our product responsibly."

In the complaint, Plaintiff alleges the warnings Defendants provided failed in three ways: (1) the warnings about the risk of death were not clear and effective; (2) they did not warn of risk of addiction from DFE; and (3) the warnings did not list the specific injuries that can result from intentional inhalation of DFE. (Compl. ¶ 259 (strict products liability – failure to warn claim); *id.* ¶ 318 (negligence claim).) As to the first, the Court finds that it cannot conclude, as a matter of law, that Defendants' warnings about the risk of death were clear and effective. However, for the second and third of these alleged inadequacies, Plaintiff's failure-to-warn claims fail as a matter of law.[16]

***Risk of Death***

The Court will not dismiss Plaintiff's claim that Defendants failed to provide a clear and adequate warning of the risk of death. Recall that for a warning to be legally adequate, it must "attract the attention of those that the product could harm." *Green Plains Otter Tail, LLC*, 953 F.3d at 548. Each of the labels here includes a statement that

[16] The complaint also alleges that the Bitterant Defendants provided inadequate warnings concerning the inclusion of DB as a deterrent to inhalation:

> Bitterant Defendants further: (4) failed to warn that DB was not added in a quantity or manner that would have a deterrent effect; (5) failed to warn that DB is undetectable to a broad swath of the population in any quantity; and (6) failed to warn that the bitterant DB has a dilating effect on the respiratory system, which can lead to increased inhalation of DFE, a highly volatile and addictive substance. The general warnings provided by the Bitterant Defendants were also cancelled out by reassuring consumers that its products were designed to prevent abuse.

(Compl. ¶ 259.) Defendants do not discuss these allegations in their briefing on the motion to dismiss (Dkt. 105 at 16–19; Dkt. 141 at 11–14), so the Court expresses no opinion on whether the complaint states a claim in this respect.

intentional inhalation of the contents of Defendants' duster products can be fatal. But to the extent Plaintiff claims that the labels did not make that warning clearly and effectively, the Court cannot conclude, as a matter of law, that the Defendants' warnings would necessarily attract the attention of those that the product could harm. Instead, taking all reasonable inferences from the allegations in the complaint in Plaintiff's favor, the Court cannot determine that a reasonable consumer would certainly have been alerted to the risk of death given the location of the warnings on the cans and their appearance. A fact finder should sort that out. And Defendants have not pointed to any case where a court applying Minnesota law resolved this inherently fact-intensive issue as a matter of law on a motion to dismiss. Therefore, to the extent Defendants argue that their warnings of a risk of death were adequate as a matter law, the joint motion to dismiss is denied.

***Risk of Addiction and Other Possible Harms***

The Court reaches a different conclusion with respect to Plaintiff's claims regarding the contents of the warnings, namely that Defendants' warnings should have warned of the risk of addiction and spelled out the possible harmful effects of intentional inhalation besides death. Plaintiff argues that the Defendants' warnings cannot be deemed legally adequate because they neither "explain the mechanism and mode of injury," nor "provide instructions on ways to safely use the product to avoid injury." *Green Plains Otter Tail, LLC*, 953 F.3d at 548. But the warnings on Defendants' labels do both. Regarding the claim that the warnings do not explain the mechanism and mode of injury, the labels specifically identify *how* the product can cause harm, including death, to a user: they state that concentrating and intentionally inhaling the canisters' contents can be

harmful or fatal. And the warnings reasonably communicate how to use the product safely by labeling inhalation as a "misuse" of the duster and admonishing the user to avoid abusing the product in that specific way.

Plaintiff's claims that the Defendants should have warned of a risk of addiction and listed other specific harms that could flow from intentional inhalation fare no better. On this point, this Court finds the decision in *Spencer* instructive. The plaintiff in *Spencer* was a minor who "was injured when a capped pop bottle, in which he had mixed dry ice and liquid soap, exploded in his hand." 1990 WL 195414, at *1. The defendants who sold the dry ice warned "against placing the ice in a stoppered bottle and [admonished] that [the ice] be kept out of the hands of children." *Id.* But the plaintiff "insist[ed] an adequate warning must further contain the terms 'danger of explosion' or 'explosive.'" *Id.* The *Spencer* court referred to the Minnesota Supreme Court's observation in *Westerberg* that "it would be totally unreasonable to require that a manufacturer warn against every injury which may ensue from mishap in the use of its product." *Id.* (quoting *Westerberg*, 148 N.W.2d at 317). And the court found the defendants' warnings were adequate as a matter of law because the injury would not have occurred if the plaintiff had heeded "the warning that the product be kept from children and not used in [a] stoppered bottle[.]" *Id.* The same is true here: if Mr. Byers had heeded Defendants' warnings and followed their admonition to use the product responsibly, he would not have intentionally inhaled the DFE contents of the dusters, and "the injury would not have occurred." *See id.* There is no reason to believe that a more developed factual record will change that reality.

Arguing to the contrary, Plaintiff relies on the decisions in *McDougall* and *Chairez*. (Dkt. 130 at 17.) But neither case requires a different outcome on this claim. In *Chairez*, the Defendants argued that they had no duty to provide a specific warning regarding the risks created by huffing a computer duster while driving because such a risk was obvious. 2021 WL 1600494, at *7. But whether a manufacturer has a duty to provide a warning is a separate inquiry from whether the manufacturer's warnings are adequate. On the other hand, *McDougall* does consider the defendant's argument that its warnings were adequate as a matter of law. 523 F. Supp. 3d at 1073–74. There, the court allowed the claims to proceed because the plaintiff alleged that the defendant did not warn of the "risk of injury to a bystander and the risk of operating a vehicle," which were connected to the plaintiff's injury in that case. *Id.* at 1073. Here, in contrast, Mr. Byers' injury (a tragic death from intentional inhalation of DFE) was precisely what Defendants warned about.

Therefore, the Court finds, as a matter of law, that the more specific or detailed warnings requested by the Plaintiff regarding the risks of addiction and other harms associated with inhaling the DFE in the cans were not required. For these reasons, the Court concludes that, in part, Plaintiff has failed to state a claim under Minnesota law for failure to provide adequate warnings regarding the risks associated with intentional inhalation of Defendants' computer duster products, and in part, the inadequate-warning claim may proceed.

### 2. Implied Warranty of Merchantability

In Count VI of the Complaint, Plaintiff claims that: all Defendants breached the implied warranty of merchantability by selling computer dusters that are unsuitable and unsafe for their intended use; and the Bitterant Defendants breached the implied warranty of merchantability because their dusters were "unsuitable for their intended purpose of deterring intention[al] inhalation." (Compl. ¶¶ 351, 357.) Minnesota has adopted the Uniform Commercial Code regarding merchants' sale of goods, which includes a provision concerning the implied warranty of merchantability. The relevant statutory provision states that "[u]nless excluded or modified . . ., a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Minn. Stat. § 336.2-314(1). For goods to be merchantable, they must at least be "fit for the ordinary purpose for which such goods are used." *Id.* § 336.2-314(2)(c); *see also Dart Transit Co. v. Paccar, Inc.*, 768 F. Supp. 3d 960, 974 (D. Minn. 2025) ("Under Minnesota law, an implied warranty of merchantability requires that goods be fit for the ordinary purposes for which [they] are used.") (quotation omitted).

To state a claim for breach of the implied warranty of merchantability, a plaintiff must establish "(1) the existence of a warranty, (2) a breach, and (3) a causal link between the breach and harm." *McDougall*, 523 F. Supp. 3d at 1074 (citing *Masepohl v. Am. Tobacco Co.*, 974 F. Supp. 1245, 1253 (D. Minn. 1997)). "A plaintiff can show a breach of this implied warranty when a product is defective to a normal buyer making ordinary use of the product." *Dart Transit Co.*, 768 F. Supp. 3d at 974 (quotation omitted).

Defendants move to dismiss the implied-warranty claims in this case on several grounds: (1) it is preempted by Minnesota's strict-liability statute; (2) the complaint does not actually assert implied-warranty claims against the Bitterant Defendants, but instead asserts only express-warranty claims; (3) the dusters were fit for their ordinary purpose; (4) Plaintiff did not provide pre-suit notice; and (5) Mr. Byers had actual knowledge of the danger. (Dkt. 105 at 19–24.) Because it disposes of most of the complaint's implied-warranty claims, the Court begins with the issue of the dusters' ordinary purpose. For the most part, Plaintiff's implied-warranty claims are dismissed because the complaint does not allege that the dusters were unfit for their ordinary purpose.

***Fit for ordinary purpose***

The ordinary purpose for which Defendants' computer duster products are used is to release the compressed DFE gas in the canisters to remove dust and small particles from computers and related components. That ordinary purpose is confirmed by the materials safety data sheets excerpted in the complaint, which identify the "recommended use" of Defendants' products as "remov[ing] dust and small particles." (Compl. ¶¶ 146, 148, 150.) There are no allegations in the complaint that Defendants' products were unfit for that ordinary purpose. *Cf. Rardon v. Falcon Safety Prods., Inc.*, No. 20-6165-CV-SJ-BP, 2021 WL 2008923, at *10 n.12 (W.D. Mo. May 4, 2021) (characterizing the computer duster as having a "'normal purpose' of removing dust" and finding that any claim by the plaintiff that the defendant breached the implied warranty of fitness for a particular purpose failed as a matter of law because the complaint alleged no warranty by defendants other than fitness for that ordinary purpose). The ordinary purpose for which

the dusters are used is not intentional inhalation of the DFE gas to achieve "intense and immediate intoxication." (*Id.* ¶¶ 9, 83, 86–89; *see also id.* ¶ 146 (MSDS for Ultra Duster noting under "Restrictions On Use" that "deliberately concentrating and inhaling contents" is a "misuse").) Plaintiff's implied-warranty claims fail as a matter of law because there can be no conclusion that Mr. Byers made ordinary use of the product. *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 53 (Minn. 1982) (explaining that the implied warranty "is breached when the product is defective to a normal buyer *making ordinary use of the product*" and a manufacturer will not be liable if the "products was not used in an ordinary way") (emphasis added).

Plaintiff's arguments do not persuade the Court otherwise. Citing *Twin City Die Castings Co. v. Yamazen, Inc.*, No. 03-cv-3069 (JRT/FLN), 2005 WL 1593368 (D. Minn. July 6, 2005), Plaintiff argues that a product's ordinary use is a fact question. (*See* Dkt. 130 at 20.) But *Twin City Die Castings Co.* does not say that what constitutes an ordinary and intended use of a product can never be resolved as a matter of law. There, the district court denied a motion for summary judgment because each side had presented evidence that would allow a reasonable jury to agree with its assertion about what the ordinary and intended uses of the manufacturing machines at the heart of the dispute were. 2005 WL 1593368, at *4 (indicating that the plaintiff provided evidence supporting its position by pointing to evidence that the defendant knew the plaintiff's plans for the machines prior to the sale and the defendant introduced the machine's specifications, which purportedly limited the ordinary and intended use). By contrast, the face of the complaint in this case demonstrates that the ordinary and intended use of Defendants'

computer duster products is to remove dust and particles from keyboards, and Mr. Byers did not use them in that intended way.[17]

Relying on *Independent School District No. 197 v. W.R. Grace & Co.*, 752 F. Supp. 286 (D. Minn. 1990), Plaintiff next argues that she has stated an implied-warranty claim because the Defendants' products are unreasonably dangerous. (Dkt. 130 at 21.) The defendant in *W.R. Grace* manufactured an "asbestos-containing fireproofing" material installed in the beams and decks of a school, and the school sued to recover costs incurred in the removal of those materials. 752 F. Supp. at 288. The district court held there was a fact issue "concerning whether [the product] was defective and unreasonably dangerous and therefore unfit for the ordinary purpose for which it was sold." *Id.* at 302. The Court finds Plaintiff's reliance on *W.R. Grace* to be misplaced. The unreasonably

[17] In her briefing, Plaintiff asserts that "Defendants appear to encourage [the prevalent intentional use of their dusters by consumers for huffing and getting high] through their marketing and sales practices," and therefore "[i]t should be up to the jury to determine what the ordinary uses of Defendants' products entail[.]" (Dkt. 130 at 22.) In support of this assertion, she points to paragraphs of the complaint emphasizing the widespread abuse of computer dusters as intentional inhalants, Defendants' decisions to sell their products in "multi-packs" containing several canisters, Defendants' continued sales of those multi-packs after being on notice of DFE's highly addictive nature and the harms caused by huffing, and the substantial revenues Defendants have seen from these products while inhalant abuse has increased. (*Id.* (citing Comp. ¶¶ 10–11, 35, 171, 334–36, 341, 370, 387).) In the last of these paragraphs, Plaintiff asserts that "all Defendants induced people to use their duster products in a manner that resulted in the user's addiction, injury, and death, with the intent that people rely thereon in connection with the sale or advertisement of Defendants' air duster products through the use of deception, fraud, false advertising, false pretenses, misrepresentations, unfair and/or deceptive practices and the concealment and suppression of material facts." (Compl. ¶ 387.) This rather audacious set of allegations imputes motivation to the Defendants to reap tremendous profits from a public-health crisis that they have knowingly caused. And Plaintiff does not explain how a claim for breach of the implied warranty of merchantability is the right vehicle for adjudicating such a claim.

dangerous nature of the asbestos material arose directly from the product's ordinary and intended use as a building insulation material.[18] The claim of dangerousness here is different. Plaintiff's allegation is that the computer dusters are unreasonably dangerous and defective because of a foreseeable *misuse*—intentionally huffing the contents of the canister to get high—not because they cause harm when they are used as intended, to remove dust and debris from computer components. Accordingly, Plaintiff's claims for breach of the implied warranty of merchantability are largely dismissed.

***Bitterant Defendants – Minn. Stat. § 336.2-314(2)(f)***

Plaintiff's implied-warranty claim against the Bitterant Defendants is different. In part, Plaintiff alleges that the Bitterant Defendants breached the implied warranty of merchantability because their products containing DB did not conform to the representations on the label that DB would deter intentional inhalation. (*See* Compl. ¶¶ 31, 356.) Under Minnesota law, goods are unmerchantable when they fail to "conform to the promises or affirmations of fact made on the container or label[.]" Minn. Stat. § 336.2-314(2)(f). This claim survives a motion to dismiss because the complaint alleges that DB does not deter intentional inhalation, contrary to the affirmations or representations on the label.

[18] The same is true of the case on which the *W.R. Grace* court relied—*Farr v. Armstrong Rubber Co.*, 179 N.W.2d 64 (1970). *W.R. Grace* cites *Farr* for the proposition "that a product which is unreasonably dangerous is not fit for the ordinary purposes for which such articles are sold and used[.]" *W.R. Grace*, 752 F. Supp. at 302. *Farr* involved a claim that a tire, which had a blowout causing an accident, was unfit for its ordinary and intended uses of both highway and off-road work. 179 N.W.2d at 67, 69.

The complaint alleges that DB is ineffective as a deterrent. It also alleges that DB makes intentional inhalation worse because DB is a bronchodilator. The labels on the Bitterant Defendants' canisters represent that the cans contain a bitterant that deters intentional inhalation, and Plaintiff's allegations suggest that the opposite is true. Defendants do not meaningfully address these allegations in their opening memorandum, nor in their reply. They argue that the merits of the claims against the Bitterant Defendants are lacking because (1) they are really express warranty claims, and (2) the Bitterant Defendants' products are fit for their ordinary purpose. (Dkt. 105; Dkt. 141 at 16–17.) But Defendants simply ignore the portion of the Minnesota statute under which the claims are brought. Defendants cite no case dismissing a claim for breach of the implied warranty of merchantability under § 336.2-314(2)(f) on the merits based on a conclusion that the products are otherwise fit for their ordinary purpose. That makes sense. Section 336.2-314(2) treats a product's fitness for its ordinary purpose under paragraph (2)(c) as a measure of the product's merchantability that is separate from the question whether goods conform to the promises or affirmations of fact made on their containers or labels under paragraph (2)(f). And while it is true that Plaintiff's express-warranty claim against the Bitterant Defendants substantially overlaps with this aspect of its implied-warranty claim, Defendants cite no case dismissing an adequately pled implied-warranty claim under paragraph (2)(f) simply because of the possible redundancy. *Cf. McDougall*, 523 F. Supp. 3d at 1075 (denying motion to dismiss and allowing plaintiff's implied-warranty claim to proceed in the alternative to strict liability claims); *Chairez*, 2021 WL 1600494, at *8.

Next, the Bitterant Defendants argue that the Plaintiff failed to show that reasonable notice was provided to a defendant, but the "bar for sufficiency is low." *See Dart Transit Co.*, 768 F. Supp. 3d at 970–71 (quoting *Drobnak v. Andersen Corp.*, 561 F.3d 778, 784 (8th Cir. 2009)). Plaintiff has shown that she sent letters alerting the Bitterant Defendants of her claims. (Dkt. 131 ¶¶ 4, 6–7 & Exs. 1, 3, and 4.) Requiring amendment of the pleadings to include allegations concerning these letters would serve no purpose, and whether these letters provided reasonable notice to the Bitterant Defendants is a question better resolved following discovery. Finally, whether Mr. Byers had actual knowledge of the danger presented by inhalation is a question of fact unsuitable to resolution at this stage. *See Chairez*, 2021 WL 1600494, at *7. Accordingly, the motion to dismiss is denied to the extent it seeks dismissal of Plaintiff's implied-warranty claim against the Bitterant Defendants under Minn. Stat. § 336.2-314(2)(f).

**3. Public Nuisance**

The joint motion to dismiss concludes with Defendants' request for dismissal of Plaintiff's public nuisance claim. Defendants argue that Plaintiff has failed to allege any "special injury" that is not common to the general public, as is required to sustain such a claim. (Dkt. 105 at 24–27.) In Minnesota, a person is guilty of the misdemeanor of maintaining a public nuisance when she "maintains or permits a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public." Minn. Stat. § 609.74(1). "Ordinarily, only the state may bring a public nuisance claim[.]" *Chairez*, 2021 WL 1600494, at *9. An individual may only bring a cause of for public nuisance when she

"has suffered some special or peculiar damage not common to the general public[.]" *Clean Water & Air Legacy, LLC v. Tofte Wastewater Treatment Ass'n*, 649 F. Supp. 3d 764, 773 (D. Minn. 2023) [hereinafter *Bluefin Bay*] (quoting *Hill v. Stokely-Van Camp, Inc.*, 109 N.W.2d 749, 753 (Minn. 1961)).

Plaintiff claims that all Defendants knew or should have known that the DFE in their products is highly addictive when intentionally inhaled, large numbers of people were abusing their products by huffing the DFE inside the canisters, and use of their products causes severe health problems and death. She also alleges that Defendants engaged in deceptive and misleading commercial practices, including selling their dusters in multi-packs and failing to track or impose limits on purchases of their products. (*See* Compl. ¶¶ 375–92.) She argues that the complaint lays out both harms to the general public created by Defendants' conduct *and* the peculiar injury that she and Mr. Byers suffered that are not shared by the general public, namely "addiction, injury, and death caused by inhalation of Defendants' computer dusters." (Dkt. 130 at 29.)

This issue is a close call, but the Court finds that Plaintiff has done enough to survive Defendants' Rule 12 motion. Defendants primarily rely on *Bluefin Bay* and *McDougall* to support their argument that Plaintiff's alleged harms do not satisfy the special-or-peculiar-damage requirement. In *Bluefin Bay*, the plaintiff was an organization advocating for clean air and waterways and the preservation of natural resources. It claimed that the defendant polluted Lake Superior by discharging wastewater into it, thereby causing a public nuisance. 649 F. Supp. 3d at 769–70 (describing the plaintiff's public nuisance claims and others). One individual who was a member of the

organization enjoyed the scenery of Lake Superior's North Shore near the point of the defendant's pollution and claimed wastewater disposal diminished enjoyment of the area. *Id.* at 770. The court dismissed the public-nuisance claim because the harm the organization claimed to have suffered was no "different from that of the general public." *Id.* at 774. The organization's members enjoyed visiting the affected area, but enjoying it "is a common privilege enjoyed by the general public, of which [plaintiff's] membership is included." *Id.* None of the visitors alleged "some special relationship to the park, such as having an ownership in land adjacent to the park, an exclusive membership, or park employment." *Id.*

In *McDougall*, the plaintiff claimed that a computer duster manufacturer created a public nuisance by selling dusters without disclosing the "particular danger" presented by a driver who intentionally inhaled the duster, became intoxicated, and caused an accident on a public roadway. 523 F. Supp. 3d at 1076–77. The court dismissed the public-nuisance claim, reasoning that because the plaintiff's "damage—losing a loved one to an intoxicated driver—while tragic, does not create the kind of peculiar harm that would give rise to a public nuisance claim by a private party[.]"*Id.* at 1077 (describing the plaintiff's harm as "unfortunately common among the public").

Contrast these decisions with older Minnesota cases that have found plaintiffs sufficiently asserted special or peculiar injuries. In these older decisions, courts emphasized the plaintiffs' unique interests. For example, in *Wilder v. DeCou*, 1 N.W.2d 48 (Minn. 1879), the court found that certain property owners suffered a special and peculiar harm when owners of an adjacent lot attempted to build a means of moving

water across the plaintiffs' land, in a manner inconsistent with the rights the defendants had acquired when the properties were conveyed. *Id.* at 19. In *Viebahn v. Board of Commissioners of Crow Wing County*, 104 N.W. 1089 (Minn. 1905), a company operating a steamboat business on the Mississippi river claimed that the construction of a bridge obstructing their activities constituted a public nuisance. The court found that the company asserted a special and peculiar harm distinct from any disruption to use of the river experienced by the general public because only the company was engaged in operation of a business that would be prevented by the bridge. *Id.* at 1094. And a leading treatise on Minnesota law observes that a tort action for public nuisance "may be maintained" in a case involving "personal injury to the plaintiff" because "the harm is normally different in kind from that suffered by other members of the public." 20A3 Minn. Practice Series, Business Law Deskbook, *Common law statutory claims in environmental litigation—Public Nuisance—Special injury rule* § 25.15 & n.6 (Jan. 2026 Update) (citing Restatement (Second) of Torts § 821C (1979) and Illustration 2: "A digs a trench across the public highway and leaves it unguarded at night without any warning light. B, driving along the highway, drives into the trench and breaks his leg. B can recover for public nuisance.")).

These cases suggest that the special-injury requirement will likely not be satisfied when the type of harm alleged by the plaintiff is akin to the harms that the general public experience as a result of a defendant's conduct (*Bluefin Bay* and *McDougall*), but the requirement may be met when the plaintiff's affected interest is unique or distinct from the types of harms faced by the broader community (*Wilder* and *Viebahn*). This case is

closer to the *Wilder* and *Viebahn* side of the line. The rationale of these cases applies here and supports allowing Plaintiff's public-nuisance claim to proceed. Plaintiff's asserted peculiar harms include Mr. Byers' addiction, injury, and death and Plaintiff's tragic loss of her son. Those harms allegedly flow from Defendants' sales of computer dusters containing DFE and their failures to take adequate steps to mitigate the risks presented by that commercial activity. While the risks presented to the general public by an intoxicated driver who intentionally inhaled DFE were found to "unfortunately common among the public" in light of the risks presented by intoxicated drivers generally, *McDougall*, 523 F. Supp. 3d at 1077, at this stage, the Court cannot say the same of Plaintiff's alleged harms here.

Ultimately, the Court concludes Defendants have not shown that Plaintiff's public nuisance claim is insufficient as a matter of law for failure to allege a special injury, and therefore, the motion is denied. The legal sufficiency of Plaintiff's claim should be addressed on a more developed record.

**B. Retailer Defendants' Individual Motions**

At last, we turn to the individual motions to dismiss filed by the Retailer Defendants—Menards, Office Depot, and Home Depot. The Retailer Defendants argue that they are entitled to dismissal under the Seller's Exception Statute, Minn. Stat. § 544.41, because they are not manufacturers of the computer dusters. They also raise challenges to the merits of several of Plaintiffs' claims against them. As explained below, these motions are granted in part and denied in part.

**1. Seller's Exception Statute**

The Retailer Defendants argue that they cannot be held liable in strict liability based on the Seller's Exception Statute. In relevant part, this statute states:

> In any product liability action based in whole or in part on strict liability in tort commenced or maintained against a defendant other than the manufacturer, that party shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing injury, death or damage. . . .
>
> Once the plaintiff has filed a complaint against a manufacturer and the manufacturer has or is required to have answered or otherwise pleaded, the court shall order the dismissal of a strict liability in tort claim against the certifying defendant, provided the certifying defendant is not within the categories set forth in subdivision 3.

Minn. Stat. § 544.41, subd. 1 & 2.

However, the statute provides exceptions to the dismissal rule as follows:

> A court shall not enter a dismissal order relative to any certifying defendant even though full compliance with subdivision 1 has been made where the plaintiff can show one of the following:
>
> (1) that the defendant has exercised some significant control over the design or manufacture of the product, or has provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the injury, death or damage;
>
> (2) that the defendant had actual knowledge of the defect in the product which caused the injury, death or damage; or
>
> (3) that the defendant created the defect in the product which caused the injury, death or damage.

*Id.*, § 544.41, subd. 3.

Because this statute implicates claims of strict liability in tort, the relevant claims in the complaint for the Retailer Defendants' motions are: Count 1 – design defect; Count 2 – failure to warn; and Count 3 – manufacturing defect. The Retailer Defendants have all certified that they are not the manufacturers of the respective computer dusters they sell and have identified who those manufacturers are. (Dkt. 89, 100, 110-2.) However, the Court concludes that dismissal under the Sellers Exception Statute is unwarranted because the complaint alleges enough facts to state a claim against the Retailer Defendants under one or more of the exceptions laid out subdivision 3.

For example, Plaintiff alleges that Office Depot is actively involved in the design, manufacture, testing, labeling, marketing, and distributing of its private label duster product. (Compl. ¶ 14; *see also id.* ¶ 68.) Taken as true, these facts could make Office Depot liable under the exception in § 544.41, subd. 3(1), for a certifying defendant who

exercised significant control over the design or manufacture of the product.[19] And Plaintiff asserts that Office Depot, Menard, and Home Depot all had knowledge of the defects in the product at the time Mr. Byers purchased them. ((Home Depot) Compl. ¶¶ 30, 35, 327, 334; (Office Depot) *id.* ¶¶ 29–31, 193–94, 381–83; (Menard) *id.* ¶¶ 107–10, 169, 334.) These allegations are sufficient for Plaintiff's to clear the Rule 12(b)(6) hurdle.

The Retail Defendants argue that Plaintiffs' allegations invoking subdivision 3's exceptions are too conclusory and she has failed to adequately allege any of them had the type of knowledge of any product defect. Having reviewed the pleadings and taken into account the parties' relative access to information regarding what the Retailer Defendants knew, the Court declines to reject Plaintiff's reliance on subdivision 3's exceptions as a matter of law at this early stage. *See Murrell v. Zimmer, Inc.*, No. 09-cv-757 (JRT/JJK),

---

[19] Office Depot suggests that Plaintiff's attempt to invoke subdivision 3's exceptions fails because she cannot "show" that any of the exceptions applies. Office Depot asserts that subdivision 3 requires Plaintiff to "'*show*' that Office Depot exercised significant control," and implies Plaintiff has failed to do so because she has not controverted Office Depot's declaration with evidence. (Dkt. 137 at 5.) To the extent Office Depot means that to survive a motion to dismiss under Rule 12(b)(g), a plaintiff must forward with evidence to support her claims, the Court disagrees. Imposing that requirement here would transform Office Depot's Rule 12(b)(6) motion into one for summary judgment. To apply § 544.41 and the exceptions in subdivision 3 in a manner consistent with the Federal Rules of Civil Procedure, on a motion to dismiss for failure to state a claim, we must ask only whether the allegations in the complaint plausibly assert facts, taken as true, that show one of the exceptions applies. *Cf. Berk v. Choy*, 607 U.S. 187 (2026) (holding that a state law requiring plaintiffs to submit an affidavit from a medical professional attesting to the merits of a suit was not applicable in federal court because it conflicted with Federal Rule of Civil Procedure that established more lenient pleading requriements); *Unity Healthcare, Inc. v. County of Hennepin*, 308 F.R.D. 537, 554 (D. Minn. 2015) (R&R of Keyes, J.) (declining to apply a Minnesota state statute requiring a motion-to-dismiss procedure that irreconcilably conflicts with Fed. R. Civ. P. 12).

2010 WL 1050309, at * 3 (D. Minn. Mar. 18, 2010) ("Zimmer's motion to dismiss prior to the commencement of discovery, which could produce evidence establishing subdivision 3's exceptions apply, creates an unfair burden on plaintiffs.").

For these reasons, the Court concludes that dismissal of Plaintiff's strict liability claims under the Sellers Exception Statute is inappropriate at this time, and their motions to dismiss are denied.

**2. Failure to State a Claim**

***Manufacturing Defect Claims***

Office Depot and Menards move to dismiss Plaintiff's manufacturing-defect claims against them. ((Office Depot) Dkt. 88 at 9–11; (Menards) Dkt. 114 at 8–9.) Under Minnesota law, "the 'crux of [a manufacturing-defect] claim is that the product, as provided to the public, was defective because the manufacturing, assembly, inspection, packaging or testing processes failed to turn out the product intended by the defendant manufacturer.'" *McDougall*, 523 F. Supp. 3d at 1072 (quoting *Johnson v. Zimmer, Inc.*, No. 02-cv-1328, 2004 WL 742038, at *10 (D. Minn. Mar. 31, 2004)). As explained below, the Court denies the motions to dismiss these claims.

Office Depot argues that Plaintiff's manufacturing-defect claims against it fail because "Plaintiff's Complaint completely ignores the requirement that the product be defective for its intended use. Plaintiff makes no allegations that the Office Depot branded computer duster was defective for its intended use—removing dust." (Dkt. 88 at 11.) It also argues that "Plaintiff's claims for manufacturing defect are barred because Mr. Byers' made abnormal use of the computer duster by intentionally inhaling it." (*Id.*)

Office Depot is correct that one element of a strict liability claim under Minnesota law requires "a product [to be] in a defective condition unreasonably dangers for its intended use." *Boda v. Viant Crane Serv., LLC*, 42 F.4th 935, 938–39 (8th Cir. 2022). But the issue in *Boda* was whether a reasonable jury could have found in the plaintiff's favor based on the theory of *res ipsa loquitur* to establish a defect. *Id. Boda* does not address whether a manufacturing-defect claim fails if a plaintiff's use of a product is a foreseeable, but unintended use. "A manufacturer is … obligated to address defects related to unintended, but reasonably foreseeable, uses." *McDougall*, 523 F. Supp. 3d at 1072–73 (citing *Billotta v. Kelley Co.*, 346 N.W.2d 616, 621 (Minn. 1984)). Thus, a foreseeable, but unintended use can form the basis of a manufacturing-defect claim. The Court has already articulated, above, why Plaintiff has adequately alleged that Mr. Byers' intentional inhalation of the product was foreseeable, and that analysis applies with equal force here. Therefore, Office Depot's motion is denied in this respect.

Menards argues that the Court should dismiss Plaintiff's manufacturing-defect claims because the complaint fails to allege proximate causation. Menards identifies a tension between Plaintiff's allegations that Ultra Duster canisters did not contain the amount of DB intended by the manufacturer and Plaintiff's assertion that adding more DB to the canisters would be more harmful because DB is a bronchodilator and would exacerbate the effects of intentional inhalation. According to Menards, this tension means that Plaintiff cannot show the alleged manufacturing flaw (too little DB in the products) was the proximate cause of Mr. Byers' death. (*See* Dkt. 114 at 8–9.)

Indeed, these two theories articulated in the complaint are difficult to reconcile with each other. Plaintiff's design-defect claims assert that manufacturers made a poor choice when selecting DB as a deterrent because it is ineffective at that task and because it acts as a bronchodilator. On these claims, the underlying premise is that adding more DB to the canisters would be more harmful. But her manufacturing-defect claims suggest that the manufacturing process should have done just that: she asserts that some flaw in the process caused the canisters Mr. Byers used to have less DB than would be present in a product that was properly made. At a later stage, Plaintiff may be forced to choose between these potentially inconsistent theories of recovery. But the Court is not persuaded that the presence of alternative, potentially incompatible theories of injury or even the presence of inconsistent facts means that she has failed to sufficiently allege proximate causation. Pleading rules allow a plaintiff to do just what Plaintiff has done here. *See Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 948 (D. Minn. 2009) ("Under the federal rules, a plaintiff may plead inconsistent facts in support of alternative theories of recovery." (quoting *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 536 (8th Cir. 1970))) (brackets omitted). Menards has failed to show these allegations require dismissal of Plaintiff's manufacturing-defect and its motion to dismiss the manufacturing-defect claim is denied.

***Negligence Claims***

Office Depot, Home Depot, and Menards all argue that that Plaintiff fails to state a negligence claim against them, and the briefing on these motions focuses overwhelmingly on whether the Retailer Defendants are liable for negligent failure to

warn.[20] (Dkt. 88 at 12–13; Dkt. 110 at 8–11; Dkt. 114 at 9–12; Dkt. 127 at 4–7; Dkt. 128 at 4–7; Dkt. 129 at 7–10.) The Court has already addressed the adequacy of warnings above, and granted in part and denied in part Defendants' joint motion to dismiss on this issue. Accordingly, the Retailer Defendants' motions to dismiss Plaintiff's negligent failure-to-warn claims are granted to the same extent.

***Express Warranty Claims***

Finally, Menards and Office Depot move to dismiss Plaintiff's claims for breach of express warranty. Under Minnesota's UCC statute, the following acts create an express warranty: (1) "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain"; and (2) "[a]ny description of the goods which is made part of the basis of the bargain." Minn. Stat. § 336.2-313(1)(a), (b). A breach-of-express-warranty claim requires proof of three elements: (1) a warranty; (2) breach; and (3) a causal link between the breach and the harm. *McDougall*, 523 F. Supp. 3d at 1074 (citing *Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52–53 (Minn. 1982)).

In her express-warranty claims, Plaintiff alleges that the Bitterant Defendants warranted that the dusters they sold contained a bitterant that deters inhalant abuse. (Compl. ¶¶ 365–74.) She alleges that they did so through their statements on the labeling of the canisters that the dusters contained a bitterant to "help discourage inhalant abuse."

[20] Office Depot argues that the negligence claims should be dismissed because it did not have a special relationship with Mr. Byers. (Dkt. 88 at 12–13.) Menards does too. (Dkt. 114 at 9–10.) However, because Plaintiff does not contend there was such a special relationship, the Court need not address this argument.

(*Id.* ¶ 367.) But Plaintiff asserts that the products did not conform to that express warranty regarding product safety because: (1) the dusters did not contain a sufficient concentration of the bitterant DB to be an effective deterrent; (2) DB is an ineffective deterrent for a large portion of the population; and (3) DB acts as a bronchodilator, so it has the opposite effect that a deterrent should. (*Id.* ¶¶ 368–371.)

Office Depot and Menards argue that the express-warranty claims should be dismissed because the statement that the dusters contained a bitterant to help discourage inhalant abuse was not "part of the basis of the bargain" when Mr. Byers bought their canisters. (Dkt. 88 at 14–15; Dkt. 114 at 13–14.) The Court agrees. A seller's affirmation of fact about its product and its statements describing the goods become a basis of the bargain between the seller and buyer when they could influence the buyer's decision to purchase the product. For example, a consumer looking to purchase a hand-held power saw may know that she intends to use it to cut particularly dense wood. If a seller makes an express warranty that it sells a saw having a particular amount of horsepower, that description of the product could influence the buyer's decision to purchase that saw instead of a less powerful model. And if the ostensibly more powerful saw she purchases doesn't have the promised horsepower, the seller has breached its express warranty.

In contrast, when Mr. Byers purchased aerosol dusters from Office Depot or Menards, he did so because he wanted to inhale them to experience the intoxicating effects of concentrated DFE. Under these circumstances, it is simply not plausible to suggest that the alleged express warranties about the presence of a bitterant were part of

the basis of the bargain in any transaction. Accordingly, the express-warranty claims are dismissed.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1. The Motion to Dismiss for Lack of Jurisdiction filed by AW Distributing, Inc. and AW Product Sales & Marketing, Inc. (Dkt. 76) is **DENIED**.

2. Defendants' Joint Motion to Strike Plaintiff's Complaint's Rule 23 Class Action Allegations (Dkt. 92) is **DENIED**.

3. Defendants' Joint Motion to Dismiss (Dkt. 103) is **GRANTED IN PART** and **DENIED IN PART** as discussed in this Order.

4. The Motion to Dismiss filed by ODP Business Solutions, LLC, The ODP Corporation, Office Depot, LLC, OfficeMax North America, Inc., and OfficeMax, LLC (Dkt. 86), the Motion to Dismiss filed by Menard, Inc. (Dkt. 97), and the Motion to Dismiss filed by Home Depot U.S.A., Inc. and The Home Depot, Inc. (Dkt. 108) are **GRANTED IN PART** and **DENIED IN PART** as discussed in this Order.

Date: September 18, 2026

*s/Katherine Menendez*
Katherine Menendez
United States District Judge